**ZENITH RADIO CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al.**

**NATIONAL UNION ELECTRIC CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al.**

**In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.**

Civ. A. Nos. 74–2451, 74–3247 and M.D.L. No. 189.

United States District Court, E. D. Pennsylvania.

June 6, 1979.

Memorandum and Order of Certification Aug. 21, 1979.

As Amended Sept. 14, 1979.

Philip J. Curtis, John Borst, Jr., Edward McCausland, Glenview, Ill., for Zenith Radio Corp.

Morton P. Rome, Philadelphia, Pa., for National Union Elec. Corp.

Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Mudge, Rose, Guthrie & Alexander, New York City, Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for Toshiba.

A. Paul Victor, Joel B. Harris, Weil, Gotshal & Manges, New York City, Miles W. Kirkpatrick, Morgan, Lewis & Bockius, Philadelphia, Pa., for Matsushita.

Charles F. Schirmeister, Robert J. Lynch, Reid & Priest, New York City, for Mitsubishi Intern. & Mitsubishi Corp.

Peter J. Gartland, Peter A. Dankin, Wender, Murase & White, New York City, for Sharp.

Asa D. Sokolow, Rosenman, Colin, Freund, Lewis & Cohen, New York City, Franklin Poul, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Sony Corp. of America & Sony Corp.

E. Houston Harsha, Thomas P. Coffey, Kirkland & Ellis, Chicago, Ill., for Motorola.

Edwin P. Rome, William H. Roberts Blank, Rome, Comisky and McCauley, Philadelphia, Pa., for Zenith Radio Corp. and National Union Elec. Corp.

## OPINION

EDWARD R. BECKER, District Judge.

## CONTENTS

I. Preliminary Statement — 892

II. The Parties' Contentions Regarding the Size & Complexity of the Litigation — 897

III. Discussion — 899

  A. Introduction — 899

  B. Construction of the Antitrust Statutes: Need We Reach the Seventh Amendment Issue? — 900

  C. The Seventh Amendment and the Historical Test — 904

    1. The Accounting Cases — 907

      a. Complex Accounting Cases and the Concurrent Jurisdiction of Law and Equity — 907

      b. The Concurrent Jurisdiction of Law and Equity After Merger — 911

    2. Other Complex Litigation — 914

    3. The Rationale of the Complex Accounting Cases — 918

    4. Treble Damages and Juries — 921

    D.  The Historical Test and Complexity After Ross v. Bernhard   922

        1.  Ross and Recent Decisions Striking Jury Demands   922

        2.  Construing Ross   926

            a.  Jury Trial Decisions in the Supreme Court Since Ross   926

            b.  Explanations of the Ross Footnote   929

        3.  Problems Inherent in the Ross "Test"   931

            a.  The Case-by-Case Approach   931

            b.  The Whole-case Approach   933

        4.  Public Policy and the Seventh Amendment: The Role of the American Jury   934

            a.  The Competence of the Jury as Finder of Fact   934

            b.  Other Functions of the Jury   938

IV.  Conclusion   942

---

## I. *Preliminary Statement*

Certain defendants in these consolidated antitrust cases, alleging that they are so "extraordinarily complex," "so massive as to make them unique in the annals of United States antitrust and trade regulation litigation," and "beyond the practical abilities and limitations of a jury," have moved for an order striking the jury demands of the plaintiffs, Zenith Radio Corporation ("Zenith") and National Union Electric Corporation ("NUE").[1] This opinion will address—and deny—defendants' motion.

NUE is the corporate successor to Emerson Radio Co., one of the pioneers in the radio and TV industry. NUE ceased all production of television receivers in February, 1970;[2] that December, it filed the first of these suits,[3] alleging that the Japanese defendants and others had conspired to take over the American consumer electronic products industry and to drive NUE out of business. In 1974, after experiencing large operating losses, Zenith filed an action making similar allegations.[4] The NUE action was then transferred to this district for coordinated or consolidated pretrial proceedings with the Zenith action. *See In re Japanese Electronic Products Antitrust Litigation,* 388 F.Supp. 565 (J.P.M.D.L.1975).[5]

---

1. The motion to strike the jury demand was first filed by Mitsubishi Corp. and the Toshiba, Matsushita, and Sony defendants. Motorola, Inc., and the Sharp defendants subsequently joined in the motion. The Mitsubishi Electric Corporation ("Melco"), Hitachi, Sanyo and Sears defendants have not participated in this motion. Except where the context indicates otherwise, "defendants" will be used herein to mean only the moving defendants.

2. After ceasing production of television receivers, NUE then resold television receivers purchased from other manufacturers until discontinuing its television business entirely in 1972.

3. *National Union Electric Corp. v. Matsushita Electric Industrial Co.,* Civil No. 1706–70 (D.N.J., filed December 21, 1970).

4. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* Civil Action No. 74–2451 (E.D.Pa., filed Sept. 20, 1974).

5. This case was transferred to our docket from the docket of Judge A. Leon Higginbotham, Jr., following his elevation to the Court of Appeals. Although the progress of the case had been slowed by the illnesses and subsequent deaths of two judges to whom the case had previously been assigned, Judge Higginbotham moved the litigation forward vigorously. One of the most important events of Judge Higginbotham's stewardship was the filing of an opinion, based on a voluminous record, disposing of the defendants' challenges to jurisdiction and venue, and to the constitutionality of the 1916 Antidumping Act. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 402 F.Supp. 251 (E.D.Pa.1975) (opinion on constitutionality of antidumping act); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 402 F.Supp. 262 (E.D.Pa.1975) (opinion on jurisdiction and venue).

In Pretrial Order # 182, filed this date, we made the transfer of the NUE action to this district unconditional, and consolidated it for trial with the Zenith action.

The ten principal defendants are Mitsubishi Corporation, a Japanese trading company; Matsushita Electric Industrial Co., Ltd., Toshiba Corporation, Hitachi, Ltd., Sharp Corporation, Mitsubishi Electric Corporation (Melco), Sanyo Electric Co., Ltd., and Sony Corporation, all Japanese manufacturers of consumer electronic products; and two American companies, Motorola, Inc. and Sears, Roebuck & Co. Fourteen other defendants are subsidiaries of the principal Japanese defendants. Of the twenty-four defendants, fifteen are defendants in both suits, seven in the Zenith action only, and two in the NUE action only.[6] In addition to the twenty-four named defendants, the plaintiffs have identified close to 100 alleged co-conspirators whose business operations span the globe, ranging from dozens of Japanese companies, large and small, to such world industrial giants as N.V. Phillips

Gloeilampenfabrieken and General Electric Co.

In capsule form, plaintiffs' complaints allege that the Japanese defendants and their co-conspirators are and have been participants in a conspiracy which, by artificially lowering export prices, has for more than twenty years sought the methodical destruction of the United States' domestic consumer electronic products industry.[7] The defendants are accused of carrying out the aims of this conspiracy by flooding the United States' market with imported goods at prices so attractive to consumers that domestic producers suffered serious losses, and were either unable to compete or able to do so only by moving some or all of their own production facilities to Mexico and the Far East.[8]

The particular offenses charged in the complaints span the laws of antitrust. The overall conspiracy is alleged to violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 73 of the Wilson Tariff Act, 15 U.S.C. § 8.[9] However, the cornerstone of

---

6. *Sony Corporation and its sales subsidiary, Sony Corporation of America, were originally named in both suits. However, they were dismissed from the Zenith action after settling with Zenith in April, 1977, and are defendants now only in the NUE action.*

The seven other principal Japanese defendants are named in both actions, as are eight of their subsidiaries: Matsushita Electric Corporation of America, Toshiba America, Inc., Hitachi Sales Corporation of Japan, Hitachi Sales Corporation of America, Sharp Electronics Corporation, Sanyo Electric, Inc., Sanyo Electric Trading, Inc., and Mitsubishi International Corporation.

Sears and Motorola are named only in the Zenith suit, as are Melco Sales, Inc., Sanyo Manufacturing Co., Matsushita Electronics Corporation, Matsushita Electric Trading Co., Ltd., and Quasar Electronics Corp., also a Matsushita subsidiary.

7. The NUE suit is limited to television receivers; the lines of commerce encompassed in the Zenith complaint also include radios, phonographs, tape and audio equipment, televisions, and electronic components. We refer to all of these collectively as "consumer electronic products."

8. Every major television manufacturer, including Zenith and RCA, now operates production facilities outside the United States.

9. That act provides:

§ 8. *Trusts in restraint of import trade illegal; penalty*

Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter. Every person who shall be engaged in the importation of goods or any commodity from any foreign country in violation of this section, or who shall combine or conspire with another to violate the same, is *guilty of a misdemeanor,* and on conviction thereof in any court of the United States such person shall be fined in a sum not less than $100 and not exceeding $5,000, and shall be further punished by imprisonment, in the discretion of the court, for a term *not less than* three months nor exceeding twelve months.

the plaintiffs' case is the allegation that the Japanese defendants have violated the 1916 Revenue Act, better known as the 1916 Antidumping Act, 15 U.S.C. § 72,[10] by "commonly and systematically" selling their products in this country for substantially less than their actual market value or wholesale price in Japan, and with predatory intent. The defendants are also charged with violating the Robinson-Patman Act, 15 U.S.C. § 13(a), by discriminating in price among American purchasers.[11] Finally, Zenith charges that Sears, Motorola, and the Matsushita and Sanyo defendants violated § 7 of the Clayton Act, 15 U.S.C. § 18, in connection with the Japanese companies' acquisitions of interests in domestic consumer electronic products manufacturers.[12]

Plaintiffs' claims, adumbrated above, have been spelled out in greater detail in two preliminary pretrial memoranda totalling 410 pages, as well as in answers to numerous contention interrogatories. The plaintiffs' papers seek to portray a worldwide conspiracy said to have lasted over a period of some 30 years and to have involved close to 100 manufacturers, exporters, and importers of consumer electronic products of various national origins.

The defendants maintain that, notwithstanding their voluminous submissions, plaintiffs have failed to elucidate their claims with any degree of precision. They also deny both the legal and factual validity of the plaintiffs' claims. Additionally, certain of the defendants have asserted counterclaims against Zenith.

The counterclaims attack Zenith on two fronts. First, they allege that Zenith, acting alone and in combination and conspiracy with others, used territorial allocations, price discrimination, horizontal and vertical price fixing arrangements and certain "key dealer preferences" in violation of the Robinson-Patman Act and §§ 1 and 2 of the

10. § 72. *Importation or sale of articles at less than market value or wholesale price*

It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided,* That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

Any person who violates or combines or conspires with any other person to violate this section is guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding $5,000, or imprisonment not exceeding one year, or both, in the discretion of the court.

Any person injured in his business or property by reason of any violation of, or combination or conspiracy to violate, this section, may sue therefor in the district court of the United States for the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages sustained, and the cost of the suit, including a reasonable attorney's fee.

The foregoing provisions shall not be construed to deprive the proper State courts of jurisdiction in actions for damages thereunder.

11. The original complaints included counts alleging that price discrimination between Japanese and American purchasers violated the Robinson-Patman Act. These counts were dismissed for failure to state a claim upon which relief may be granted. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 402 F.Supp. 244 (E.D.Pa.1975) (Higginbotham, J.).

12. Zenith challenges two acquisitions. The first is the 1974 sale by Motorola of its consumer electronic products division and its "Quasar" tradename to Matsushita. The other is the 1976 acquisition by Sanyo of a majority interest in Warwick Electronics, Inc. Warwick had manufactured television receivers for sale to U.S. private label customers, the largest of which was Sears. Sears owned 25% of Warwick's common shares, and after the transactions was 25% owner of Warwick's successor, Sanyo Manufacturing Co. (an American corporation). Zenith alleges that Sears has contracted to purchase 70% of its console color television requirements from Sanyo Manufacturing.

Sherman Act. Second, they accuse Zenith and its co-conspirators of seeking to interfere with its competitors, including the counterclaimants, "by every means available, including the submission of complaints, petitions, testimony and other information to various federal governmental agencies and officials, federal courts, and the United States Congress which were based upon sham, false and misleading allegations and information, without regard to the truth or merits of the claims made." The counterclaiming defendants thus invoke the "sham litigation" theory of antitrust liability recognized in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). Defendants have likewise filed extensive preliminary pretrial memoranda detailing their counterclaims.[13]

We are now approaching the end of pretrial discovery. To say that the discovery has been massive would be a considerable understatement. To date over 20 million documents have been produced for inspection. A considerable number of these have had to be translated from Japanese into English. The deposition transcripts completed to date total well over 100,000 pages, and many depositions remain to be taken. The interrogatory practice has been voluminous, coming in wave after wave. We have been inundated with a plethora of discovery motions; in the past few months we have dealt with over 50 Rule 37 motions of various descriptions, and pretrial conferences with counsel for the parties are consuming at least 3 full days per month, mostly to resolve discovery problems. We have entered a comprehensive pretrial order which fixed discovery deadlines and times for filing annotated final pretrial statements and other pretrial material, and set the case for trial in February, 1980.[14] It is anticipated that the trial will consume approximately one year.

Following the filing of the motion to strike the jury demand, we heard extensive argument thereon. Since it appeared to us that a helpful way of framing the complexity issue was to request the parties to prepare proposed forms of special interrogatories which might be submitted to a jury, we did so and defendants made extensive submissions. Numerous legal memoranda have been filed in connection with the motions, many of them dwelling upon the rash of recent cases where complexity has led to the striking of timely jury demands. We address defendants' motion at this time because we are satisfied that we have an adequate record on which to decide it and because we believe it to be fair to decide the issue sufficiently in advance of trial that the losing party may attempt to obtain appellate review.

We write at length for a number of reasons. First is the current importance of the problem, which appears on the agenda of almost every seminar on class actions, antitrust law and federal practice concerning which we have recently received brochures. Second, we suspect that given the enormous scope of contemporary class action and antitrust litigation, this will not be the last occasion on which the enormous tension between the demands of these massive cases and the mandate of the Seventh Amendment will generate a motion to strike a jury demand on grounds of complexity. Hence, our discussion of the case law may be of help to the bench and bar.[15]

---

13. The counterclaims described in the text are asserted by certain of the Matsushita, Mitsubishi, Hitachi, Sharp, Sanyo, and Toshiba defendants. In addition, Sears asserts a counterclaim against Zenith based on the Lanham Act, 15 U.S.C. §§ 1051–1127.

14. The time remaining before trial will be devoted to the disposition of numerous motions for summary judgment, and to the preparation by counsel of annotated final pretrial statements setting forth all facts to be proved, and trial briefs.

15. We draw much sustenance from the excellent discussions of this problem already extant in the literature. Among the cases which we find particularly helpful are *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59 (S.D.N.Y. 1978) (Brieant, J.); *Radial Lip Machine, Inc. v. International Carbide Corp.,* 76 F.R.D. 224 (N.D.Ill.1977) (Marshall, J.); and *In re U.S. Financial Securities Litigation,* 75 F.R.D. 702 (S.D.Cal.1977) (Turrentine, J.). Of equal value is an article by Judge Patrick Higginbotham, *Continuing the Dialogue: Civil Juries and the*

We consider herein only the defendants' arguments that the jury trial demand should be struck on grounds of complexity.

*Allocation of Judicial Power*, 56 Tex.L.Rev. 47 (1977).

16. These grounds are that plaintiffs have waived a jury and that the plaintiffs have engaged in a publicity campaign so prejudicial to the defendants that striking the jury demand is appropriate both as a sanction for this alleged misbehavior and because the publicity has made it impossible to impanel an impartial jury.

The defendants concede that both plaintiffs made timely demands for jury trial. Their waiver argument is based instead on excerpts from the transcripts of numerous pretrial conferences.

In several of these colloquies, plaintiffs' counsel indicated a willingness to agree to a non-jury trial if *all* parties so agreed, but "A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties." Rule 38(d), Fed.R.Civ.P. 39(a) permits the withdrawal of jury demands "by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record . . . ." *See Collins v. Government of the Virgin Islands*, 366 F.2d 279 (3d Cir.) *cert. denied*, 386 U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1966).

We have carefully reviewed the cited portions of the record, and find that at no time did the plaintiffs state an unequivocal much less irrevocable intention to withdraw their jury demands. Even if they had, it would be manifestly unjust to treat an unaccepted offer to enter into a Rule 39(a) stipulation as irrevocable throughout the pendency of the pretrial stages in any case. Moreover, at no time have all parties agreed to dispense with a jury, and several defendants continue to join the plaintiffs in seeking a jury trial. The alleged "waiver" or "withdrawal" therefore fails to meet the clear requirements of the Federal Rules.

Defendants' argument based on allegations of plaintiff-inspired prejudicial publicity fails for several reasons.

First, we simply do not believe that the "massive publicity campaign" characterized by the Sharp defendants as "a plan to corrupt the minds of the ultimate triers of fact" could possibly have more than a marginal effect on the venire in this district. The 40-odd press clippings presented as evidence of "Zenith's publicity crusade" are, for the most part, collected from the inner pages of the Japan Times, Home Furnishings Daily, Electronics News, the Chicago Tribune, and other periodicals of limited circulation in this area. Even if every single one of the allegedly prejudicial articles had been published on the front pages of the general circulation Philadelphia dailies, they would

We find the other two asserted grounds for their motion plainly without merit, and reject them out of hand.[16]

not even begin to compare with the press coverage given to Watergate or the My Lai massacre—yet impartial juries were selected in cases dealing with those events. *See United States v. Haldeman*, 181 U.S.App.D.C. 254, 282–294, 559 F.2d 31, 59–71 (1976) *cert. denied, sub noms. Ehrlichman v. United States and Mitchell v. United States*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Calley v. Callaway*, 519 F.2d 184, 203–13 (5th Cir. 1975) (en banc) *cert. denied*, 423 U.S. 888, 96 S.Ct. 182, 46 L.Ed.2d 119 (1976). Moreover, this district is comprised of 10 counties, in most of which the Philadelphia newspapers are not widely read. There has been no evidence of publicity on radio and television.

Second, in the absence of prejudicial publicity so outrageous and pervasive that "[a]ny subsequent court proceedings in [the] community . . . could be but a hollow formality," *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), any conclusion as to the impact of publicity on prospective jurors in this case now, almost a year before trial, would necessarily be speculative. *See Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539, 563, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). The *voir dire* will provide an opportunity to determine whether the prospective jurors have, in fact, been prejudiced; it would clearly be improper to strike the jury demand on no more than speculation.

Third, a variety of less drastic measures may be available to cure or ameliorate any prejudice which might be found. *See, e. g.,* id. at 563–64, 96 S.Ct. 2791. The alternatives listed in *Nebraska Press* must be carefully considered before resort may be had to a step as extreme as denying the constitutional right to jury trial.

If at *voir dire* we find that Zenith's "publicity campaign" has in fact "corrupted the minds" of the potential jurors, and if we also find the prejudice so substantial that the defendants' right to a fair trial can best be protected by a remedy as drastic as striking the plaintiffs' jury demands, we would then have to confront a number of difficult constitutional questions. Several courts have recently discussed the extent to which the paramount interest in preserving the integrity of the judicial process can justify interference with activities normally protected by the First Amendment. *See, e. g., Hirschkop v. Snead*, 594 F.2d 356 (4th Cir. 1979); *In re Halkin*, 194 U.S.App.D.C. 257, 598 F.2d 176 (1979); *Rodgers v. United States Steel Corp.*, 536 F.2d 1001 (3d Cir. 1976); *CBS Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir. 1975) *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). Because the

II. *The Parties' Contentions Regarding the Size & Complexity of the Litigation*

The defendants' motion is based, as we have noted, on the contention that this litigation is so extraordinarily massive and complex as to be beyond the practical abilities and limitations of a jury. In support of this contention, the defendants emphasize the nature of the conspiracy charged, the statutory claims asserted, the procedural posture of the case, and the anticipated length of trial. The defendants provided the following summary of their contentions in their first memorandum in support of their motion to strike the jury demand:

1. The alleged conspiracy is claimed to have been worldwide, to have lasted over a period of 30 years and to have involved more than 97 manufacturers, exporters and importers of consumer electronic products ("CEP's") of various national origins.

2. Over seventy of the alleged co-conspirators are not defendants in this proceeding. Necessarily plaintiffs will attempt to produce evidence to support their allegations that the non-defendant co-conspirators participated in the alleged conspiracy with the various defendants who are charged in the complaints. This will create complicated and confusing issues for the jury as to whether the defendants and alleged non-defendant co-conspirators knew of, joined and participated in the alleged conspiracy. More confusing will be the question of whether evidence presented as to specific defendant(s) and specific non-defendant co-conspirator(s) has been connected to and is admissible against the various defendants in the litigation.

3. The plaintiffs assert violations based upon various sophisticated and esoteric antitrust and trade regulation laws which few American lawyers let alone untrained laymen or jurors can understand and interpret. The allegations are further complicated by the fact that one of the laws, the Wilson Tariff Act (15

U.S.C. § 18), is rarely used and interpreted in litigation, and the 1916 Antidumping Act (15 U.S.C. § 72) has never been construed or interpreted in a trial situation in its over 60 year history. Even if appropriate and legally sufficient instructions are given to the jury as to the meaning of these laws and the standards of proof which must be met, application of complicated and detailed accounting, marketing, economic and legal evidence to such legal standards and guidelines would be mindboggling for a jury.

4. The trial of these litigations is anticipated to last at least one year.

5. The majority of the defendants are Japanese, their native language has no common basis with the English language and their business records and therefore much of the evidence in these litigations will be Japanese language documents.

6. At the time the trial commences almost nine years of discovery will have been completed, including the production of untold millions of documents and literally hundreds of depositions which will constitute the evidence to be presented. As noted above, a major portion of these documents are in Japanese and will require translation and interpretation. Further, much of the documentation whether in English, Japanese or other languages is of a highly technical engineering and accounting nature.

7. The evidence at trial will consist in part of the testimony of expert witnesses as to the nature of competition and marketing practices in both the United States and Japan CEP industries, accounting practices in both the United States and Japan CEP industries, the engineering and scientific developments of CEPs in both the Japanese and United States markets which will have to be applied to the vast quantity of factual information which will be introduced in both English and Japanese.

8. The cases involve overlapping and different products (the NUE case deals only with television receivers; while the

possibility that the *voir dire* will uncover substantial prejudice is remote at best, we need

not decide the First Amendment issues now, and express no opinion thereon.

Zenith case deals not only with television receivers but also with radios, stereos, audio equipment, tape recorders and components of such products); the injury claims involve overlapping and different time periods of the alleged conspiracy (NUE 1966 to 1970 and Zenith, 1968 to 1977). Further, the Zenith case challenges the acquisition by two Japanese manufacturers of failing American CEP manufacturers (Matsushita's acquisition of Motorola's color television receiver business and Sanyo's acquisition of Warwick). The Zenith case also includes charges of violations of the Robinson-Patman Act (15 U.S.C. 13(a)) which the NUE case does not.

9. The cases involve overlapping and different parties. The Zenith action involves six parties who are not parties in the NUE action. The Sony defendants are a party to the NUE action but not the Zenith action.

10. The defendants have asserted extensive counterclaims against plaintiff Zenith charging it with engaging in marketing practices in violation of the United States antitrust laws and in a conspiracy with certain other American CEP manufacturers, distributers, labor unions and others to prevent and impede the ability of the defendants in these litigations, particularly the Japanese defendants, from competing in the United States CEP industries through a series of sham and harassing charges, allegations, investigations and legal proceedings. The counterclaims involve highly sophisticated and technical legal and factual evidence which will require the presentation of vast quantities of materials.

11. While these cases are individually extraordinarily complex and involve diverse claims as to products, parties, statutes involved and damage periods, plaintiffs claim they involve a single conspiracy against the defendants and the alleged non-defendant co-conspirators. In such a situation consolidation for trial might seem a logical and efficient utilization of counsels' and the Court's time. However, to consolidate cases which individually are incapable of comprehension by a jury for a trial before a jury would exacerbate and expand the complexity of the trial by a geometric progression which defies quantification.

This summary has been expanded and supplemented in a lengthy affidavit and numerous other submissions.

In their affidavit, the defendants assert that they have produced more than ten million pages of documents; that the plaintiffs have copied one million pages and "expect to introduce several thousand documents into evidence." For their own part, the defendants plan to offer an undefined "major portion" of the 2 million pages they have copied from the more than twenty million pages produced by the plaintiffs.

The defendants' views are also illustrated by the sample special interrogatories submitted so that we might identify the issues to be decided by the jury and assess their complexity.

With respect to the conspiracy claims, the defendants' proposed sample interrogatory contains 23 subparts, to be asked of the jury "for each of the 24 defendants with respect to each of the 108 other defendants and alleged co-conspirators." Together with other subparts which may be required, the defendants suggest that the jury might therefore be asked "over 15,000 separate interrogatories for each relevant product market" as to the conspiracy claims alone. In addition, the defendants argue that because of the thousands of models of consumer electronics products imported and sold by each of the defendants, thousands upon thousands of special interrogatories will have to be propounded to the jury on the dumping claims as well as the other statutory causes of action asserted by the plaintiffs.

The plaintiffs' response to these contentions is simply that the case is large, but not complex. First, they emphasize that they charge only one conspiracy, not many. Therefore, it would serve no purpose to ask the jury to answer a complete set of conspiracy interrogatories for each of the 2,316

possible pairings of each defendant with every other co-conspirator. Instead, they suggest posing "simply the question whether the plaintiffs have proved that the individual defendants have been engaged in an unlawful combination or conspiracy in restraint of trade." As regards the thousands of special interrogatories which defendants say would have to be propounded on the dumping claims, plaintiffs submit that the jury need not decide separately whether there has been dumping as to each of the thousands of models of consumer electronic products involved, and need not perform a separate computation of dumping margins for each of these models.

According to the plaintiffs, the jury's task will be simplified by other factors. First, although there are 24 defendants, they are grouped into no more than ten separate enterprises. Second, the difficulties attending class actions are not present here. Third, plaintiffs note that there are only two cases involved, compared with the 18 separate cases involved in one litigation in which a jury demand has been struck.[17] In sum, the plaintiffs conclude,

> the fact remains that the present litigation involves classic conspiracy claims and proof of exactly the same nature as that which has been presented in dozens and dozens of private antitrust actions and criminal prosecutions across the nation. . . . The issues of motive, intent and conspiracy . . . are of the type routinely submitted to juries in the federal courts on a daily basis. As in most cases involving a number of discrete transactions, the jury will be assisted by presentation of the evidence in a summarized

format easily grasped by individual jurors.

We expect that the actual size and complexity of this litigation falls somewhere in between the two extremes portrayed by the parties. We are skeptical of the plaintiffs' efforts to portray this litigation as an essentially simple, "single conspiracy" case, although of course we express no opinion as to what they may be able to prove at trial. We are equally skeptical of the defendants' contentions regarding the number of documents they will introduce and the number of special interrogatories which would have to be submitted to a jury.[18] By any yardstick, this case is at least as large and complex as the others in which jury demands have been struck. *See* pp. 923–925 *infra*. However, resolution of these disputes as to the *degree* of complexity of this case is unnecessary in light of our discussion of the legal issues, to which we now turn.

### III. *Discussion*

#### A. *Introduction*

The issue before us is whether trial by jury, usually available as of right in private, treble-damage antitrust cases, is guaranteed even in a case so massive and complex as to be beyond "the practical abilities and limitations of juries."

The plaintiffs, relying heavily on the decision of the Supreme Court in *Fleitmann v. Welsbach Street Lighting Co.*, 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916), argue vigorously that the Seventh Amendment guarantees their right to a jury trial, regardless of considerations of size and com-

---

**17.** *See In re U. S. Financial Securities Litigation*, 75 F.R.D. 702 (S.D.Cal.1977) (striking jury demand in litigation involving eighteen cases consolidated for trial in which five classes had been certified). Permission to appeal from the order of the District Court was granted by the Ninth Circuit on August 29, 1977. That appeal is currently pending.

**18.** In this respect, we note that Rule 52(a) requires the judge in a bench trial to find both ultimate and subsidiary facts with "detail and exactness." *See EEOC v. United Virginia Bank*, 555 F.2d 403 (4th Cir. 1977); *O'Neill v.*

*United States*, 411 F.2d 139, 146 (3d Cir. 1969); *Roberts v. Ross*, 344 F.2d 747, 751 (3d Cir. 1965). The number of findings which a court would have to make might therefore equal or exceed the number of interrogatories which would have to be submitted to a jury. If this number were a mere 50,000—a number well within the defendants' projections—and if the finder of fact were to work 40 hours a week without respite, spending a mere five minutes on each, it would take the court or jury two full years just to make the requisite findings of fact.

plexity. In *Fleitmann*, the Court held that a shareholders' derivative action could not be brought in equity when the underlying corporate claim was one for treble damages for violation of the antitrust laws, because to permit equity jurisdiction over such actions would deprive the defendants of their right to trial by jury:

> [T]he inquiry . . . arises why the defendants' right to a jury trial should be taken away . . . .
>
> [W]e agree with the courts below that when a penalty of triple damages is sought to be inflicted, the statute should not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury in a court of common law.
>
> On the contrary, it plainly provides the latter remedy, and it provides no other.

*Id.*, 240 U.S. at 28–29, 36 S.Ct. at 234.[19] Since the *Fleitmann* decision, it has been regarded as "well settled" that antitrust claims for treble damages are "triable by jury on timely demand of a party." *Ring v. Spina*, 166 F.2d 546, 550 (2d Cir.) *cert. denied*, 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 368 (1948). *See, e. g., Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 690 (9th Cir.) *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *Siegfried v. Kansas City Star Co.*, 298 F.2d 1 (8th Cir.) *cert. denied*, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); *Hartford-Empire Co. v. Glenshaw Glass Co.*, 3 F.R.D. 50 (W.D.Pa. 1943).

The defendants concede "the applicability of the Seventh Amendment to all but the most lengthy and complex damage actions." They frame the issue as "whether or not there is a certain small class of cases which are too lengthy and complex to be handled by a jury, and, therefore, must be tried before the Bench." In support of their argument that this litigation can be placed in such a class of cases without offending the constitution, the defendants first argue that complex cases were historically tried in equity. Moreover, they urge us to follow the example of several courts which have recently struck jury demands in large and complex actions, including two antitrust cases. *See* pp. 923–925, *infra*. These courts have found the Seventh Amendment inapplicable to such matters, largely on the authority of dicta in a recent Supreme Court decision implying that the constitutional right to a jury trial in civil actions may sometimes depend on "the practical abilities and limitations of juries." *Ross v. Bernhard*, 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970).

**B.** *Construction of the Antitrust Statutes: Need We Reach the Seventh Amendment Issue?*

Although the parties have treated the issue before us as depending solely on the scope of the Seventh Amendment right to jury trial, we must first determine whether it is necessary to reach the constitutional issue. " 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.' *Spector Motor Co. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). Before deciding

---

**19.** At the time that the *Fleitmann* suit was brought, only the government could seek an injunction to restrain an antitrust violation. Before the Supreme Court issued its decision, the Clayton Act extended that right to private parties; however, the Court rejected the notion that this effected any change in the right to a jury trial on treble damage claims. 240 U.S. at 29, 36 S.Ct. 233.

The plaintiff in *Fleitmann* sought relief in equity because shareholder derivative suits were purely equitable actions, not cognizable at law. *See United Copper Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917) (shareholder had no standing to sue at law on a corporate cause of action).

The merger of law and equity, effected by the adoption of the Federal Rules of Civil Procedure in 1938, eliminated the dilemma. The legal claims in a derivative action can now be tried by a jury after a court determination of the plaintiff's right to proceed on the corporation's behalf. *See Ross v. Bernhard*, 396 U.S. 531, 535–37 & n. 6, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

the constitutional question, it [is] incumbent on . . . courts to consider whether . . . statutory grounds might be dispositive." *New York City Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). *See Ashwander v. TVA,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

█ The right to jury trial may, of course, be expressly provided by the terms of a federal statute. *See, e. g.,* Great Lakes Act, 28 U.S.C. § 1873 (tort and contract actions in admiralty jurisdiction involving shipping on the Great Lakes); 28 U.S.C. § 1874 (jury to assess sum due on forfeiture of bond); 11 U.S.C. § 42(a) (right of involuntary bankrupt to jury trial). Because there is no constitutional right to a *nonjury* trial, the Seventh Amendment does not prevent either judicial or legislative extension of the right to jury trial, and such statutes raise no constitutional difficulties. *See e. g., The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 459–50, 13 L.Ed. 1058 (1852) (Great Lakes Act); 9 Wright and Miller, Federal Practice and Procedure § 2302, at 15 (1971).

· ██ On the other hand, when a statute creating new rights or remedies is silent as to the mode of trial, the availability of a jury as of right generally becomes a Seventh Amendment question. Courts fit the statutory claim "into the nearest historical analogy to determine whether there is a [constitutional] right to jury trial." James, *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655, 656 (1963); *Ross v. Bernhard,* 396 U.S. 531, 543 n. 1, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (Stewart, J., dissenting); *Patzig v. O'Neil,* 577 F.2d 841, 848 (3d Cir. 1978); *Nedd v. Thomas,* 316 F.Supp. 74, 77 (M.D.Pa.1970); 5 Moore's Federal Practice ¶ 38.11[7], at 128–128.4 (2d ed. 1978); 9 Wright and Miller, Federal Practice and

Procedure §§ 2302, 2316 at 16, 79–80 (1971). *See, e. g., Pernell v. Southall Realty,* 416 U.S. 363, 375–76, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Curtis v. Loether,* 415 U.S. 189, 193–97, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Luria v. United States,* 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101 (1913); *United States v. Jepson,* 90 F.Supp. 983 (D.N.J.1950); *Olearchick v. American Steel Foundries,* 73 F.Supp. 273 (W.D.Pa.1947). As the Court said in *Curtis*:

> [W]e have often found the Seventh Amendment applicable to causes of action based on statutes. *See, e. g., Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477, 82 S.Ct. 894, 899, 8 L.Ed.2d 44 (1962) (trademark laws); *Hepner v. United States,* 213 U.S. 103, 115, 29 S.Ct. 474, 479, 53 L.Ed. 720 (1909) (immigration laws); *cf. Fleitmann v. Welsbach Street Lighting Co.,* 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916) (antitrust laws), and the discussion of *Fleitmann* in *Ross v. Bernhard,* 396 U.S. 531, 535–536, 90 S.Ct. 733, 736–737, 24 L.Ed.2d 729 (1970). Whatever doubt may have existed should now be dispelled. The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law.

415 U.S. at 193–94, 94 S.Ct. at 1008 (footnotes omitted).

Thus, if in enacting the antitrust laws Congress has granted the right to trial by jury in antitrust damage suits regardless of their size and complexity, any such limitation to the scope of the Seventh Amendment would be irrelevant. But if the antitrust laws do not themselves guarantee trial by jury on demand, we would have to decide the constitutional issue.[20]

---

**20.** Although decisions of the Supreme Court have necessarily assumed that there is a right to a jury trial in antitrust suits, the Court has never had to decide whether the right is grounded in the statute or in the Seventh Amendment. The rather oblique statement of the Court in *Fleitmann* that "the statute should

not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury . . . . [but] it plainly provides the latter remedy, and it provides no other," 240 U.S. at 29, 36 S.Ct. at 234, can be read as finding the right in the statute, or it could be read as confirming and adding to the

Private damage suits for relief under the antitrust laws are authorized by § 4 of the Clayton Act, 15 U.S.C. § 15, which replaced § 7 of the Sherman Act, ch. 647, § 7, 26 Stat. 210 (1890). Neither section makes any express mention of trial by jury, but the matter does not end there. In *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), the Court interpreted the Age Discrimination in Employment Act of 1967 as requiring a jury trial on demand, even though that statute is also silent on the issue. In drafting the ADEA, Congress incorporated by reference the remedial provisions of the Fair Labor Standards Act, which courts had held to carry a constitutional right to trial by jury. Because of this, the Court held, the statutory scheme showed that congress "intended that in a private action under the ADEA a trial by jury would be available where sought by one of the parties." 434 U.S., at 585, 98 S.Ct. at 872. The Court's analysis thus applied the "principle of reenactment," a settled canon of statutory construction which presumes that when language with an accepted meaning derived from judicial or administrative interpretation is thereafter used in a statute, Congress intended the language to carry its accepted meaning into the statute. *See United States v. Board of Commissioners,* 435 U.S. 110, 132–35, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978); *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 278–79, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977).

Although the legislative history of the Sherman and Clayton Acts may be susceptible to a similar interpretation, the effort would be somewhat strained. Scattered remarks of several Senators during the debates prior to passage of the Sherman Act show that they assumed that jury trials would be available in antitrust damage actions. *See* 21 Cong.Rec. 1767 (1890) (remarks of Sen. George); id., at 2643 (remarks of Sen. Gray); id., at 3149 (remarks of Sens. Morgan and George). A belief that parties in treble damage antitrust litigation were entitled to jury trial as a matter of constitutional right is also evident in the remarks of several members of Congress during the debates prior to passage of the Clayton Act. *See* 51 Cong.Rec. 1466, 88 (1914) (remarks of Reps. Scott and Volstead); id., at 9489 (remarks of Reps. Floyd and Volstead); id., at 9491 (remarks of Reps. Green and Scott).[21] Moreover, because damages and especially penal damages were a traditional remedy of the courts of law, *see* pp. 921–922, *infra,* Congress was almost certainly aware that litigants in antitrust damage suits would be entitled to trial by jury as a matter of constitutional right. However, mindful of "the difficulty of discerning congressional intent where the statute provides no express answer," *Lorillard v. Pons,* 434 U.S. at 585, 98 S.Ct. at 872, we find this evidence insufficient to allow an extension of the reasoning of *Lorillard* to the antitrust statutes.

clear holding of the Court of Appeals in that case that the right is constitutional, *see Fleitmann v. United Gas Improvement Co.,* 211 F. 103 (2d Cir. 1914), aff'd sub nom. *Fleitmann v. Welsbach Street Lighting Co.,* 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916), especially in view of the settled principle that "[c]ourts of equity do not award . . . damages penal in character without express statutory authority" *Decorative Stone Co. v. Building Trades Council,* 23 F.2d 426, 427–28 (2d Cir.) *cert. denied,* 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005 (1928).

Later decisions of the Court have been equally ambiguous. In *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), the Court discussed the right to a jury trial on the issues presented by an antitrust counterclaim. At one point in its opinion the jury trial right in antitrust cases is describ-

ed as "an essential part of the congressional plan for making competition rather than monopoly the rule of trade . . .," id., at 504, 79 S.Ct. at 953 (dictum); at another the Court refers to the right involved as constitutional. Id., at 510, 79 S.Ct. 948 (dictum). In *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Court described *Fleitmann* and said, "Although the decision had obvious Seventh Amendment overtones, its ultimate rationale was grounded in the antitrust laws." Id., at 536, 90 S.Ct. at 737 (dictum). *See* id., at 547, 90 S.Ct. 733 (Stewart, J., dissenting).

21. Prior to consideration of the Clayton Act, it had been held that damage suits under the Sherman Act were actions at law in which the parties were entitled to trial by jury. *See Meeker v. Lehigh Valley R. R.,* 162 F. 354 (C.C.S.D.N.Y.1908).

We note first that since *Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 7 L.Ed. 732 (1830), it has been clear—and Congress has presumably been aware—that the constitutional jury trial right attaches to statutory causes of action involving "legal" rights and remedies.[22] *See Pernell v. Southall Realty,* 416 U.S. 363, 374–75, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Curtis v. Loether,* 415 U.S. 189, 193–94, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). In spite of this, and with the sole exception of *Lorillard v. Pons,* the Supreme Court has consistently used constitutional analysis to determine the availability of trial by jury when the statute creating a cause of action is silent on the subject. This resort to Seventh Amendment analysis for most causes of action based on statutes implies strongly that mere congressional *awareness* of the applicability of the Seventh Amendment, like that evident in the legislative history of the antitrust laws, is not enough to make jury trial available as a matter of statutory construction.

By way of contrast, the legislative history of the ADEA provides much stronger evidence that Congress was not only aware of, but intended that jury trials be available.

In *Lorillard,* the Court stressed Congress' deliberate choice of certain of the FLSA's remedial provisions, and its rejection both of other portions of the FLSA and of the remedial provisions of Title VII, which, though they accord similar relief, do so in terms not held to carry a right to jury trial. Clearly, Congress could have chosen to incorporate instead the remedial provisions of Title VII, thereby entitling plaintiffs to virtually identical relief, but without a jury.

The Congresses that enacted the antitrust laws were in a very different position. Unlike the backpay available under Title VII, the damages available for antitrust violations cannot be fairly described as "restitution" or other equitable relief. *See Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 66–67 (S.D.N.Y.1978). And in suits for penal damages, the right to a jury was then as much a part of the constitutional landscape as it is now in trials for criminal offenses punishable by lengthy imprisonment and large fines. When Congress defines certain conduct as a serious offense, it certainly "intends" that the conduct be severely punished, and necessarily *assumes* that defendants would have the right to trial by jury. However, it need not "intend" this to be the case; indeed, it might devoutly wish just the opposite, but feel constrained by the constitution.

Such constraint was evidently felt by the Congress that passed the Clayton Act; the discussion there of trial by jury showed less concern for the right to a jury trial than for the constitutionality of the proposed changes in the antitrust laws then being debated. *See, e. g.,* 51 Cong.Rec. 9491 (1914) (remarks of Reps. Green and Scott).[23] Whereas Congress in the ADEA deliberate-

22. The presumption that Congress intends to "reenact" the meaning given to language by judicial interpretation is particularly strong when the interpretation at issue is that of the Supreme Court. *Ward v. Northern Ohio Telephone Co.,* 251 F.Supp. 606, 610 (N.D.Ohio 1966) *aff'd. per curiam* 381 F.2d 16 (6th Cir. 1967). *See Shapiro v. United States,* 335 U.S. 1, 16, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *Hecht v. Malley,* 265 U.S. 144, 153, 44 S.Ct. 462, 68 L.Ed. 949 (1924).

23. The debates in the House concerned a proposal that final judgments in suits brought by the government have conclusive collateral estoppel effect, both for and against the defendant, in subsequent private actions. Since there would be no right to a jury in suits brought by the government in equity to restrain antitrust violations, Congress was concerned that the statute might unconstitutionally foreclose pre-sentation of those issues to a jury in later damage suits.

The colloquy included the following statement by Representative Green:

I am not entirely clear as to whether this section is constitutional even as against the defendant corporation, but I am inclined to think that the provision might stand in that respect. . . . The suit commenced by a third party might be a suit for damages commenced in a case at law, in which either party is entitled to a trial by jury. . . . [T]he trial by jury will still go on as to the extent of the damages; . . . [b]ut I agree with the gentleman from Texas [Mr. BEALL] in saying that even as to that matter the section is of doubtful constitutionality. . . He can use, presumably, and obtain the same evidence which the Government has used, even though the decree be not made conclusive in his favor; but if it is possible, if it can

ly chose statutory language known to carry a right to a jury trial when it could instead have provided equivalent "equitable" relief, Congress in enacting the antitrust laws had no such choice, because equity had no remedy equivalent to treble damages. Clearly, it makes much more sense to discern an "intention" in the first situation than in the second.

■ Thus, because the legislative history of the antitrust laws does not yield the positive evidence of congressional intent required to hold that the plaintiff's right to a jury trial is guaranteed by the statute, we must address the constitutional issue.[24]

constitutionally be made conclusive in his favor, I would be in favor of having it done. In any event, the amendment of the gentleman from Minnesota [Mr. VOLSTEAD] ought to be agreed to. . . ." (Emphasis added)

And this response from Representative Scott: I think there is a grave question also as to the constitutionality of the statute, even if changed to conform to the amendment offered by the gentleman from Minnesota. However, I am not clear upon that question. I am satisfied, however, that the matter never will be settled until it reaches the Supreme Court of the United States. When you enact into this statute a provision which deprives a corporation of the right to a hearing before a jury as provided by the Constitution you will find that statute challenged and you will never know what the law is upon the question until the court of last resort speaks the last word. . . .

However, upon no course of reasoning could it be held that this statute in its present form would be constitutional, and, therefore, I believe that the amendment of the gentleman from Minnesota should prevail.

The proposal being debated was eventually rejected in favor of what is now 15 U.S.C. § 16(a), providing that the judgment in a government suit is only prima facie evidence, and only against the defendant.

**24.** Even if we were able to find the right to jury trial implicit in the statutory scheme, it would still be necessary to address the constitutional question in order to determine the scope of the statutory right, because the right incorporated by such an exercise of statutory construction *is* the constitutional right. We might also have to decide whether the right thus incorporated is "frozen" despite later changes in what the Seventh Amendment is thought to require, or whether the statutory right is now whatever the Seventh Amendment now requires, even if it was thought to require something else at the

## C. *The Seventh Amendment and the Historical Test*

The Seventh Amendment provides:

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

Although the continuing vitality of the Bill of Rights after nearly two centuries may be partly due to our courts' recognition of the need to read twentieth-century

time of enactment of the statute in question. For example, at the time that the Clayton Act became law, Congress doubtless thought not only that treble damage actions required juries, but that they required juries of twelve. *See e. g., Capital Traction Co. v. Hof,* 174 U.S. 1, 13–14, 19 S.Ct. 580, 43 L.Ed. 873 (1899); *Maxwell v. Dow,* 176 U.S. 581, 586, 20 S.Ct. 448, 44 L.Ed. 597 (1900) ("And as the right of trial by jury in certain suits at common law is preserved by the Seventh Amendment, such a trial implies that there shall be a unanimous verdict of twelve jurors in all Federal courts where a jury trial is held."). Now that the Seventh Amendment is known *not* to require a jury of twelve, *see Colgrove v. Battin,* 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), courts in districts that do not make a jury of twelve available as of right would need to decide whether such juries must nevertheless be available to the parties in antitrust suits and other actions based on statutes whose legislative histories show some expectation that the constitution would require juries of twelve.

This type of puzzle would be presented here by the alternate possibilities that there was a "complexity" exception to the jury trial rule at the time that the antitrust laws were enacted, (a possibility suggested by the defendants' reliance on *Kirby v. Lake Shore & M. S. R. R.,* 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569 (1887), decided just three years before the Sherman Act), or that such an exception was first recognized to be of constitutional dimension in *Ross v. Bernhard,* 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). The decisions of the Court in *Colgrove* and in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), would seem to imply that the statutory right is whatever the constitution would require, complete with exceptions and limitations, but that issue is not before us.

meanings into eighteenth-century terms,[25] the scope of the Seventh Amendment has traditionally been determined by applying a comparatively static, "historical test," which looks to the English common law as it existed in 1791, when the Seventh Amendment became part of the constitution.[26] *See, e. g., Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Curtis v. Loether,* 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Baltimore & Carolina Line, Inc. v. Redman,* 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935) ("The right of trial by jury thus preserved is the right which exist-

ed under the English common law when the amendment was adopted."); *Dimick v. Scheidt,* 293 U.S. 474, 476, 55 S.Ct. 296, 79 L.Ed. 603 (1935). *See generally* F. James & G. Hazard, Civil Procedure § 8.1 at 347 (1977); 5 Moore's Federal Practice ¶ 38.-08[5], at 79–80 (2d ed. 1978).[27]

In looking to the English common law of 1791, the critical distinction is that between "law" and "equity:"

By common law, [the framers of the amendment] meant what the constitution denominated in the third article "law;" not merely suits, which the common law

25. *See, e. g., Jackson v. Bishop,* 404 F.2d 571, 578–79 (8th Cir. 1968) (Blackmun, J.) (scope of the Eighth Amendment ban on cruel and unusual punishment is determined by society's "evolving standards of decency").

26. The first ten amendments were submitted to the states by Congress on September 25, 1789, 1 Stat. 97 (1789), and became effective on December 15, 1791, when Virginia brought to eleven the number of states approving them. *See* Wolfram, *The Constitutional History of the Seventh Amendment,* 57 Minn.L.Rev. 639, 725–726 (1973).

27. The historical test may have evolved almost by accident. *See generally,* Wolfram, *supra,* note 26 at 639–642. The reference to the law of England appears to have been first used by Justice Story in *United States v. Wonson,* 28 F.Cas. 745, 750 (C.C.D.Mass.1812):

Beyond all question, the common law here alluded to [in the Seventh Amendment] is not the common law of any individual state, (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence. It cannot be necessary for me to expound the grounds of this opinion, because they must be obvious to every person acquainted with the history of the law.

According to Wolfram, this rule has never been seriously questioned: "perhaps later judges have hesitated to appear to be the kind of intractable person that would require Mr. Justice Story to elaborate on the obvious." Wolfram, *supra,* 57 Minn.L.Rev. at 641. Nevertheless, Wolfram's thorough canvass of the debates in the Constitutional Convention and in the state ratification conventions demonstrates that the reference to English law could hardly have been "obvious." *See id.,* at 712–18, 721–22, 734.

Once the use of English common law had become settled, the historical test followed, though not until the end of the nineteenth century. *See id.,* at 642. Wolfram suggests that

this is because earlier cases involved issues as to which changes in the English common law were irrelevant. *Id.* However, since England had no parallel constitutional guarantee, Parliament was free to change the scope of the right to a jury, and it did. The Judicature Acts of 1873–75 permitted the court "to dispense with a jury in chancery cases, cases requiring review of voluminous documents, and cases requiring any scientific or other type of investigation not conveniently made with a jury." Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Powers,* 56 Tex.L.Rev. 47, 51 (1977). Thus, the historical reference may have been required to prevent the scope of an American constitutional right from depending on changes in English practice a century after independence. *See* Wolfram, *supra,* at 642.

Although English decisions from the 1780's and 90's are obviously the most helpful in determining which issues were tried to juries there in 1791, Seventh Amendment questions frequently require recourse to earlier or later cases, which "presumably would be authoritative only to the extent that they themselves accurately reflect the English state of practice in 1791." *Id.,* at 642, n. 8. But since the constitution itself has sought to "preserve" that state of practice in the federal courts, federal cases may be presumed to reflect that position somewhat more accurately than cases from the English courts or the state courts, other things being equal. Most state constitutions also "preserve" the right to trial by jury in similar terms, but the scope of those guarantees varies widely. This is because the practices in the original 13 colonies varied and because states admitted later sometimes used a different referent. For example, in California the scope of the right is determined by reference to the English common law in 1850, when California's constitution was adopted. *See* F. James & G. Hazard, Civil Procedure § 8.1 at 347–348 & n. 4 (1977).

recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contra-distinction to those where equitable rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity, was often found in the same suit. Probably, there were few, if any, states in the Union, in which some new legal remedies, differing from the old common-law forms, were not in use; but in which, however, the trial by jury intervened, and the general regulations in order respects were according to the course of the common law. Proceedings in cases of partition, and of foreign and domestic attachment, might be cited as examples variously adopted and modified. In a just sense, the amendment then may well be construed to embrace all suits, which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights. *Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 446, 7 L.Ed. 732 (1830). *Accord, e. g., Atlas Roofing Co., Inc. v. OSHRC,* 430 U.S. 442, 449, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Pernell v. Southall Realty,* 416 U.S. 363, 374–75, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Curtis v. Loether,* 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Ross v. Bernhard,* 396 U.S. 531, 533, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Because the Court has applied this rule in such a way as to "preserve the substance of the common-law right of trial by jury, as distinguished from mere matters of form or procedure," *Baltimore & Carolina Line, supra,* 295 U.S. at

657, 55 S.Ct. at 891, it has been able to accommodate procedural change without being unfaithful to the historical test. *See, e. g., Colgrove v. Battin,* 413 U.S. 149, 156–57, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (twelve-member jury not required by Seventh Amendment); *Galloway v. United States,* 319 U.S. 372, 390, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943) (directed verdict permitted by Seventh Amendment); *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 498, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) (New trial on less than all issues in case may be ordered, even though at common law there was no practice of setting aside a verdict in part); *Ex parte Peterson,* 253 U.S. 300, 309, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (court appointment of auditor to examine complex accounts between the parties in order to simplify and define issues does not violate Seventh Amendment, as long as ultimate determination of disputed issues is left to the jury); *Walker v. New Mexico & S.P.R.R.,* 165 U.S. 593, 596, 17 S.Ct. 421, 41 L.Ed. 837 (1897) (where jury's general verdict is inconsistent with jury's answers to special interrogatories, Seventh Amendment is not violated by entry of judgment on the basis of the special verdict, setting the general verdict aside). Although in each of these cases the Court approved procedural incidents of jury trials different from those that had been in practice in 1791, in none was the right to a jury trial lost where that right had been enjoyed at the time of the adoption of the Seventh Amendment.[28]

We have noted earlier the defendants' concession that the Seventh Amendment applies "to all but the most lengthy and

**28.** In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court held that a defendant in a private damage suit may be collaterally estopped from relitigating before a jury issues adversely determined in an earlier injunctive action brought by the SEC, where no jury was available. Whether he is thereby denied a jury determination of an issue on which he would have been entitled to one in 1791 depends on how the question is put. It is true that there would have been no estoppel in 1791 because at that time collateral estoppel was available only between parties in the prior litigation; on the other hand, it is equally the case that at common law, "a litigant was not entitled to have a jury determine issues that had been previously adjudicated by a chancellor in equity." *Compare* id. 99 S.Ct. 652 at 652–55 (opinion of the Court) *with* id. at 659–61. (Rehnquist, J., dissenting). *See generally* Shapiro and Coquillette, *The Fetish of Jury Trials in Civil Cases: A Comment on Rachal v. Hill,* 85 Harv.L.Rev. 442 (1971).

complex damage actions." [29] The issue, therefore, as framed by the historical test, is whether jury trials were unavailable in complex matters in 1791.

### 1. The Accounting Cases

In support of their contention that "[a]t the time that the Seventh Amendment was ratified, . . . litigations involving complex facts or sophisticated business transactions were tried before the Court and not a jury," the defendants cite a number of cases in which plaintiffs proceeded in equity to obtain "an accounting." In some of these cases, the jurisdiction of a court of equity was sustained, even though the matter was cognizable at law, because the complexity of the accounts between the parties rendered the remedy at law inadequate. For example, in *Kirby v. Lake Shore & M. S. R. R.,* 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569 (1887), the Court said:

> The case made by the plaintiff is clearly one of which a court of equity may take cognizance. The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity.

*Id.,* at 134, 7 S.Ct. at 432. And in *Fowle v. Lawrason,* 30 U.S. (5 Pet.) 495, 8 L.Ed. 204 (1831), while holding that the case at bar was not sufficiently complex to justify equity jurisdiction, the Court stated the rule as being that "in transactions [not involving certain fiduciary relationships], great complexity ought to exist in the accounts, or some difficulty at law should interpose,

some discovery should be required, in order to induce a court of chancery to exercise jurisdiction." *Id.,* at 503. *Accord, H. B. Zachry Co. v. Terry,* 195 F.2d 185 (5th Cir. 1952); *Quality Realty Co. v. Wabash Ry. Co.,* 50 F.2d 1051 (8th Cir. 1931); *Goffe & Clarkener, Inc. v. Lyons Milling Co.,* 26 F.2d 801 (D.Kan.1928) (discussing cases), *aff'd on other grounds,* 46 F.2d 241 (10th Cir. 1931); *Harrington v. Churchward,* 29 L.J.Ch. 521 (1860); *O'Connor v. Spaight,* 1 Sch. & Lef. 305, 309 (Irish Ch.1804). *See Kilbourn v. Sunderland,* 130 U.S. 505, 9 S.Ct. 594, 32 L.Ed. 1005 (1889); *Standard Oil Co. v. Atlantic Coast Line R. Co.,* 13 F.2d 633 (W.D. Ky.1926) *aff'd on other grounds,* 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927). Thus, complexity was sometimes a factor in determining the mode of trial. However, because in these cases the plaintiffs could choose whether to seek relief in law or equity, jury trials *were* available—even if only at the plaintiff's opinion. Moreover, the merger of law and equity in the federal courts casts considerable doubt on the survival of the plaintiff's historical ability to choose a non-jury trial in such matters. These "accounting" cases, therefore, do not help the defendants here.

### a. Complex Accounting Cases and the Concurrent Jurisdiction of Law and Equity

Actions seeking an accounting are the descendants of the old action of "Account" or "Account-render," one of the earliest

---

**29.** In view of this concession, it is unnecessary to engage in the extensive historical analysis which would be required to determine conclusively the question of the applicability of the Seventh Amendment to antitrust actions. For examples of this type of analysis, see Mr. Justice Marshall's opinion for the Court in *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), tracing the history of actions for the recovery of real property, and Judge Friendly's opinion for the majority in *Damsky v. Zavatt,* 289 F.2d 46 (2d Cir. 1961), tracing the history of the Court of Exchequer in order to determine whether there was a constitutional right to a jury in a suit by the government to collect taxes allegedly due.

Although in view of the defendant's position we assume without deciding that there is a constitutional right to jury trial in antitrust cases, we note that this assumption is supported by abundant evidence. The acts prohibited by the antitrust laws are similar to those banned by the Statute of Laborors, 1349, 23 Edw. 3, c. 6, and the Statute of Monopolies, 1623, 21 Jac. c. 3, both of which gave a right to penal damages in the courts of common law. *In addition, antitrust actions have been held to sound in tort, classically a "legal" cause, see n. 61, infra.* Finally, treble damages are traditionally a remedy available only in the courts of law. *See* pp. 921–922, *infra.*

forms of action at common law.[30] The common-law action of account was never very popular—perhaps because it was procedurally cumbersome[31] and of limited scope[32] —and by the eighteenth century it was largely replaced by other remedies, both legal and equitable.[33]

In some cases there were no incidents of equitable jurisdiction, and the plaintiff had to proceed at law. *See, e. g., Fowle v. Lawrason,* 30 U.S. (5 Pet.) 495, 8 L.Ed. 204 (1831) (lessor's action for an accounting of rent allegedly due). When the claims underlying the demand for an accounting were equitable claims, equity jurisdiction was exclusive. 5 Moore's Federal Practice ¶ 38.25, at 199 (2d ed. 1978). *See, e. g., Newberry v. Wilkinson,* 199 F. 673, 678 (9th Cir. 1912) (suit for accounting against administratrix of a decedent's estate); *Miller v. Weiant,* 42 F.Supp. 760 (S.D.Ohio 1942) (action to compel directors to account for corporate assets); *Williams v. Collier,* 38 F.Supp. 321 (E.D.Pa.1940) (suit by trustee in bankruptcy to void fraudulent transfer and impose constructive trust); 4 Pomer-

oy's Equity Jurisprudence §§ 1420, 1421 (5th ed. 1941).

Those cases in which resort to equity was based on the complication of the accounts between the parties fell into a third category—the concurrent jurisdiction of law and equity.[34] 5 Moore's Federal Practice ¶ 38.-25, at 199 (2d ed. 1978). *See e. g., Kirby v. Lake Shore & M. S. R. R.,* 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569 (1887); *Fowle v. Lawrason,* 30 U.S. (5 Pet.) 495, 8 L.Ed. 204 (1831); *H. B. Zachry Co. v. Terry,* 195 F.2d 185 (5th Cir. 1952); *McNair v. Burt,* 68 F.2d 814, 815 (5th Cir. 1934); *Goffe & Clarkener, Inc. v. Lyons Milling Co.,* 26 F.2d 891 (D.Kan.1928); *aff'd on other grounds,* 46 F.2d 241 (10th Cir. 1931). This overlap in the jurisdictions of law and equity gave plaintiffs in such cases the practical ability to choose the forum—and thereby the mode of trial. When the plaintiff chose to bring his action at law, the defendant's ability to obtain a non-jury trial was severely limited:

> [T]he doctrine is well settled that when the jurisdictions of law and equity are concurrent the one which first takes actual cognizance of any particular controver-

**30.** *See Williams v. Collier,* 32 F.Supp. 321 (E.D. Pa.1940) (Kalodner, J.); Belsheim, *The Old Action of Account,* 45 Harv.L.Rev. 466 (1932); 5 Moore's Federal Practice ¶ 38.25, at 198 (2d ed. 1978); 2 Story's Equity Jurisprudence §§ 580–602, at 1–17 (14th ed. 1918). Belsheim traces Account back to the early thirteenth century when, in a system of land ownership where "it was common for [feudal] lords to grant out manors to bailiffs, who were to account for the rents and profits thereof, deduction being made for the expenses incurred," the action provided redress for the lord "in case such a bailiff refused to account." Belsheim, *supra,* at 467–68.

**31.** In order to obtain relief, the plaintiff needed first to establish before a jury the defendant's obligation to account to him. The defendant would then be compelled—by physical arrest and imprisonment, if necessary—to appear before auditors appointed by the court, who would settle the accounts between the parties. Disputed issues of fact arising before the auditors would also be resolved by a jury. *See Ex parte Peterson,* 253 U.S. 300, 308, 40 S.Ct. 543, 64 L.Ed. 919 (1920). Finally, the plaintiff could submit the auditors' final computation to the court of law to obtain a final judgment for any amount due. Belsheim, *supra* note 30, at 493–499.

**32.** During the earlier middle ages, account could be brought only against bailiffs, guardians in socage, receivers *ad computandum,* and certain few others; it was later extended to other types of receivers, to partners, to the plaintiff's executors, to the defendant's executors, and to third party beneficiaries. *See id.,* at 475–493.

**33.** Though the old action of account fell into general disuse, it had not entirely disappeared at the close of the eighteenth century. *See,* Belsheim, *supra* note 27, at 466; 2 Story's Equity Jurisprudence § 581, at 2 & n. 1 (14th ed. 1918). According to Story, such actions were also brought "in the form of assumpsit, covenant, and debt . . . in the Courts of Common Law," or by a bill in equity. Id.

**34.** The concurrent jurisdiction in matters of account also included cases involving mutual accounts, an accounting between two partners, an accounting by the principal where the agent's compensation depended upon the principal's profits, and others. *See* 4 Pomeroy's Equity Jurisprudence §§ 1420, 1421 (5th ed. 1941). For a survey of other matters within the concurrent jurisdiction, *see* 1 id. §§ 139, 140, at 191–194.

sy ordinarily thereby becomes exclusive. If, therefore, the subject-matter of primary right or interest, although legal, is one of a class which may come within the concurrent jurisdiction of equity, and an action at law has already been commenced, a court of equity will not, unless some definite and sufficient ground of equitable interference exists, entertain a suit over the same subject-matter. . . . The grounds which permit the exercise of the equitable jurisdiction in such cases are the existence of some distinctively equitable feature of the controversy which cannot be determined by a court of law, or some fraudulent or otherwise irregular incidents of the legal proceedings sufficient to warrant their being enjoined, or the necessity of a discovery, either of which grounds would render the legal remedy inadequate. This rule results in part, in the United States, from the provisions of the national and state constitutions securing the right to a jury trial.

1 Pomeroy's Equity Jurisprudence § 179, at 251–252 (5th ed. 1941).

Because Story's view was that "[t]he whole machinery of Courts of Equity is better adapted to the purpose of an account. . . ." 2 Story's Equity Jurisprudence § 591, at 9 (14th ed., 1918), he was distressed by the ability of plaintiffs to bring such actions in the courts of law where they would be tried by juries:

> [N]ow the [equity] jurisdiction extends not only to cases of an equitable nature, but to many cases where the form of the account is purely legal, and the items constituting the account are founded on obligations purely legal. Upon such legal obligations however suits, although not in the form of actions of account, yet in the form of assumpsit, covenant, and debt, are still daily prosecuted in the Courts of Common Law, and legal defenses are there brought forward. But even in these cases, as the courts possess no authority to stop the ordinary progress of such suits for the purpose of subjecting the matters in dispute to the investiga-

tion of a more convenient tribunal than a jury, unless the parties agree to a voluntary arrangement for this purpose the cause often proceeds to trial in a manner wholly unsuitable to its real merits.

Id., § 581, at 2 (footnotes omitted).

Thus, defendants were not able to have such matters transferred to equity after the plaintiff had brought an action at law. For example, in Williams v. Herring, 183 Iowa 127, 165 N.W. 342 (1917), the defendant sought to have an action transferred to equity on the ground that "the number of items involved" in the business between the parties was "so great that same can be properly tried and determined only by a court of chancery." Although agreeing that "the number of items . . . will be cumbersome and difficult to present to a jury," the court was of the view that they could be presented "in such a way as to reasonably be within the understanding and comprehension of a jury," and held:

> The fact that the controversy involves a large number of items of debit and credit arising out of many business transactions, and that same could be more conveniently tried to the court, is not a ground of equitable jurisdiction. The test is not whether the cause can be more conveniently or satisfactorily tried and determined by the court than a jury, but the accounts must be mutual requiring an accounting, or there must be some other ground of equitable cognizance not shown to exist in this case.

\*     \*     \*     \*     \*     \*

In our opinion, plaintiff's cause of action upon both counts was properly brought at law, and he is entitled to a trial thereof by jury.

Id., 165 N.W. at 344–45. See also Crane v. Ely, 37 N.J.Eq. 564 (1883).

These "complex" cases for an accounting therefore reflect only the availability of a jury or nonjury trial at the plaintiff's option. There is nothing in any of these cases

to indicate that the plaintiff could not have chosen to proceed at law, with a jury.[35] In this respect, they are no different from many other kinds of actions presenting issues which, before the merger of law and equity, would be tried to a jury or to the court depending on the manner in which the plaintiff chose to proceed.[36]

**35.** The proposition that complex accounting cases were within the concurrent jurisdiction of law and equity might best be described as the majority view. At least one court has expressed the opinion that some cases might be complex enough to justify an injunction against a pending action at law. *See Crane v. Ely,* 37 N.J.Eq. 564, 571 (1883) (dictum). Other authorities imply that mere complication of accounts, in the absence of some trust or fiduciary relation, may not be enough to sustain equity jurisdiction:

> It is held that equity has jurisdiction to award an accounting between parties where there are involved mutual accounts or accounts of such complication that it is not practicable to try the case at law before a jury. . . . This has been denied where no trust relationship is involved. . . .
> But, however this may be, it is settled that equity will not take jurisdiction because of the complication of accounts unless the remedy at law is clearly inadequate; and where the practice at law permits reference to auditors or referees there is seldom occasion· for the exercise of the jurisdiction. . . . Under the federal practice, cases involving complicated accounts can be referred to auditors for the simplification of the issues involved, and the difficulties of trial at law of actions involving such accounts are thus in large measure obviated.

*Broderick v. American General Corp.,* 71 F.2d 864, 867–68 (4th Cir. 1934) (citations omitted). *See Sedalia v. Standard Oil Co.,* 66 F.2d 757, 761 (8th Cir. 1933) *cert. denied,* 290 U.S. 706, 54 S.Ct. 374, 78 L.Ed. 607 (1934); 2 Story's Equity Jurisprudence § 598, at 13–14 (14th ed. 1918). We may well conclude with Story that "where there is a remedy at law there is no small confusion and difficulty in the authorities . . . which . . . seem to deliver over the subject to interminable doubts." Id., § 595, at 11–12.

That the Seventh Amendment guaranty of jury trial extends to the plaintiffs in such cases was assumed by the Court in *Ex parte Peterson,* 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920). The plaintiff brought an action at law on an account including 298 items; the defendant's answer and counterclaim "set up another account containing 402 items." In the trial court, Judge Augustus Hand appointed an auditor

> to make a preliminary investigation as to the facts, hear the witnesses, examine the accounts of the parties, and make and file a report in the office of the clerk of this court, with a view to simplifying the issues for the jury, but not to finally determine any of the issues in the action, the final determination

of all issues of fact to be made by the jury on the trial . . . .

Id., at 304, 40 S.Ct. at 544. The plaintiff then sought a writ of mandamus, complaining that the appointment of the auditor interfered with his Seventh Amendment right.

In an opinion by Justice Brandeis, the Court approved Judge Hand's appointment of an auditor, comparing it to the traditional practice of appointing such auditors to aid courts of equity "where the facts are complicated and the evidence voluminous." Id., at 313, 40 S.Ct. at 547.

> What the District Judge was seeking when he appointed the auditor in the case at bar was just such aid. He required it himself, because without the aid to be rendered through the preliminary hearing and report, the trial judge would be unable to perform his duty of defining to the jury the issues submitted for their determination and of directing their attention to the matters actually in issue. *United States v. Reading Railroad,* 123 U.S. 113, 114, 8 S.Ct. 77, 31 L.Ed. 138. The hearing and report were also essential as shown above to enable the jury to perform their specific duty. Owing to the difference in the character of the proceedings and of the questions ordinarily involved, the occasion for seeking such aid as is afforded to a judge by special masters, auditors, or examiners arises less frequently at law than in equity.

Id., at 313–14, 40 S.Ct. at 547. Thus, the Court recognized that matters complex enough to require the aid of an auditor, though more often found in courts of equity, were cognizable at law as well. And as long as the auditor's report was no more than prima facie evidence, "[t]he limitation imposed by the [Seventh] amendment . . . that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with," was respected. Id., at 310, 40 S.Ct. at 546.

Provision for such appointments in complex matters to be tried to juries is now made in Rule 53(b), Fed.R.Civ.P. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

**36.** Issues as to which the plaintiff was able to choose the mode of trial arose in two basic patterns. They are explained by Professors James and Hazard:

> B's violation of A's statutory right (e. g., to a patent or copyright) might entitle A to an injunction, to compensatory damages, and to a penalty. The right to any relief would turn on whether B violated the statute. A might get a determination of that issue without a

b. *The Concurrent Jurisdiction of Law and Equity After Merger*

In the federal courts, the merger of law and equity was not intended to affect the scope of the jury trial right; Rule 38(a) requires only that the right "as declared by the Seventh Amendment to the Constitution or as given by a statute . . . shall be preserved to the parties inviolate." However, a problem was presented by those matters in which the plaintiff had previously

> had an option as to the mode of trial that excluded any option by defendant or any discretion by the court. . . . [T]he [post-merger] question, properly put, is between giving effect to the plaintiff's former option and giving defendant a counter-option—and this involves a decision as to whether jury trial is to be preferred when either party (and not just the plaintiff) wants a jury trial.

F. James & G. Hazard, Civil Procedure § 8.7, at 374–75 (1977).

The problem as it was encountered in the federal system has been ably summarized by Judge Wisdom:

> In 1938 merger of the federal courts of law and equity caused considerable uncer-

tainty in the determination of jury trial rights; the liberal joinder provisions and the broad, sometimes mandatory, counterclaim provisions of the Federal Rules mixed legal and equitable causes in a single litigation with unprecedented frequency. . . . The difficulty comes in deciding whether the legal or the equitable cause should be tried first—an issue of practical importance to litigants, since the determination of either cause acts as collateral estoppel on common questions of fact in the other. The broad grant of discretion under Rule 42 for a trial judge to order separate trials would seem to imply authority to decide the order of the separate trials, but courts struggled with this problem without clear guidelines. Some decisions rested on the "basic nature" of the case taken as a whole. In many other decisions this test was not recognized and the choice was left to the discretion of the trial judge. On occasion, attempts to apply the "basic nature" test have led to inconsistent results.

*Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.,* 294 F.2d 486, 488–89 (5th Cir. 1961) (footnotes omitted). The problem reached the Supreme Court in *Beacon Thea-*

---

jury in an equity suit, seeking an injunction and perhaps compensatory damages as incidental to an injunction. Or he might get such determination in an action at law for damages or for the penalty. Since equity refused to enforce a penalty and the law would not give an injunction, two suits would be required for complete relief. A had the choice which to bring first. And the first determination of the common issue (violation vel non) would bind the parties in the second action. The plaintiff thus had the power to choose the mode of trial of the common issue, and he could so exercise it as to leave no room for judicial discretion.

If the statute did not provide for a penalty, A might be able to get complete relief in a suit in equity. But he would also have the option to sue for damages at law and for an injunction in equity separately, in whichever order he chose. So here again A could control the mode of trial of the common issue, without leaving room for judicial discretion.

In another class of cases A also had a choice, but it was a more limited one. Breach of certain kinds of contracts (e. g., to convey land) would entitle the injured party

to either specific performance (with incidental damages for delay of performance, and the like) or to damages for breach (measured on the assumption that the contract would not be performed). Here A could in no case get both forms of relief—he had to elect one or the other. His election would govern the mode of trial of issues (the making of the contract, performance of conditions precedent, breach, and the like), which would be presented in a claim for *either* kind of relief. F. James & G. Hazard, Civil Procedure § 8.7, at 370–72 (1977) (footnotes omitted); James, *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655, 671–73 (1963). Actions within the concurrent jurisdiction of law and equity fall into the latter pattern, except that, instead of choosing between "legal" and "equitable" remedies for the same right, the plaintiff simply chooses between the remedy provided in the law courts and the remedy "of the same general nature" made available by equity because for some reason the remedy administered at law is not "full, adequate, and complete." 1 Pomeroy's Equity Jurisprudence § 139, at 191–92 (5th ed. 1941).

*tres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). *Beacon Theatres* involved a legal counterclaim to an equitable claim;[37] in *Dairy Queen* the plaintiff sought a court trial of an action presenting both legal and equitable claims.[38] In both cases there were factual issues common to both the legal and equitable claims.

Writing for the Court in *Dairy Queen,* Justice Black left no room for doubt about the solution to the problem that was to be followed in the federal courts:

[A]fter the adoption of the Federal Rules, attempts were made indirectly to undercut [the constitutional jury trial] right by having federal courts in which cases involving both legal and equitable claims were filed decide the equitable claim first. The result of this procedure in those cases in which it was followed was that any issue common to both the legal and equitable claims was finally determined by the court and the party seeking trial by jury on the legal claim was deprived of that right as to these common issues. This procedure finally came before us in *Beacon Theatres, Inc. v. Westover* . . . .

Our decision [in *Beacon Theatres* defines] the protection to which that right is entitled in cases involving both legal and equitable claims. The holding

in *Beacon Theatres* was that where both legal and equitable issues are presented in a single case, "only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims."

*Id.,* at 472–73, 82 S.Ct. at 897. Therefore, the Court reasoned,

the sole question which we must decide is whether the action now pending before the District Court contains legal issues.

*Id.,* at 473, 82 S.Ct. at 897. The Court then examined the relief sought in the complaint, which had been brought by the owners of the "Dairy Queen" trademark against one of their licensees. The plaintiffs asked for injunctive relief to restrain the licensee from using the trademark or collecting any money from its sublicensees, "an accounting to determine the exact amount of money owing . . . and a judgment for that amount." Determining that the claim for a money judgment was "wholly legal in its nature however the complaint is construed," the Court held that the *defendant* had a right to a jury trial of the legal claim, including the common factual issues of breach of contract and trademark infringement. *Id.,* at 475–80, 82 S.Ct. at 898–99. Thus, the federal courts, preferring a jury trial at the demand of either party, have

---

**37.** The complaint in *Beacon Theatres* sought a declaratory judgment that the plaintiff was not violating the antitrust laws, and an injunction to prevent the defendant from instituting an antitrust suit against the plaintiff. The defendant counterclaimed for treble damages, and the trial court then ordered that the plaintiff's "essentially equitable" claims be tried without a jury before the jury trial on the counterclaim, even though the issue of violation of the Sherman Act was common to both claims, and the party against whom that issue was determined in the court trial would be collaterally estopped from relitigating it before the jury. The Supreme Court granted mandamus and ordered a jury trial on all issues in defendant's claim.

**38.** In *Dairy Queen,* a franchisor alleging breach of the franchise agreement sued to restrain the

franchisee from use of the franchise and trademark, and from collecting funds from subfranchisees. It also sought "an accounting to determine the exact amount of money owing . . . ." 369 U.S., at 475, 82 S.Ct. at 898. The district court struck the defendant's jury demand on the alternate theories that the action was "purely equitable" or that, if not, then the legal issues were "incidental" to the equitable ones. The Supreme Court reversed, holding that the claim for a money judgment for breach of contract is not equitable merely because it is "cast in terms of an 'accounting,' rather than in terms of an action for 'debt' or 'damages.'" *Id.,* at 477–78, 82 S.Ct. at 900. And it strongly rejected the notion that it is ever permissible to characterize legal issues as "incidental" in order to restrict the right to a jury trial.

determined to give defendants a "counter-option." James & Hazard, *supra*, at 377.[39]

There are dicta in *Dairy Queen* implying that a defendant would not have the same "counter-option" in a complex accounting case. In response to the plaintiff's contention that its money claim was "purely equitable," because it was "cast in terms of an 'accounting' rather than . . . 'debt' or 'damages'," the Court said:

> But the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings. The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theatres*, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them.

In view of the powers given to District Courts by Federal Rule of Civil Procedure 53(b) to appoint masters to assist the jury in those exceptional cases where the legal issues are too complicated for the jury adequately to handle alone, the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met. But be that as it may, this is certainly not such a case. *Id.*, at 477–78, 82 S.Ct. at 900.[40]

The matter, therefore, is in some doubt: In its holding in *Dairy Queen*, the Court extended the defendant's jury trial right to an issue on which, before merger, the plaintiff could have obtained the court trial it wanted; yet in dicta it suggested that the plaintiff's choice of mode of trial may yet be preserved in complex accounting cases. This question does not appear to have been resolved by any court, although federal courts in other types of cases have generally held that the federal policy favoring trial by jury, expressed in *Beacon Theatres* and *Dairy Queen*, requires that either party be able to demand a jury when the action

**39.** The expanded boundaries for the right to jury trial established in *Beacon Theatres* and *Dairy Queen* seem to have been regarded in those opinions as constitutionally required. Consequently, some commentators have viewed *Beacon Theatres, Dairy Queen,* and *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) as representing an abandonment of the historical test in favor of a "dynamic" or "flexible" or "rational" approach to the Seventh Amendment. *See* 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2302, at 24 (1971); McCoid, *Procedural Reform and the Right to Jury Trial; A Study of Beacon Theatres, Inc. v. Westover,* 116 U.Pa.L. Rev. 1 (1967); Redish, *Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making,* 70 Nw.U.L.Rev. 486, 526 (1975). Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv.L. Rev. 898, 900–904 & n. 28 (1979). However, the Court in later cases has referred to the *Beacon Theatres/Dairy Queen* holding as an "equitable doctrine." *See Katchen v. Landy,* 382 U.S. 323, 339, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). To the extent that *Beacon Theatres* and *Dairy Queen* have expanded the right to jury trial further than required by a strict application of the historical test, the characterization in *Katchen* is accurate. The Seventh Amendment, of course, does not prohibit such an expansion, but merely prohibits any con-

traction of the jury trial right to limits narrower than those permitted by the historical test. Moreover, the Court's more recent decisions have eliminated any doubt about the continuing validity of the historical test. *See* pp. 926–929, *infra.*

**40.** The dicta in *Dairy Queen* were themselves based on earlier dicta in *Kirby v. Lake Shore & M. S. R. R.,* 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569 (1887). In *Kirby,* after holding that "The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity," id., at 134, 7 S.Ct. at 432, the Court went on to observe,

> It would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion as to the amount of drawbacks to which Alexander & Co. were entitled on each settlement. 1 Story, Eq.Jur. § 451. Justice could not be done except by employing the methods of investigation peculiar to courts of equity. When to these considerations is added the charge against the defendants of actual concealed fraud, the right of the plaintiff to invoke the jurisdiction of equity cannot well be doubted.

Id., at 134, 7 S.Ct. at 432.

presents issues so triable. James & Hazard, *supra*, at 377. *See, e. g., Johns Hopkins University v. Hutton*, 488 F.2d 912, 916 (4th Cir. 1973) (defendant entitled to jury trial on factual issues in plaintiff's action for recission of contract so long as plaintiff holds claim for damages in reserve should court find that it is not entitled to recission) *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *Minnesota Mutual Life Ins. Co. v. Brodish*, 200 F.Supp. 777 (E.D.Pa. 1962) (defendant entitled to jury trial on issues common to plaintiff's equitable claim and defendant's legal counterclaim). *Cf. Leimer · v. Woods*, 196 F.2d 828 (8th Cir. 1952) (jury available upon demand of either party when consolidated or joined legal and equitable claims have common question of fact).

For two reasons, we need not now determine whether the plaintiff's limited right to a court trial of complex accounting cases has survived the merger of law and equity. First, if this *were* an action for an accounting, the plaintiff's clearly expressed demand for a jury trial would be controlling, just as it would have been in 1791. Second, this is simply not an accounting case. "There are no accounts between the parties. The cause of action is one arising in tort, and cannot be converted into one for an account." *United States v. Bitter Root Development Co.*, 200 U.S. 451, 478, 26 S.Ct. 318, 327, 50 L.Ed. 550 (1906). *See e. g., Broderick v. American General Corp.*, 71 F.2d 864, 868 (4th Cir. 1934). None of the fiduciary or trust relationships giving rise to an obligation to account are present. *See American Air Filter Co., Inc. v. McNichol*, 527 F.2d 1297, 1300 (3d Cir. 1975); *Sulzer v. Watson*, 39 F. 414, 415 (C.C.D.Vt. 1889). Nor do the plaintiffs seek an accounting in the sense of disgorgement of "profits made from the unfair use of a plaintiff's trademark or tradename." *Robert Bruce, Inc. v. Sears, Roebuck & Co.*, 343 F.Supp. 1333, 1348 (E.D.Pa.1972).

### 2. *Other Complex Litigation*

Because this suit is not an action for an accounting, it is important to determine whether complexity permitted a resort to equity only in accounting cases, or in other kinds of litigation as well.

The availability of equity jurisdiction in cases involving complicated facts was addressed in *United States v. Bitter Root Development Co.*, 200 U.S. 451, 26 S.Ct. 318, 50 L.Ed. 550 (1906) and *Curriden v. Middleton*, 232 U.S. 633, 34 S.Ct. 458, 58 L.Ed. 765 (1914). In *Bitter Root*, the United States sought relief in equity after millions of feet of timber were allegedly removed and sold by means of an involved conspiracy. Equity jurisdiction was invoked because, "by reason of the frauds and conspiracies . . . and the complications which have resulted therefrom, no plain, adequate, and complete remedy can be given . . . at law . . . ." 200 U.S., at 462, 26 S.Ct. at 323. But the Court ruled that there was no equity jurisdiction:

> The principal ground upon which it is claimed that the remedy at law is inadequate is really nothing more than a difficulty in proving the case against the defendants. The bill shows that whatever was done in the way of cutting the timber and carrying it away was done by the defendants as tort feasors, and the various devices alleged to have been resorted to by the deceased, Daly, by way of organizing different corporations, in order to, as alleged, cover up his tracks, and to render it more difficult for the complainant to make proof of his action, does not in the least tend to give a court of equity jurisdiction on that account. It is simply a question of evidence to show who did the wrong and upon that point the fact could be ascertained as readily at law as in equity.

*Id.*, at 472–73, 26 S.Ct. at 324–25. And in *Curriden v. Middleton*, the Court reaffirmed this holding, saying, "[M]ere complication of facts alone and difficulty of proof are not a basis of equity jurisdiction." 232 U.S. at 636, 34 S.Ct. at 458.

Moreover, there is evidence that the English recognized the difficulty of large and complex matters for ordinary juries, and found a solution not in equity, but in the

"special jury." The early procedures for trial by special jury were unregulated. *See* Thayer, *The Jury and Its Development*, 5 Harv.L.Rev. 295, 301 (1892). But in 1730, it was provided by statute that "on the motion of any plaintiff or plaintiffs, defendant or defendants in any action, cause, or suit whatsoever, depending or to be brought and carried on in the . . . courts of king's bench, common pleas and exchequer, or in any of them, . . . said courts are hereby respectively authorized and required, upon motion as aforesaid, in any of the cases before-mentioned, to order and appoint a jury to be struck . . . in such manner as special juries have been, and are usually struck in such courts. . ." 3 Geo. 2, c. 25, § 15 (1730). The act also provided that the party applying for a special jury was to pay the fees incurred thereby, id., § 16, and that qualification to serve on a special jury was determined on the basis of income. Id., § 18. Some years later, the procedure was altered so that the party applying for the special jury was to pay not only the extra sheriff's fee, but all additional expenses due to the use of a special jury. These amounts were not taxable as costs to the losing party unless the judge certified that "the same was a cause proper to be tried by a special jury." 24 Geo. 2, c. 18 (1751).[41]

According to Blackstone, "Special juries were originally introduced in trials at bar when the causes were of too great nicety for the discussion of ordinary freeholders, or where the sheriff was suspected of par-

tiality, though not upon such apparent cause as to warrant an exception to him." 3 W. Blackstone, Commentaries *357.[42] The continuing relevance of complexity as a cause for impaneling special juries appears in reported opinions discussing certifications requested pursuant to the 1751 Act. *Compare London Bank of Scotland v. Marshall*, 4 Foster & Finlason's Nisi Prius Reports 1046 (1865) (certifying the case as proper for a special jury "because the plea, which if proved would have raised a difficult question of law, would in its proof raise difficult questions of fact,") *with Humber Iron Co. v. Jones*, 4 Fos. & Fin. 1047 (1865) (The judge "declined to certify for a special jury, as it was the ordinary evidence under the general issue."); *cf. Linscott v. Jepp*, 8 T.L.R. 130 (Q.B.1891) (In refusing to overturn the decision of a trial judge in a slander case not to allow a special jury, Lord Coleridge said, "There is . . . no difficulty in the trial of such a case so as to require a special jury."); *Price v. Williams*, 5 Dowl. 160 (Exch.1836) (special jury could be called to determine damages on writ of inquiry).

The defendants' argument that equity was generally available whenever a case presented matters too difficult for a jury relies heavily on two English decisions: *Wedderburn v. Pickering*, 13 Ch.D. 767 (1879), and *Clench v. Tomley*, 21 Eng.Rep. 13 (Ch.1603).[43]

In *Wedderburn*, an action concerning a dispute as to the location of the boundary

**41.** Later statutes further modifying the procedures for special juries include 6 Geo. 4, c. 50, §§ 30–35 (1825), and 3 & 4 Will. 4, c. 42, § 35 (1833). For a discussion of special juries in nineteenth-century England, *see* 18 Halsbury's Laws of England, Juries §§ 634–640, at 259–63 (1st ed. 1911).

By 1958, the use of special juries in England was limited to "cases as entered in the commercial list in the Queen's Bench Division of the High Court at the Royal Courts of Justice." 23 Halsbury's Laws of England, Juries ' 4 (3d ed. 1958). Special juries were abolished altogether by the Courts Act, 1971, § 40. *See* 23 Halsbury's Laws of England, Juries ' 4 (1978 cum.supp.).

**42.** For a more extended discussion of special juries, see Thayer, *The Jury and Its Develop-*

*ment*, 5 Harv.L.Rev. 295, 300–302 (1892). According to Thayer, "there seems always to have existed the power of selecting those especially qualified for a given service . . . . What we call the "special jury" . . . was a natural result of the principle that those were to be summoned who could best tell the *veritatem rei*. . . . For the handling of these greater and more complicated causes, there was picked out a better class of jurymen . . . ." *Id.*, at 300–301.

**43.** The defendants appear to adopt the presentation of this argument found in *In re U. S. Financial Securities Litigation*, 75 F.R.D. 702, 708–709 (S.D.Cal.1977) *appeal pending* # 77–8213 (9th Cir. 8/29/77).

between the parties' properties, the court found that the matter "cannot be conveniently tried before a jury" and denied the defendant's request for a jury, relying not on any common-law tradition but on Order XXXVI, rules 3 & 26, Rules of Court, 1875.[44] These rules were promulgated as part of the merger of law and equity in the English Courts effected by the Judicature Act, 1873, 36 & 37 Vict. c. 66, as amended by the Judicature Act, 1875, 38 & 39 Vict. c. 77.

Rule 3 provided that either party could obtain trial by jury of *any* action, both those formerly "legal" and those formerly "equitable." Rule 26 was a limitation on Rule 3, and allowed the court discretion to order a trial without a jury in cases which "previously to the passing of the Act could, without any consent of parties, be tried without a jury." This rule "was framed expressly to meet cases which would under the old system [before merger] have been tried in the Chancery Division, *and* which might be considered, by reason of involving a mixture of law and fact, or from great complexity, or otherwise, not capable of being tried before a jury." *Clarke v. Cookson*, 2 Ch.D. 746 (1876) (emphasis added). As we would expect in view of this statement of Rule 26 and its purpose, the decisions applying it involved matters which were clearly "equitable" regardless of their complexity. *See, e. g., Powell v. Williams*, 12 Ch.D. 234 (1879) (suit to enjoin nuisance); *Swindell v. Birmingham Syndicate*, 3 Ch.D. 127 (1876) (action for specific per-

formance, counterclaim for recission). And in *Wedderburn* itself, the defendant would have had no right to a jury trial before merger because, as the plaintiff's counsel argued, the action might have been tried at common law, "or the Plaintiff might have come to the Court of Chancery for an injunction." 13 Ch.D., at 770.

Thus, the 1875 rules and the cases applying them do not support the proposition that complexity can make a "legal" issue into an "equitable" one. Indeed, this very question was raised in *Sugg v. Silber*, 1 Q.B.D. 362 (1876), a patent infringement case which, according to Chief Justice Cockburn, could "be adequately dealt with only by assessors who have the requisite scientific knowledge." Nevertheless, the court concurred in his conclusion that the Judicature Acts and the Rules did not allow a judge "to take away from a defendant the right which he previously had of trying his case before a jury." We conclude that the English post-merger cases demonstrate only that the English used the relative difficulty of trying complex cases before juries as a limitation on the *extension* of jury trials to formerly equitable matters. The defendants' reliance on them is therefore misplaced.

The report of the *Clench* case is set forth in full:

*Possession bound by decree, and the party prohibited to sue at common law.*—Inter Tomley and Clench, it appeared by testimony of ancient witnesses

---

44. The relevant rules provide:

> 2. Actions shall be tried and heard either before a Judge or Judges, or before a Judge sitting with assessors, or before a Judge and jury, or before an official or special referee, with or without assessors.
> 3. Subject to the provisions of the following Rules, the plaintiff may, with his reply, or at any time after the close of the pleadings, give notice of trial of the action, and thereby specify one of the modes mentioned in Rule 2; and the defendant may, upon giving notice within four days from the time of the service of the notice of trial, or within such extended time as the Court or Judge may allow, to the effect that he desires to have the issues of fact tried before a Judge and jury, be entitled to have the same so tried.

> 26. The Court or a Judge may, if it shall appear desirable, direct a trial without a jury of any question or issue of fact, or partly of fact and partly of law, arising in any cause or matter which previously to the passing of the Act could, without any consent of parties, be tried without a jury.

Order XXXVI, Rules 2, 3, 26, Rules of Court, 1875. The 1873 Judicature Act had significantly limited the availability of trial by jury, but the 1875 Act and Rules generally restored the jury trial right to its pre-1873 limits. *See* Judicature Act, 1875, § 22; *Sugg v. Silber*, 1 Q.B.D. 362, 366 (1876) (opinion of Pollock, B.).

speaking of sixty years before, and account books and other writings, that Francis Vaughan, from whom Tomley claimed, was mulier [legitimate]; and Anthony, from whom Clench claimeth, was a bastard; and the possession had gone with Tomley fifty years. In this case the Lord Egerton not only decreed the possession with Tomley, but ordered also that Clench should not have any trial at the common law for his right till he had shewed better matter in the Chancery, being a thing so long past; it rested not properly in notice *de pais*, but to be discerned by books and deeds, of which the Court was better able to judge then [sic] a jury of ploughmen, notwithstanding that exceptions were alleged against those ancient writings; and that for the copyhold land, the verdict went with Clench upon evidence given three days before Serjeant Williams that Anthony was mulier (31st May, 1 Jacob. 1603).

*Clench v. Tomley*, 21 Eng.Rep. 13 (1603). This case seems to be the sole support offered for the defendants' contention that "[a]t early common law, at a time when jurors were often illiterate and uneducated, matters involving complex writings were determined by the court." *See Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59, 67 (S.D.N.Y.1978). One court has relied upon *Clench* for the broader proposition that "since long before the American Revolution, the common law recognized that the sheer complexity of a case, in particular a case which involved many complicated documents, was sufficient grounds to deny a jury trial . . .." *In re U. S. Financial Securities Litigation*, 75 F.R.D. 702, 708–09 (S.D.Cal.1977) *appeal pending*, # 77–8213 (9th Cir. 8/29/77).

Initially, we note that a single report of such a venerable case should be approached with caution, because such reports were frequently inaccurate and were "only of those parts of the opinion deemed by the particular reporter to be useful to the lawyer." *Dawson v. Contractors Transport Corp.*, 151 U.S.App.D.C. 401, 411, 467 F.2d 727, 737 (1972) (Fahy, J., dissenting) *citing* M. Price & H. Bitner, Effective Legal Research 283

(1953). In any event, we think that the state of development of the jury system in 1603—the historical context of that case—demonstrates that defendants' reliance on it is misplaced.

The practice of submitting documentary evidence to juries was, at the time, already long-established. According to one scholar, "Our earliest records show the practice of exhibiting charters and other writings to the jury." Thayer, *The Jury and Its Development* (II), 5 Harv.L.Rev. 295, 307 (1892). Thayer traces the development of the showing of documents to juries from about 1200 until the fifteenth century "to bring [it] down . . . to the modern form." *See id.*, at 307–311. Thus, if *Clench* is not to be dismissed as an aberration, it must be explained on some grounds other than the inaccurate supposition that matters involving documentary evidence were kept from juries.

These grounds might be found in the fact that the jury was then still expected to bring its own knowledge of the disputed issues to court. The presentation to the jury of the testimony of witnesses, in fact, came centuries after the presentation of documentary evidence, developing during the fourteenth and fifteenth centuries. *See id.*, at 310, 357–363. The transformation of the jury from a body which came to court knowing the truth of the matter to one which came untainted by prior knowledge, to find the truth from the evidence presented, seems to have occurred largely between the middle of the seventeenth and the end of the eighteenth centuries. *See id.*, at 380–87; 3 W. Blackstone, Commentaries *374–75. In *Bushell's Case*, Vaughan 135, 124 Eng.Rep. 1006 (C.P. en banc, 1670), habeas corpus was granted to jurors who had been imprisoned for returning a verdict contrary to the evidence and the direction of the court. The opinion of Chief Justice Vaughan in *Bushell*'s case, *supra*, demonstrates the continuing importance, long after *Clench v. Tomley*, of the jurors' personal knowledge of the matters in dispute.

[A] court, Vaughan says, does not charge a jury with matter of law in the abstract,

but only upon the law as growing out of some supposition of fact. This matter of fact is for the jury; it is not for the judge, "having heard the evidence given in court (for he knows no other)," to order the jury to find the fact one way rather than the other; for if he could, "the jury is but a troublesome delay, great charge, and of no use." The judge cannot know all the evidence which the jury goes upon; they have much other than what is given in court. They are from the vicinage, because the law supposes them to be able to decide the case though no evidence at all were given in court on either side. They may, from their private knowledge of which the judge knows nothing, have ground to discredit all that is given in evidence in court. They may proceed upon a view. "A man cannot see by another's eye, nor hear by another's ear; no more can a man conclude or infer the thing to be resolved by another's understanding or reasoning." It is absurd that a judge should fine a jury for going against their evidence, when he knows but part of it, "for the better and greater part of the evidence may be wholly unknown to him; and this may happen in most cases, and often doth, as in *Granby* and *Short's Case.*"

*Thayer, supra*, at 382–83 (footnotes omitted). It may well have been that the sixty-year old facts of the *Clench* case "rested not properly in notice *de pais*" (of the country) because they were matters of which jurors would have had no personal knowledge; since the matter had to be decided solely on the basis of evidence produced in court—documents and "the testimony of ancient witnesses"—Lord Egerton could easily have felt that a jury would have been, in Vaughan's words, "but a troublesome delay, great charge, and of no use.[45]

Even if *Clench* demonstrated an unequivocal rejection of jury trials in complex matters, however, it would still be of limited relevance to the matter before us. The historical test, after all, defines the Seventh Amendment right with reference to the practice in 1791—not 1603. Because of the continuing development of the jury system and the constantly shifting boundaries of the jurisdictions of law and equity during those two centuries, any decision as old as *Clench* provides little evidence of what the practices were 188 years later. *See* Thayer, *supra*, at 380–87; James, *Right to a Jury Trial in Civil Actions*, 72 Yale L.J. 655, 658 (1963). Moreover, of course, what evidence we do have from the eighteenth century indicates that complex matters were heard in the common law courts, albeit by "special" juries.

We therefore conclude that, as a matter of actual historical practice, matters cognizable at law were tried to juries in the courts of common law, regardless of complexity. Though there was an exception to this general rule, that exception was limited to matters of "account," and further limited by the plaintiff's ability to choose a jury or non-jury trial in such matters.

### 3. The Rationale of the Complex Accounting Cases

The defendants also suggest that the complex accounting cases demonstrate an

---

**45.** We suggest the above reading of *Clench* largely for the purpose of showing that defendants' reading is not necessarily the only or the best one. We do not claim ours to be definitive; nevertheless, given the fact that juries had long considered documentary evidence, any "recognition" in *Clench* that equity would enjoin jury trials of matters involving complex documents would have been out of step with the prior and subsequent developments in the common law.

Other grounds for the *Clench* decision can easily be hypothesized. In view of the significance of documentary evidence, Lord Egerton may have kept the matter in equity because only in equity could discovery be compelled. And there is certainly a hint of the doctrine of laches in the order enjoining trial of a 50-year-old claim "till he had shewed better matter . . . ., being a thing so long past." *Cf. Gee v. CBS, Inc.*, 471 F.Supp. 600 (E.D.Pa.1979) (50 year old claim for breach of fiduciary duty barred by statute of limitations).

Finally, it is possible that a complete reading of *Clench* would have to take account of the temptations to excess at a time when the famous struggle between law and equity was approaching its climax. *See* F. James & G. Hazard, Civil Procedure § 1.5, at 15–17 (1977).

"implicit . . . belief that if a jury could not understand the matter being presented, there was not the requisite 'plain, adequate and complete remedy at law'." We find the actual historical practice in complex cases sufficiently clear that no recourse to "implicit beliefs" is necessary. However, dicta in a few of these cases show enough mistrust of juries that some inquiry is warranted into the rationale (if any) implicit in the availability of equity jurisdiction in complex accounting matters.[46]

As an initial matter, it is clear that the difficulty of an accounting for juries cold not have had anything to do with the original extension of equity jurisdiction into matters of account, since in the common-law action of account the actual "accounting" was never performed by the jury. The jury's verdict was that the defendant was obliged to account, and the account was then taken by court-appointed auditors. Similarly, when equity took cognizance of such matters, the chancellor appointed a master to undertake the accounting. *See* 2 Story's Equity Jurisprudence §§ 587, 590 at 5, 6, 8 (14th ed. 1918); note 31, *supra*.

Some later courts have, indeed, justified the recourse to equity in such cases on the ground of their difficulty for juries, or at least used that difficulty to determine whether equity jurisdiction was properly invoked. *See* James, *Right to a Jury Trial in Civil Actions*, 72 Yale L.J. 655, 663 & n. 48 (1963). However, according to Blackstone, the existence of the concurrent jurisdiction of equity in matters of account is to be explained by the power of courts of equity to compel the production of books and records: "But, for want of this discovery at law, the courts of equity have acquired a concurrent jurisdiction with every court in all matters of account." 3 W. Blackstone, Commentaries *437.[47] And Story's opinion that "the whole machinery of Courts of Equity is better adapted to the purpose of an account" was expressed without any special mention of juries.[48] Moreover, since

---

**46.** *See* p. 902 & n. 40, *supra*; *Goffe & Clarkener, Inc. v. Lyons Milling Co.*, 26 F.2d 801 (D.Kan.1928), and sources cited therein. Perhaps the most extreme example is provided by *Bennett v. United Lumber & Supply Co.*, 110 Conn. 536, 148 A. 369 (1930):

> The action upon the second count was in reality an action for an accounting involving many charges and credits between the parties aggregating upwards of $50,000. The trial was a protracted one; the account a difficult one to unravel. The printed evidence consists of 366 pages of the record while there were introduced in evidence 64 exhibits. No action for an accounting, or one of this character, should be tried to the jury. It imposes upon a jury an impossible task to expect them to carry in memory the details of a case of this character. It is unfair to a litigant to have his case determined by a tribunal which cannot fulfill that duty with accuracy or justice, however intelligent and desirous of doing their full duty the tribunal may be.

*Id.* Surprisingly enough, the court in *Bennett* then proceeded to reinstate the jury's verdict, reversing the judgment n. o. v. won by the defendant in the trial court.

Dicta such as those in *Bennett* must be read with extreme caution, not only because they are dicta, but also because "the courts of the nineteenth and early twentieth century simply did not share [the unequivocal commitment to the virtue of jury trials shown in *Beacon Thea-*

tres. There was instead] a more or less distinctly conscious judicial aversion to jury trial, especially in the federal courts and the court systems of the Northeastern states." F. James & G. Hazard, Civil Procedure § 8.5, at 364 (1977) (footnotes omitted). The *Bennett* dictum must be read with even greater caution, coming as it does from a state system which, at the time of the adoption of the federal constitution, "had a procedure all its own, going beyond anything in English practice, by which all issues of fact or law could be decided by the court," Henderson, *The Background of the Seventh Amendment*, 80 Harv.L.Rev. 289, 317 (1966), and in which such procedures apparently survived well into the twentieth century. *See Ex parte Peterson*, 253 U.S. 300, 308–09 & n. 3, 40 S.Ct. 543, 64 L.Ed. 919 (1920); *Sulzer v. Watson*, 39 F. 414 (C.C.D.Vt.1889) (in action of "book-account" in Connecticut, trial is by court-appointed auditor rather than by jury; Connecticut procedure could not be used in federal court because of Seventh Amendment).

**47.** Blackstone's Commentaries were first published in 1765 and may, therefore, be especially valuable as a guide to the theory and practice of late eighteenth-century England.

**48.** Story was responding to Blackstone's view that discovery was the sole ground for equity jurisdiction in matters of account.

> According to Story, discovery
> . . ., although a strong yet is not the sole ground of [concurrent] jurisdiction [in mat-

trial to the court or a jury was just one element of the choice between law and equity in a system where the procedures of one or the other had to be taken as a package, it is difficult to assess with any confidence the importance of that one element in any particular change in the respective jurisdictions.

The difficulties attending such speculation have been well described by Professor James:

> At no time in history was the line dividing equity from law altogether—or even largely—the product of a rational choice between issues which were better suited to court or to jury trial. There is little to suggest that the chancellor's initial choice of a procedure borrowed from canon law reflected a considered rejection of jury trial. Rather, the choice between law and equity frequently was made upon considerations of other factors. For when equity procedure took shape it differed from the procedure at law in several important respects. Evidence in equity was produced largely by sworn pleadings and written depositions taken upon written interrogatories, rather than by testimony taken orally and subject to oral cross-examination, all in the presence of the trier of fact. At law the parties to an action were neither competent nor compellable to testify, whereas in equity each party could offer his own sworn statements and also "probe the conscience" of his adversary by propounding written interrogatories, which had to be answered under oath. The chancellor used specific remedies which were not available to the law courts, and the chancellor could handle multiple parties and the possibility of multiple suits in a way that the law

courts had not developed. The procedure of each tribunal had to be taken as a package, and each procedure had substantial limitations which the other did not share. In equity the procedure was epistolary, included the statements of both parties, might provide for specific relief and handle multiple parties and suits, and involved no jury. At law the procedure involved oral testimony and cross-examination at a jury trial, relief *in rem*, and the unavailability of the testimony of either party.

From the above it may be seen that even where the allocation of issues between the jurisdictions was based on rational considerations, it would often be dictated by some factor other than jury trial. When the chancellor was faced with a prickly question of credibility of witnesses, his rational desire for the benefits of demeanor evidence could be satisfied only by sending the issue to the law court with its jury. *Where an accounting between business associates was sought, if the inquiry was to have the benefit of the testimony of the parties (the two witnesses who could shed the most— sometimes the only—light on the matter), it would have to be conducted in equity, where the chancellor would decide questions of fact without a jury.* The same thing was true where specific performance of a contract was appropriate rather than damages for its breach, or when unnecessary multiplicity of suits was to be prevented. To put it colloquially, jury trial (or court trial) was often merely the tail of the dog under a system where you had to take the whole dog.

ters of account]. The whole machinery of Courts of Equity is better adapted to the purpose of an account in general, and in many cases independent of the searching power of discovery, and supposing a Court of Law to possess it, it would be impossible for the latter to do entire justice between the parties; for equitable rights and claims not cognizable at law are often involved in the contest. Lord Redesdale has justly said that in a complicated account a Court of Law

would be incompetent to examine it at Nisi Prius with all the necessary accuracy. This is the principle on which Courts of Equity constantly act by taking cognizance of matters which though cognizable at law are yet so involved with a complex account that it cannot be properly take at law; and until the result of the account is known, the justice of the case cannot appear.
2 Story's Equity Jurisprudence § 591, at 9 (14th ed. 1918). (footnote omitted).

James, *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655, 661–62 (1963) (footnotes omitted; emphasis added). Sometimes, of course, the choice between law and equity had nothing to do with any of the procedural advantages of either system, reflecting instead the political struggle between the King and Parliament. *See id.,* at 663; F. James & G. Hazard, Civil Procedure § 8.2, at 358 & n. 32 (1977).

The proposition that these cases demonstrate some sort of policy or belief that complex matters should not be decided by juries is further weakened by the apparent fact that the "complexity exception" to the "jury trial rule" was limited to matters of account. *See* pp. 914–918, *supra.* This limitation has been explained by some by distinguishing between complication in determining liability and complication in determining damages. *See Tights, Inc. v. Stanley,* 441 F.2d 336, 340–41 (4th Cir.) *cert. denied,* 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 91 (1971); *Radial Lip Machine, Inc. v. International Carbide Corp.,* 76 F.R.D. 224, 228 (N.D.Ill.1977).[49] This explanation is attractive in that it harmonizes two groups of cases by enunciating a rational principle for distinguishing between them. However, it would imply that complex remedial issues in cases other than accounting cases have been (or can be) withdrawn from juries for that reason—something of which there is no evidence. Moreover, the assumption that some rational principle is embedded in a practice which may be no more than an anachronistic remnant of legal history is hardly deserving of uncritical acceptance.

We therefore see no basis for finding in the complex accounting cases a rationale, policy, or "implicit belief" that complex and difficult questions of fact, whether of liability or of damages, must be decided by judges rather than juries.

### 4. Treble Damages and Juries

Earlier in this opinion, we noted that the complex accounting cases were within the concurrent jurisdiction of equity, *i. e.,* they were cognizable at law but could, for some reason, also be brought in equity. *See* pp. 907–911, *supra.* There were many other instances in which, for reasons other than complexity, rights and remedies normally "legal" could be determined in equity. For example, compensatory damages could be awarded in equity as "incidental" in suits seeking specific performance for breach of a contract to convey land, or actions for injunctions against copyright infringement. *See* F. James & G. Hazard, Civil Procedure § 8.7, at 370–372 (1977). And the "general understanding" prior to merger was that "equity could properly resolve corporate claims of any kind [including normally 'legal' claims] without a jury when properly pleaded in derivative suits complying with the equity rules." *Ross v. Bernhard,* 396 U.S. 531, 536–37, 90 S.Ct. 733, 737, 24 L.Ed.2d 729 (1970).

But there were certain kinds of claims which were exclusively legal and could never be the subject of an action in equity. *Scott v. Neely,* 140 U.S. 106, 109–111, 117, 11 S.Ct. 712, 716, 35 L.Ed. 358 (1891) (court of equity has no jurisdiction in a suit where "a claim properly cognizable only at law is united in the same pleadings with a claim for equitable relief.") *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 470–72, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Claims for treble damages—the relief sought by the plaintiffs in this suit—have traditionally been among those "properly cognizable only at law:"

> The right to recover penal damages still remains a right enforceable only in a common-law action. Courts of equity do not award as incidental relief damages penal in character without express statutory [authorization], as has frequently been held in copyright and patent cases.

*Decorative Stone Co. v. Building Trades Council,* 23 F.2d 426, 427–28 (2d Cir.) *cert. denied,* 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005 (1928). *See Fleitmann v. Welsbach*

---

49. It is noteworthy that in the case before us the alleged complexity is in the determination of liability, not damages.

*Street Lighting Co.,* 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916); 5 Moore's Federal Practice ¶¶ 38.19[2] & 38.37[2], at 171, 308–308.3 (2d ed. 1978). Thus, even if the exercise of equity jurisdiction over complex legal claims were not limited to matters of account, it would still not extend to this case because of the exclusively legal nature of the relief sought.[50]

D. *The Historical Test and Complexity After Ross v. Bernhard*

1. *Ross and Recent Decisions Striking Jury Demands*

In *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Court continued the expansion of the right to jury trial begun in *Beacon Theatres* and *Dairy Queen.* The issue decided in *Ross* was the one that left the plaintiff in *Fleitmann* without a remedy—the presentation of a "legal" claim in a shareholders derivative action, previously cognizable only in equity.[51] The Court held that the merger of law and equity had removed the procedural barriers to the trial of such claims by jury; derivative actions were thereafter to be viewed as having a "dual nature." The Court held that the purely equitable question of the right of the shareholders to proceed on behalf of the corporation was to be determined by the court, and that the corporation's underlying claims could then be tried by the appropriate method—by the court if "equitable," and by a jury if "legal." In order to reach this result, the Court drew from *Beacon Theatres* and *Dairy Queen* the lesson that

> where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims. The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action.

396 U.S., at 537–38, 90 S.Ct. at 738.[52] It then added the following footnote:

> As our cases indicate, the "legal" nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and *third, the practical abilities and limitations of juries.* Of these factors, the first, requiring extensive and possibly abstruse historical inquiry, is obviously the most difficult to apply. See James, Right to a Jury Trial in Civil Actions, 72 Yale L.J. 655 (1963).

*Id.* at 538, n. 10, 90 S.Ct. at 738 (dictum) (emphasis added). Since *Ross,* several courts have struck jury demands on the authority of this dictum, which has been described by one commentator as "a suggestion of infidelity to the [historical] test."

---

**50.** The defendants' claim of an absolute right to a non-jury trial in this litigation must be based upon the unarticulated premise that matters deemed too complex for juries were within the *exclusive* jurisdiction of equity, much as derivative actions were cognizable only in equity. But, had defendants been able to establish this premise, the exclusively legal nature of treble damages would create a potential conflict of rights in every complex antitrust case not unlike the conflict that left the plaintiff in the *Fleitmann* case without a remedy. *See* n. 19, *supra.* However, the refusal of the law courts to entertain derivative suits was a mere "procedural impediment" to the trial by jury of legal claims presented in such suits, a problem eliminated by merger. *See Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). The conflict of rights which the defendants here seek to create would admit of no solution unless one of the rights is preferred, or all parties agree on the mode of trial.

**51.** The plaintiffs in *Ross* were shareholders in a closed-end investment company, which they claimed had paid excessive brokerage fees because of improper control by its broker. The plaintiffs alleged breach of the contract between the investment company and its broker; they accused the directors of breach of fiduciary duty, conversion of corporate assets, bad faith, gross negligence, and misconduct. The suit sought to require that the defendants, including the brokerage house, "account for and pay to the Corporation . . . their profits and gains and its losses." 396 U.S. at 531–32, 90 S.Ct. at 734.

**52.** Because there were no factual questions common to both issues in *Ross,* the principles of *Beacon Theatres* were not offended by resolving the equitable issue first.

Wolfram, *The Constitutional History of the Seventh Amendment,* 57 Minn.L.Rev. 639, 643 (1973).

The first was *Hyde Properties v. McCoy,* 507 F.2d 301 (6th Cir. 1974), an interpleader action instituted by the purchaser of a building to resolve conflicting claims to the amount it owed on the notes issued in payment for the building. The building had been purchased from a corporation (IHPT) which then used the notes to redeem the shares held by McCoy, a principal stockholder. "The United States maintained that the redemption of McCoy's stock with the notes was a fraudulent conveyance as to it as a tax lien creditor. McCoy contended that the transfer was a legal redemption of the stock by a solvent corporation." *Id.,* at 304. A four-day jury trial [53] followed the district judge's denial of the Government's motion to strike McCoy's jury demand, and, after the jury determined that the conveyance was not fraudulent, the court granted judgment n. o. v. for the Government. The court of appeals viewed the Seventh Amendment question as a "threshold issue . . . because it bears directly upon the district court's rulings subsequent to the verdict." *Id.*[54]

In order to determine whether the issues presented were "legal" or "equitable," the court looked to the *Ross* footnote as a three-part test, finding as to the first part that "[q]uestions involving fraud cannot be classified from custom as solely legal or solely equitable and, as a result, the nature of the remedy sought becomes considerably more important . . .. If a fraudulent conveyance action is brought to set aside a transfer, such a remedy is cognizable solely in equity." 507 F.2d at 305. After noting that the case was "hybrid" because both legal and equitable remedies were theoretically available, the court decided that "equitable relief was necessary for enforcement of the Government's claim." *Id.,* at 306.

Finally, the court considered the practical abilities of juries:

At trial the fraudulent conveyance issue depended upon the solvency or insolvency of IHPT at the time of or immediately after the transfer. The determination of this question involved conflicting issues of fact concerning accounting procedures used to list the assets and liabilities of the corporation. In its opinion, the district court acknowledged that "the issues between the parties were both complex and likely to be confusing in light of the underlying facts and circumstances. . . ." We agree with this observation and consequently find as to the third factor that a jury is not especially well-qualified to dispose of such issues and that a non-jury trial of the issues is both more efficient and more likely to produce a just result.

It then concluded that "there is no constitutional right to a jury trial in an interpleader action when the creditor is proceeding against the fund and seeking to annul the conveyance to the transferee." *Id.*

The court's view that non-jury trials in such cases are "more efficient and more likely to produce a just result," though contributing to the court's holding, does not appear to have been a major ground for it. The court seemed instead to rely largely on the need for equitable relief; [55] certainly its

---

53. Letter from Ronald Lee Gilman, Esquire to Judge Edward R. Becker (March 2, 1979), filed of record. Mr. Gilman, who represented McCoy, was kind enough to furnish this information at our request.

54. Had McCoy been entitled to a jury trial, the court of appeals could have affirmed the judgment n. o. v. only if there was insufficient evidence to support the jury's verdict. *See Upton v. Western Ins. Co.,* 492 F.2d 148 (6th Cir. 1974); *DeGarmo v. City of Alcoa,* 332 F.2d 403 (6th Cir. 1964). Since the court of appeals determined that McCoy was not entitled to a

jury, the trial court's findings of fact on the fraudulent conveyance issue were reviewed under the "clearly erroneous" standard applicable after a bench trial.

55. The court may also have been influenced by the fact that interpleader, like the derivative action, had been a remedial device belonging to equity alone, although it interpreted *Ross* as requiring that in interpleader suits, as in derivative actions, the legal or equitable nature of the underlying issues was to determine the Seventh Amendment question.

924

opinion cannot be read as holding that complexity alone is sufficient to make "equitable" an otherwise "legal" issue. Similarly, in *SEC v. Associated Minerals, Inc.,* 75 F.R.D. 724, 725–26 (E.D.Mich.1977), the court struck a jury demand after finding that the claims presented and remedies sought were equitable, adding that "to the extent that a jury's ability to properly decide an action may be relevant . . . the issues of fraud and noncompliance with the registration provisions of the securities laws . . . are indeed complex and for this reason are not especially suited by resolution for a jury." However, several other courts have struck jury demands on the *sole* ground of size and complexity in cases that would traditionally have been viewed as purely "legal."

The first of these decisions was *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99 (W.D.Wash.1976), a securities fraud litigation growing out of two corporate acquisitions in which the plaintiffs had received Boise Cascade stock shortly before write-downs of corporate assets caused the stock to lose more than 80% of its value. Although recognizing that there was no apparent authority for the third part of the *Ross* footnote, the court found it to be "of constitutional dimensions. It must be seen as a limitation to or interpretation of the Seventh Amendment." *Id.* at 105. After a review of the complex issues involved in the case convinced the court that "it would be more capable of fairly deciding the facts" than a jury, the plaintiffs' jury demands were struck to preserve both "the appearance and fact of fairness." *Id.*[56]

The following year, jury demands were struck by the court *sua sponte* in *In re U. S. Financial Securities Litigation,* 75 F.R.D. 702 (S.D.Cal.1977) *appeal pending,* # 77–8213 (9th Cir. Aug. 29, 1977). The litigation

comprised eighteen separate actions, consolidated for pretrial purposes by the Judicial Panel on Multidistrict Litigation. Five plaintiff classes had been certified; they asserted various securities law claims against "20 or so individual defendants and . . . 80-odd corporate or partnership defendants." *Id.,* at 706. The court's review of the scope of pretrial discovery and the probable extent of the trial reveals a litigation whose magnitude is comparable in many ways to that of the case now before us. *See id.,* at 706–708, 711–714. After reviewing many of the cases discussed above, including the accounting cases, *id.,* at 708–11, the court distilled the following:

general guidelines . . . for deciding whether a particular case is so complex that equity jurisdiction will attach and permit the case to be tried without a jury.

First, although mere complexity is not enough, complicated accounting problems are not generally amenable to jury resolution. Although such problems often arise only during the damages portion of a trial, they sometimes are present during the liability portion as well. Also, given the comments in *Dairy Queen* regarding special masters, only a case in which such a special master could not assist the jury meaningfully may be subject to removal from the province of the jury because of complex accounts.

Second, the jury members must be capable of understanding and of dealing rationally with the issues of the case.

And third, an unusually long trial may make extraordinary demands upon a jury which would make it difficult for the jurors to function effectively throughout the trial.

**56.** The court's analysis of the third *Ross* factor emphasized the centrality of "an impartial and capable fact finder" to the fairness which, under the due process clauses of the Fifth and Fourteenth Amendments, measures "the legitimacy of government action. . . ." 420 F.Supp., at 104. The court then considered the need to excuse employed persons from the jury because of an estimated trial time of four to six

months, the possibility that evidence of settlement of other litigation against the defendant would prejudice the jury, and the advantages enjoyed by the court as fact finder, including experience in other commercial cases, familiarity with the case from the pretrial proceedings, the ability to review daily transcripts, etc. Id., at 103, 104–05.

*Id.* at 711. Because the court found that all three of its guidelines militated against a jury trial, it determined to try the cases without a jury. The only factors considered were size and complexity; the court did not discuss the otherwise legal or equitable nature of the claims made and the remedies sought.

The next decision striking a jury on the authority of *Ross* was *Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59 (S.D.N.Y. 1978), a class action asserting antitrust claims on behalf of the composers and lyricists who have written for television and motion pictures. As in the *U. S. Financial* litigation, the question of a jury's ability to handle the case was raised by the court *sua sponte.*

The court in *Bernstein* regarded the *Ross* footnote as announcing "a three-fold test to determine the 'legal nature of an issue'." It recognized that "[t]he third prong of this test is devoid of cited authority and has been regarded by some as a departure, perhaps unintentional, from former law," but thoughtfully related the practical abilities of juries to the "remedy sought," since "the adequacy of the legal remedy necessarily involves the adequacy of the jury and its competency to find the facts," and concluded after review of many of the cases discussed above that consideration of the practical abilities of juries "[f]ar from being an innovation . . . is actually the re-

statement of . . . traditional equity powers." *Id.*, at 66–67.[57]

In applying the *Ross* test, the *Bernstein* court determined that the pre-merger custom in antitrust cases was to require jury trials, and that the demands for declaratory relief and treble damages were "clearly not equitable," [58] but that the estimated trial time of more than four months would make it impossible to empanel a representative jury. Moreover, the court found that "the sheer size of the litigation and the complexity of the relationships among the parties render it *as a whole* beyond the ability and competence of any jury to understand and decide with rationality." *Id.*, at 66–67, 70. Thus, the order striking the plaintiffs' jury demand was based entirely on the "third prong" of the *Ross* "test."

*The most recent decision striking a jury* demand on the authority of *Ross v. Bernhard* is *ILC Peripherals Leasing Corp. v. I. B. M. Corp.*, 458 F.Supp. 423, 445–449 (N.D. Cal.1978), a treble damage antitrust case. Evaluating the case in the terms of the *Ross* dictum, the court found that both the premerger custom and the remedy sought were traditionally legal, but that "the third factor of the equation, the practical abilities and limitations of jurors, . . . causes the court to conclude that the issues in this case must be considered to be equitable." *Id.* at 445.[59]

**57.** The cases considered by the court in reaching this conclusion included the *Clench* and *Wedderburn* cases discussed above at 49–55, and several of the complex accounting cases discussed above at 33–40.

**58.** The court rejected the defendants' suggestion that the damages be characterized as equitable restitution. The plaintiffs also sought injunctive relief, but it is of course well settled that the joinder of legal and equitable claims does not waive the right to a jury on the legal claims, including any common issues. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

**59.** In *ILC* Judge Conti had denied a pretrial motion to strike the jury demand on the ground of complexity. The trial took 96 days but ended in a mistrial, declared when the jury was deadlocked after 19 days of deliberations. Judge Conti then directed a verdict for the

defendants, and struck the jury demand in the event that a remand necessitated a second trial.

In finding that the case was beyond the abilities of jurors, Judge Conti relied heavily on his own observations during trial:

The jurors were conscientious and diligent, but their past experience had not prepared them to decide a case involving technical and financial questions of the highest order.

Throughout the trial, the court felt that the jury was having trouble grasping the concepts that were being discussed by the expert witnesses, most of whom had doctorate degrees in their specialities. This perception was confirmed when the court questioned the jurors during the course of their deliberations and after they were discharged. When asked by the court whether a case of this type should be tried to a jury, the foreman of the jury said, "If you can find a jury that's both a computer technician, a lawyer, an economist, knows all about that stuff, yes, I think you

Many other courts have also indicated that Seventh Amendment questions are to be determined by applying the three factors identified in the *Ross* dictum. *See, e. g., Pons v. Lorillard,* 549 F.2d 950, 953 (4th Cir. 1977) ("the three-pronged classical test"), *aff'd on other grounds,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); *Minnis v. UAW,* 531 F.2d 850, 852–53 (8th Cir. 1975); *Farmer-Peoples Bank v. United States,* 477 F.2d 752 (6th Cir. 1973); *Dawson v. Contractors Transport Corp.,* 151 U.S.App.D.C. 401, 405, 467 F.2d 727, 731 (1972); *id.,* 151 U.S.App.D.C. at 410, 414, 467 F.2d at 736, 740 (Fahy, J., dissenting); *Fellows v. Medford Corp.,* 431 F.Supp. 199, 201–02 (D.Or. 1977); *Polstorff v. Fletcher,* 430 F.Supp. 592, 593–94 (N.D.Ala.1977); *General Tire & Rubber Co. v. Watson-Bowman Associates,* 74 F.R.D. 139, 140–142 (D.Del.1977); *Jones v. Orenstein,* 73 F.R.D. 604, 606 (S.D.N.Y. 1977); *Marshall v. Electric Hose & Rubber Co.,* 413 F.Supp. 663, 667 (D.Del.1976); *Cayman Music, Ltd. v. Reichenberger,* 403 F.Supp. 794, 796–97 (W.D.Wis.1975); *Cleverly v. Western Electric Co.,* 69 F.R.D. 348, 350–52 (W.D.Mo.1975); *Rowan v. Howard Sober, Inc.,* 384 F.Supp. 1121, 1124–25 (E.D. Mich.1974); *VanErmen v. Schmidt,* 374 F.Supp. 1070, 1074–75 (W.D.Wis.1974); *Chilton v. National Cash Register Co.,* 370 F.Supp. 660, 662–65 (S.D.Ohio 1974); *Richards v. Smoltich,* 359 F.Supp. 9 (N.D.Ill. 1973). *Cf. Rogers v. Loether,* 467 F.2d 1110, 1118 (7th Cir. 1972) (alternative ground for holding), *aff'd on other grounds sub nom Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).

█ Not all the lower federal courts have used *Ross* as the definitive Seventh Amendment test—the Second and Fourth Circuits, for example, have questioned the scope and validity of the *Ross* footnote. *See Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 225 & n. 25

(4th Cir. 1978); *United States v. J. B. Williams Company, Inc.,* 498 F.2d 414, 428–29 (2d Cir. 1974). *But see id.,* at 452–53 (Oakes, J., dissenting). And in a later Seventh Amendment decision, the Second Circuit ignored the *Ross* footnote entirely. *See SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90 (2d Cir. 1978). But in no decision of which we are aware has a court reached the conclusion that we reach here—that the *Ross* footnote may not be read as requiring or permitting the consideration of "the practical abilities and limitations of juries" in determining whether the constitutional right to trial by jury extends to matters committed by Congress or the common law to federal district courts.

We have reached this conclusion with great respect for, and mindful of the authority of, the many courts that have reached the opposite result. Our conclusion is based on three considerations: (1) the available evidence shows that the Supreme Court never intended that the *Ross* footnote be a "test" for Seventh Amendment questions; (2) the proposed "test" is unworkable; and (3) application of the *Ross* "test" in the manner proposed would be fundamentally inconsistent with the policies underlying the role of the jury in civil actions in the United States. Our reasoning will be set out in the balance of this opinion; because of the extensive authority to the contrary, we do so at somewhat greater length than is customary.

### 2. Construing Ross

### a. Jury Trial Decisions in the Supreme Court Since Ross

It would be at least unusual for the Supreme Court to announce a new rule of constitutional magnitude in dicta, in a footnote, and unsupported by any explanation or citation of authority.[60] The use of such

---

could have a qualified jury, but we don't know anything about that." (Tr. 19,548). Several of the other jurors indicated that they thought the major stumbling block was the requirement that the verdict be unanimous. When they were questioned after the trial, most of the jurors indicated that they

thought a complex antitrust case like this one should be tried to the court.
458 F.Supp., at 447–48.

**60.** Even the famous dictum in *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) did not go nearly as far as some have suggested for the *Ross* footnote. *See Regents of the University*

means to modify *sub silentio* a rule of constitutional interpretation that has been consistently followed for decades, if not centuries, would be even more unusual. As one commentator has written, "[T]he footnote is so cursory, conclusory and devoid of cited authority or reasoned analysis that it is difficult to believe it could have been intended to reject such established historical practice or Supreme Court precedent." Redish, *Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making,* 70 Nw.U.L.Rev. 486, 526 (1975). Thus, "absent a much clearer statement by the Supreme Court," *Skehan v. Board of Trustees,* 590 F.2d 470, 490 (3d Cir. 1978), to the effect that *Ross* authorized a departure from the historical test, we would most likely consider ourselves bound by the prior decisions of the Court approving the historical test.[61] But we need not decide on that basis, because the *Ross* dictum is not the most recent entry on the Court's Seventh Amendment slate. We think it very significant that, despite many opportunities to do so, the Court has never proclaimed or apparently recognized that the *Ross* footnote prescribed a test for the Seventh Amendment.

The *Ross* case itself is the first and best example of this. In *Ross,* the argument that the case was too complex for determination by a jury had been raised at every level. The district court found that the issues in the case were not too complicated for a jury, while the court of appeals expressed its doubts that juries were competent to try derivative suits "because of the exceedingly complex nature of many of these actions," but considered it irrelevant because "the Seventh Amendment does not ask that we assess the suitability of a given type of litigation for jury trial." *See Ross v. Bernhard,* 275 F.Supp. 569, 570 (S.D.N.Y. 1967), *rev'd on other grounds,* 403 F.2d 909, 915 (2d Cir. 1968), *rev'd on other grounds,*

396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Opposing the petition for certiorari, the respondents contended that the case was unsuitable for a jury because "a precise and obviously difficult measurement of claimed disadvantage" to the corporation would be required for "each of many thousands of transactions." Respondents' Brief in Opposition to Petition for Writ of Certiorari, at 6–7. The respondents argued that statements in *Kirby* and *Dairy Queen* described a general exception to the Seventh Amendment, and that *Ross* fell within it. *See* id.; Brief for Respondents, at 17–19.[62] The petitioners in *Ross* did not dispute the respondents' position that some cases were too complex for juries, but argued instead that their case was not the "rare case" referred to in *Dairy Queen. See* Brief for Petitioners at 18; Reply Brief for Petitioners at 10–12.

Thus, the arguments made by the defendants here were squarely presented to the Court in *Ross,* and the cryptic mention in footnote 10 of "the practical abilities and limitations of juries" may possibly be explained by reference to these arguments. Yet, when the Court considered the claims asserted on behalf of the corporation in *Ross,* it determined that the claims were "at least in part . . . legal" without any evaluation or even mention of the ability of a jury to understand the issues:

> The relief sought is money damages. There are allegations in the complaint of a breach of fiduciary duty, but there are also allegations of ordinary breach of contract and gross negligence. The corporation, had it sued on its own behalf, would have been entitled to a jury's determination, at a minimum, of its damages against its broker under the brokerage contract and of its rights against its own directors because of their negligence.

*Ross v. Bernhard,* 396 U.S. 531, 542, 90 S.Ct. 733, 740, 24 L.Ed.2d 729 (1970). The omis-

---

of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 2748 n. 28, 57 L.Ed.2d 750 (1978).

**61.** In *Skehan,* the court of appeals was discussing the question whether *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662

(1974) had been overruled *sub silentio* by *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**62.** *See* pp. 907, 913–914 & n. 40, *supra.*

sion of any discussion of the jury's ability to deal with the complex issues presented in *Ross* implies strongly that the Court did not deem it relevant to the Seventh Amendment issue there.

The next case in which the Court could have applied the *Ross* "test" was *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), in which a unanimous Court decided that the Seventh Amendment required jury trials of actions brought under § 812 of the Civil Rights Act of 1968, 42 U.S.C. § 3612. It did not analyze the problem in the terms of the *Ross* footnote, but instead stated the rule to be that "[t]he Seventh Amendment . . . requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Id.,* at 194, 94 S.Ct. at 1008. The Court then found that trial by jury must be available because the action was analogous to common-law torts,[63] *id.,* at 195, 94 S.Ct. 1005, and because the "relief sought here—actual and punitive damages—is the traditional form of relief offered in the courts of law," *id.,* at 196, 94 S.Ct. at 1009.

The Supreme Court's omission of the *Ross* "test" from its discussion of the constitutional issue stands in marked contrast to the opinion of the court of appeals in that case. Expressing uncertainty about the "full implications" of *Ross,* the court of appeals had first determined that traditional Seventh Amendment analysis required trial by jury, and then independently considered the second and third criteria identified in the *Ross* footnote, determining that they, too, were consistent with a jury trial.

See *Rogers v. Loether,* 467 F.2d 1110, 1116–18 (7th Cir. 1972), *aff'd on other grounds sub nom. Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Thus, the Supreme Court's exclusive reliance on traditional Seventh Amendment analysis in *Curtis* represents at least a *sub silentio* rejection of the *Ross* footnote as the appropriate test. *Cf. Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 225 n. 25 (4th Cir. 1978) (questioning continued validity of *Ross* test in light of its omission from *Curtis* ).

Later the same term, the Court decided in *Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974), that the Seventh Amendment mandated trial by jury of actions under the District of Columbia's summary procedure for evictions. Again, the Court's decision was based on the historical test alone, without any reference at all to the *Ross* dictum. *Id.,* at 370–81, 94 S.Ct. 1723.[64] Moreover, in rejecting the analysis of the D. C. Court of Appeals as "fundamentally at odds with *the test we have formulated for resolving Seventh Amendment questions," id.,* at 374, 94 S.Ct. at 1729 (emphasis added), the Court described that "test" by quoting from the distinction between law and equity drawn in *Parsons v. Bedford,*[65] concluding that the Seventh Amendment "requires trial by jury in actions unheard of at common law, provided that the action involves rights and remedies of the sort traditionally enforced in an action at law, rather than in an action in equity or admiralty." *Id.,* at 374–75, 94 S.Ct. at 1729.

This view of the Seventh Amendment was reaffirmed by the Court in *Atlas Roofing Co., Inc. v. OSHRC,* 430 U.S. 442, 449,

**63.** Antitrust actions have similarly been held to sound in tort. *See, e. g., Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389, 392 n. 4 (5th Cir. 1976); *Tondas v. Amateur Hockey Ass'n.,* 438 F.Supp. 310, 315 (W.D.N.Y.1977); *Albert Levine Associates v. Bertoni & Cotti, S.p.A.,* 314 F.Supp. 169, 171 (S.D.N.Y.1970); *Fagan v. Sunbeam Lighting Co.,* 303 F.Supp. 356 (S.D.Ill. 1969).

**64.** One commentator draws the opposite inference from the failure of the *Curtis* and *Pernell* decisions to mention the *Ross* footnote, thinking it "unlikely . . . that the Court would

overturn so significant a decision without some comment." Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv.L.Rev. 898, 902 n. 28. But this argument *assumes* that the *Ross* footnote announced a significant constitutional doctrine, and is also based on the questionable premise that the Court had abandoned the historical test in favor of a "dynamic" interpretation of the Seventh Amendment. *See* note 39, *supra.*

**65.** *See* pp. 905–906, *supra.*

97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) and *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).[66] Moreover, in *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court has once again decided a Seventh Amendment issue by applying a historical test, without any mention of the abilities of jurors or the *Ross* dicta.[67] Thus, instead of using the *Ross* dicta as a test for Seventh Amendment questions, the Court's opinions during this decade have consistently reaffirmed the continuing validity of the historical test.

b. *Explanations of the Ross Footnote*

Because the Court's mention of the "practical abilities and limitations of juries" in *Ross* was without any citation of authority and unrelated to anything else in the opinion of the Court, there has been no small measure of speculation about its source. In *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59 (S.D.N.Y.1978), the court explained the "third prong" of the *Ross* test by relating it to the traditional availability of equity when the remedy at law is inadequate, since

> where the "remedy sought" necessarily involves determination of complexities that "only a court of equity can satisfactorily unravel," the "practical abilities and limitations of juries" are also necessarily involved and must be considered in evaluating the right to a jury trial. The adequacy of the legal remedy necessarily involves the jury and its competency to find the facts.

*Id.* at 66. And in *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 104 (W.D.Wash.1976), the court related the third part of the *Ross* dictum to concepts of fundamental fairness and due process. Scholars, too, have joined the debate. *Com-*

pare Wolfram, *supra* note 25, at 644–45 (a "fleeting expression . . . of infidelity to the centrality of the traditional historical test . . . [which] would suggest, for the first time, . . . an explicitly functional approach. . . .") *with* Note, *Congressional Provision for Nonjury Trial Under the Seventh Amendment,* 83 Yale L.J. 401, 411–12 (1973) (finding a "long and distinguished" lineage for the third part of the *Ross* test in the traditional resort to equity because of "procedural inadequacies" such as "rules against multifarious actions . . . or limited provisions for discovery. . . . One such failing (jury trial) has not been mitigated by merger.").

Our own research discloses two very limited circumstances in which functional aspects of jury trials have been considered by the Supreme Court in Seventh Amendment contexts and to which, therefore, the *Ross* dictum might refer, but neither supports the position of the defendants. One of these is the traditional availability of equity jurisdiction in complex accounting cases which was discussed in dicta in *Kirby* and *Dairy Queen* in terms of the difficulty of such matters for juries, *see* pp. 913–914 & n. 40, *supra,* even though the available evidence suggests that this consideration had little or no relation to the existence of that part of equity jurisdiction. *See* pp. 918–921, *supra.* As we have already noted, this argument was so fully presented to the Court in *Ross* that the mention of the limitations of juries in the footnote may be a reference to it, but could hardly be an endorsement. *Supra,* at 927–928.

The second circumstance, and the only one in which functional considerations have actually contributed to a *holding* that there is no jury trial right in certain cases, involves actions committed by Congress to

---

66. Although in *Pons* the Court described the parameters of the Seventh Amendment in terms of "legal relief . . . and legal rights," the holding of the Court was based on statutory grounds.

67. Because the "legal" or "equitable" nature of a claim was not an issue in *Parklane,* the Court's failure to use the *Ross* "test" does not

of itself vitiate the claim that the *Ross* footnote is the appropriate test for such issues. However, both the majority and dissenting opinions in *Parklane* clearly subscribed to the historical test. *Compare Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 652–55, 58 L.Ed.2d 552 (1979), *with* id., at 337–350, 99 S.Ct. at 655–61 (Rehnquist, J., dissenting).

special adjudicatory bodies as part of a statutory scheme. The rationale of *NLRB· v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) and *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) was explained by the Court in *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974):

> *Jones & Laughlin* . . . stands for the proposition that the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication [8]
>
>   [8] "[T]he concept of expertise on which the administrative agency rests is not consistent with the use by it of a jury as fact finder." L. Jaffe, Judicial Control of Administrative Action 90 (1965).
>
> and would substantially interfere with the NLRB's role in the statutory scheme. *Katchen v. Landy,* 382 U.S. 323, [86 S.Ct. 467, 15 L.Ed.2d 391], . . . is to like effect. There the Court upheld, over a Seventh Amendment challenge, the Bankruptcy Act's grant of summary jurisdiction to the bankruptcy court over the trustee's action to compel a claimant to surrender a voidable preference; the Court recognized that a bankruptcy court has been traditionally viewed as a court of equity, and that jury trials would "dismember" the statutory scheme of the Bankruptcy Act. *Id.,* at 339, 86 S.Ct., at 478. See also *Guthrie National Bank v. Guthrie,* 173 U.S. 528, 19 S.Ct. 513, 43 L.Ed. 796 (1899). These cases uphold congressional power to entrust enforcement of statutory rights to an administrative process or specialized court of equity free from the strictures of the Seventh Amendment. But when Congress provides for enforcement of statutory rights in an ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right, a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law.

*Id.,* at 194–95, 94 S.Ct. at 1008. *See Atlas Roofing Co. Inc. v. OSHRC,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Pernell v.* *Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974).

■ Significantly, Justice White, the author of the *Ross* opinion, had written for the Court in *Katchen v. Landy* just a few years earlier. It is therefore likely that the "practical abilities and limitations of juries" language of *Ross* refers to the established exception to the Seventh Amendment in administrative proceedings and specialized courts of equity. As Justice White has more recently written for the Court in another decision based on this principle: "[H]istory and our cases support the proposition that the right to a jury trial turns not solely on the nature of the issue to be resolved, but also on the forum in which it is to be resolved. . . . The Seventh Amendment prevents Congress from depriving a litigant of a jury trial in a "legal" action *before a tribunal customarily utilizing a jury as its factfinding arm . . ."* *Atlas Roofing Co., Inc. v. OSHRC,* 430 U.S. 442, 460–61 & n. 16, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) (emphasis added). This exception to the Seventh Amendment is obviously inapplicable in any action in a United States District Court.

Whether the *Ross* footnote referred to one or the other (or both) of these two possible limitations to the Seventh Amendment, it clearly did not purport to expand either exception beyond its narrow limits into a general "test" for the right to jury trial. These interpretations would provide a meaning for the footnote that does not reduce it to mere surplusage, but are consistent with the Court's continued adherence to the historical test. *See supra,* at 926–929. We think it clear, therefore, that the Court has never intended that the *Ross* footnote change the historical test. This judgment is buttressed by the problems that would attend any attempt to articulate standards governing the *Ross* "test," and by our perception of the policies underlying the Seventh Amendment. It is to these problems and policies that we now turn.

### 3. Problems Inherent in the Ross "Test"

We believe that the *Ross* footnote is also unsuitable for use as a test for Seventh Amendment issues because there is no satisfactory method for the consistent application of such a test.

#### a. The Case-by-Case Approach

In each of the decisions in which the right to jury trial has been denied on the sole ground of the size and complexity of the case, the test was applied on an *ad hoc* basis. The courts did not decide that all antitrust cases or class actions were beyond the ken of juries, but only that the particular actions before them were. *See ILC Peripherals Leasing Corporation v. IBM,* 458 F.Supp. 423, 448–49 (N.D.Cal.1978); *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 70 (S.D.N.Y.1978); *In re U. S. Financial Securities Litigation,* 75 F.R.D. 702, 712–14 (S.D.Cal.1977); *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 104–05 (W.D.Wash.1976).[68] Although none of these decisions considered the possibility of applying *Ross* on a "generic" basis, a case-by-case approach would seem to be required by the nature of the *Ross* "test."[69]

However, a case-by-case approach would be a major departure from the settled method of Seventh Amendment analysis used by the Supreme Court in its own decisions, both before and after *Ross.* In these decisions, the Court has either indicated or clearly assumed that they apply to all cases or claims of the same class. *See, e. g., Pernell v. Southall Realty,* 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974) (jury required in actions to recover real property in courts of general jurisdiction); *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (jury·trial guaranteed in all damage suits under 42 U.S.C. § 3612); *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (damage actions against corporate directors for negligence and breach of contract); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (actions on debts allegedly due under a contract or for damages for trademark infringement); *Whitehead v. Shattuck,* 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873 (1891) (suits to quiet title to real estate).[70]

Second, the standard of complexity is an extraordinarily difficult one to apply, even on a case-by-case basis. The problems of speculation about the abilities of a hypothetical jury and the complexities of the issues in the case would be compounded by the need to speculate about the degree to which partial settlements or summary judg-

---

**68.** The decision in the *Hyde Properties* case would seem to apply not only to the action then before the court, but to all such actions. However, as we have noted, the alleged difficulty of such· matters for juries did not seem to be important to the holding of the court. *See supra,* at 923.

**69.** In *Radial Lip Machine, Inc. v. International Carbide Corp.,* 76 F.R.D. 224 (N.D.Ill.1977), the court read *Ross* as "clearly [directing] federal courts to inquire into the competence of juries to handle different kinds of issues," *id.,* at 226, but considered and rejected the case-by-case approach:

The inquiry is a generic one, directed toward classifying a group of claims. Thus, the historical portion of the *Ross* test evaluates the entire line of judicial precedents to determine the traditional characterization of a particular claim. Once the court finds that the nature of an issue is basically legal, the right to a jury trial exists for that entire class of claims. The portion of the *Ross* test which weighs the practical abilities and limitations of juries contemplates a general analysis of the problems typically presented by those claims, not a specific case-by-case analysis of the complexity of the litigation. Otherwise, the courts would be forced to apply an unmanageable standard of complexity in every case before them.

*Id.,* at 227–28. While we agree with Judge Marshall that the case-by-case approach is unmanageable, it is difficult for us to see how the proposed "generic" inquiry is any less so. On what basis would the court find the relevant facts and decide that patent or tax or antitrust or securities issues are, as a class, too difficult for juries? Clearly, issues within each of these classes (or almost any other that might be named) range from the very simple to the very complex. The judgment that some generic class of issues is "too complex" for decision by jury is the type of judgment better made in the political or legislative process.

**70.** Actions seeking an accounting, maintainable in equity if sufficiently complicated, would seem to have been an exception to this general rule. *See supra,* at 923–924.

ments may simplify matters before a trial actually begins—or even in the midst of a trial.[71] And, because there is nothing in *Ross* to say *how* complex a case must be before a jury demand may be struck, it would likely be a long time before a consistent pattern of decision emerged.[72] A related problem is the absence of any guide to the relationship among the three factors identified in the *Ross* footnote.[73] We agree

**71.** In an attempt to avoid such speculation, a court may indicate, as the court did in *In re U. S. Financial Securities Litigation,* 75 F.R.D. 702, 714 (S.D.Cal.1977) that the jury demand will be reinstated if subsequent developments sufficiently simplify the case. This would give the party seeking trial by jury an incentive to settle part of the case in order to obtain a jury trial of the remainder. At the same time, the party opposing trial by jury is given a countervailing and similarly strong incentive *not* to settle even when he otherwise would, since by settling some of the claims he jeopardizes his newfound "right" to a non-jury trial of the remainder.

**72.** The line-drawing problems awaiting any attempt to apply the *Ross* test in a principled and consistent manner are obvious. *Compare, e. g., In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 105 (court would be "more capable of fairly deciding the facts"); *SEC v. Associated Minerals, Inc.,* 75 F.R.D. 724, 726 (E.D.Mich.1977) ("issues . . . are indeed complex and for this reason are not especially suited for resolution by a jury"); *with Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 70 (S.D.N.Y.1978) (matter is "beyond the ability and competence of any jury to understand and decide with rationality").

**73.** *See* Note, *Ross v. Bernhard: The Uncertain Future of the Seventh Amendment,* 81 Yale L.J. 112, 128–29 (1971). Decisions in which the Supreme Court has explicitly prescribed multipronged "tests" provide examples of the kinds of rules that there might be, and a contrast to the absence, in *Ross,* of any such rule defining the role of each "prong" in the test.

In *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Court enumerated the three factors relevant in determining whether a government program violates the establishment clause: "[T]o pass muster under the Establishment Clause the law in question first must reflect a clearly secular legislative purpose . . ., second, must have a primary effect that neither advances nor inhibits religion . . ., and, third, must avoid excessive government entanglement with religion . . ." Id., at 773, 93 S.Ct. at 2965. *Accord, e. g., Meek v. Pittenger,* 421 U.S. 349, 358, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Although this test does not set "the precise limits to the necessary constitutional inquiry," *Meek, supra,* 421 U.S. at 358–59, 95 S.Ct. 1753, *see id.,* at 373–74, 95 S.Ct.

1753 (Brennan, J., concurring and dissenting), the language used by the Court makes clear that a law or government program which fails *any* of these three "prongs" is invalid.

A different type of rule was used in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). There the Court held that the question of deprivation of the Sixth Amendment right to a speedy trial was to be determined by balancing four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id., at 530, 92 S.Ct. at 2192. Because the test prescribed is a "balancing" test, "none of the four factors identified above [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." Id., at 533, 92 S.Ct. at 2193.

A third type of test prescribes one or more factors which are normally dispositive, and one or more others to be used only if the first level of the test yields no result. Examples of this type are rules permitting the presiding officer in a legislative body to vote only to break a tie and rules in athletic leagues for determining which team is "champion" when the won-lost records produce a tie for first place. Some tests of this sort prescribe a factor or set of factors (themselves to be ordered by some rule) which are sufficient but not necessary for membership in a given category. Examples are the rules for *per se* antitrust violations and the SEC's "safe harbor" rules. There are doubtless other types of rules as well, and endless variations and combinations of the types described here.

The courts in the *Boise Cascade, U. S. Financial, Bernstein,* and *ILC* cases struck the jury demands on the strength of the third factor listed in the *Ross* dictum, without regard to the other two. Although this approach could be consistent with any of the three types of tests just described, it probably indicates an assumption that the test was like the test in *Nyquist* —that the "equitable" nature of *any* of the factors was sufficient to mandate a non-jury trial. But such an assumption is without support in *Ross* itself, and seems to fly in the face of *Fleitmann,* which held that a defendant may not be deprived of his right to a jury determination of treble damage claims in spite of the "equitable" nature of derivative actions.

At least one court seems to regard the *Ross* dictum as prescribing a kind of balancing test. *See Radial Lip Machine, Inc. v. International Carbide Corp.,* 76 F.R.D. 224, 227 (N.D.Ill.1977) ("The three *Ross* criteria are guides for deter-

with Judge Marshall that "[t]he likely result [of a case-by-case application of *Ross*] would be a dilution of the right to a jury trial," *Radial Lip Machine, Inc., supra,* 76 F.R.D. at 228, and with Wolfram's observation that the *Ross* footnote raises "the spectre of federal judges using a disturbingly broad discretion in their determination of whether a jury ought to be interposed in particular cases." *Wolfram, supra,* 57 Minn.L.Rev. at 644.

Third, recognition of the possible validity of motions to strike jury demands on the grounds of complexity would impose yet one more burden on courts managing "big" cases. There would doubtless be motions to dispense with juries in most or all of these cases, and the motion could serve as a dilatory tactic, with potential interlocutory appeals adding to the delay.[74]

### b. *The Whole-case Approach*

While the relationship between size and complexity has led courts to apply the *Ross* "test" to each case as a whole, *see ILC Peripherals Leasing Corp. v. IBM,* 458 F.Supp. 423, 448 (N.D.Cal.1978); *Bernstein*

*v. Universal Pictures, Inc.,* 79 F.R.D. 59, 70 (S.D.N.Y.1978); *In re U. S. Financial Securities Litigation,* 75 F.R.D. 702, 714 (S.D. Cal.1977); *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 103–05 (W.D. Wash.1976),[75] *Ross* itself—in the very sentence explained by footnote ten—emphasizes that "[t]he Seventh Amendment question depends on *the nature of the issue to be tried* rather than the character of the overall action." 396 U.S. at 538, 90 S.Ct. at 738 (emphasis added). The "nature of the issue" test, as it developed in *Beacon Theatres, Dairy Queen,* and *Ross,* was a response to the jury trial problems created by the merger of law and equity,[76] and represents an expression of the "federal policy favoring jury trials . . . of historic and continuing strength." *Simler v. Connor,* 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963). It now comprises at least two similar but distinct propositions.

First, the jury trial right may not be sacrificed merely because a "legal" issue comes into Court wearing the "equitable" procedural clothing of a class action, a de-

---

mining whether a claim typically has a sufficient quantum of legal elements so that it must be tried to a jury."). But a balancing approach to these Seventh Amendment questions is also without warrant in *Ross* or in other cases and, at least as an approach to an entire case, has been rejected by the modern cases.

The relation of the third *Ross* factor to the other two (and of the first two to each other) may, of course, be determined by reference to history. But to do so is to jettison any claim that the *Ross* footnote authorizes a departure from the historical test. And, as we have already determined, the history of jury practice and of Seventh Amendment adjudication provide no support for the deprivation of the jury trial right in all cases deemed "too difficult" for juries.

**74.** *Cf. Community Broadcasting of Boston v. FCC,* 178 U.S.App.D.C. 256, 261, 546 F.2d 1022, 1027 (1976) ("A rule allowing interlocutory appeals [from orders denying motions to disqualify counsel on ethical grounds] would provide litigants with yet another device by which to delay final determination on the merits, and would lead the court to divert its attention from the central issues in the case."); *Melamed v. ITT Continental Baking Co.,* 592 F.2d 290 (6th Cir. 1979). In spite of the potential for abuse, interlocutory review may be desirable because of the importance of jury trial and the likeli-

hood that erroneous decisions to strike juries would necessitate retrials. We note that the courts in the *Boise Cascade, U. S. Financial,* and *Bernstein* cases certified their orders for interlocutory review pursuant to 28 U.S.C. § 1292(b). Should a trial court decline such certification in an effort to move the case along, "the right to grant mandamus to require jury trial where it has been improperly denied is settled." *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 511, 79 S.Ct. 948, 957, 3 L.Ed.2d 988 (1959).

**75.** In *Hyde Properties v. McCoy,* 507 F.2d 301 (6th Cir. 1974), the jury demand was struck after trial, and only as to certain issues deemed equitable by the court of appeals; the jury's verdict on a breach of contract issue was not challenged. The court recognized the need to deal separately with the legal and equitable issues presented in a single case. Id., at 303, n. 1. Because the jury demand in *Hyde* was struck after trial—and because the trial lasted only four days—the court was not as concerned with the size of the litigation and the length of trial as were the courts in *ILC, Bernstein, U. S. Financial,* and *Boise Cascade.*

**76.** *See* pp. 911–913, *supra.*

rivative action, or an interpleader, even though jury trials were not available in such actions before a merger. *Ross v. Bernhard,* 396 U.S. at 540–42 & n. 15, 90 S.Ct. 733.

Second, because the federal rules permit—and require—the joinder of legal and equitable claims in a single civil action, the right to jury trial on the legal claims may not be compromised by characterizing the case as "basically equitable," by characterizing the legal claims as "incidental" to the equitable ones, or by trying factual issues common to both legal and equitable claims to the court. *Beacon Theatres, supra,* 359 U.S. at 507–511, 79 S.Ct. 948; *Dairy Queen, supra,* 369 U.S. at 471–473, 82 S.Ct. 894; *Ross, supra,* 396 U.S. at 537–38, 90 S.Ct. 733.[77] Thus,

> [c]omplex lawsuits with multiple claims and parties must be broken down into their constituent parts. If any legal cause is apparent, the right to a jury trial exists. The presence of a maze of other equitable claims in the litigation cannot obliterate defendants' right to a jury.

*Radial Lip Machine, Inc. v. International Carbide Corp.,* 76 F.R.D. 224, 228 (N.D.Ill. 1977). The use of the *Ross* footnote as a test would therefore place on the party seeking a non-jury trial the burden of showing that *each* otherwise legal claim or issue

in the case was too complex for a jury, with the right to jury trial, including the preclusive effect of the jury's findings on any common issues of fact, preserved for all issues as to which that burden is not met. The defendants here have made no attempt to meet such a burden.

4. *Public Policy and the Seventh Amendment: The Role of the American Jury*

The argument that the administration of justice would be improved by the elimination of juries in some or all civil litigation is hardly new, although it seems to have gained additional impetus in recent years.[78] However, this argument is based on a number of premises that should not be accepted without critical examination.

a. *The Competence of the Jury as Finder of Fact*

First, those who would dispense with juries in complex cases overlook the fact that the alternative to a lay jury is a lay judge.[79] We agree with Judge Patrick Higginbotham, who has written: "Apart from the occasional situation in which a judge possesses unique training . . . the assumption that a jury collectively has less ability to comprehend complex material than does a single judge is an unjustified conclusion." P. Higginbotham, *Continuing*

---

77. The Court in *Beacon Theatres* did indicate that "only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, . . . the right to a jury trial of legal issues [might] be lost through prior determination of equitable claims." 359 U.S. at 510–11, 79 S.Ct. at 957. Such circumstances have since arisen, if at all, only in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (defendant in private damage suit may be estopped from relitigating before jury issues adversely determined in prior SEC injunction action, where no jury was available), and *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (Bankruptcy Court in summary proceeding may order creditor to surrender voidable preference before considering creditor's claim, even though if the creditor had filed no claim, preference could be recovered by trustee only in an action where the creditor would have a right to jury trial).

78. *See, e. g.,* Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv.L.Rev. 898 (1979); Note, *Congressional Provision for Non-jury Trial under the Seventh Amendment,* 83 Yale L.J. 401 (1973); Comment, *The Right to an Incompetent Jury: Protracted Commercial Litigation and the Seventh Amendment,* 10 Conn.L.Rev. 775 (1978).

79. Matters requiring decision by an expert fact-finder may, within certain limits, be committed by Congress to an administrative agency or specialized court. *See, e. g., Atlas Roofing Co. v. OSHRC,* 430 U.S. 442, 461 & n. 16, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Pernell v. Southall Realty Co.,* 416 U.S. 363, 383, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974). But in a United States District Court, experts are available only as witnesses or special masters. *See* Rule 53, Fed.R.Civ.P.; Rule 706, Fed.R.Ev.

*the Dialogue: Civil Juries and the Allocation of Judicial Power,* 56 Tex.L.Rev. 47, 53 (1977).[80] Trial lawyers and judges—and we are no exception—often ponder the question whether judges are superior to juries in arriving at the truth in complex or technical cases. After eight and a half years on the bench, we remain convinced that judges are not. Our view is that a jury, applying its collective wisdom, judgment and common sense to the facts of a case (in the light of proper instructions on the law) is brighter, more astute, and more perceptive than a single judge, even in a complex or technical case; at least it is not less so.

The foreperson of Judge Conti's jury in the *ILC* case, *see* n. 59, *supra,* responded to the court's questioning with the view that "a jury that's both a computer technician, a lawyer, [and] an economist" would be qualified to try that case. But no judge is all of these, and one is more likely to find a computer technician or an economist on a jury than on the bench. Complex and technical cases, no less than other cases, require judgments on the credibility of witnesses and inferences to be drawn from facts. These are the tasks at which jurors, interacting with other jurors in the crucible of trial, particularly excel.

We also note our dissent from the proposition that a jury trial in a complex matter must necessarily yield an irrational verdict because of the cumbersomeness of presenting an enormous mass of evidence to a lay jury. A strong argument can be made that the presence of a jury actually disciplines and improves the factfinding process by imposing on both court and counsel the obligation to streamline, clarify, and teach. Judge Patrick Higginbotham puts it well:

> Both the "technical" case and the "big" case arguments overlook an enormously valuable contribution made by the presence of a jury. The process of distilling complex material into a comprehensible form operates less effectively in bench trials than in jury trials. Although the

rules of evidence purport to discipline an advocate's presentation, they are generally only loosely followed in bench trials, on the assumption that the trial judge will consider only admissible evidence. I have found that as counsel drop their evidentiary antennae they also tend to lose their sensitivity to questions of relevance; correspondingly, the marshaling of proof so essential to clarity suffers. Trial to a jury imposes a fierce discipline on the advocates. The virtue of forcing counsel to organize a complex mass of information into a form understandable by the uninitiated is that counsel ultimately must understand the issues and evidence in the case well enough to teach. If counsel cannot comprehensibly present their case to lay persons, is it likely that counsel do, in fact, understand the case? One need only view how trials of complicated matters are conducted by able counsel to appreciate the powerful contribution that the presence of a jury makes to clarity of argumentation. The jury's presence not only encourages the clear presentation of facts during a trial, but the process of drafting the charge also contributes to the clarification of the controlling legal issues. When properly designed and freed of obscure "legalese," the charge enhances understanding by the court and counsel, as well as by the jury.

Higginbotham, *supra,* at 54.

While not essential to our decision in view of our Seventh Amendment analysis, it is appropriate, we believe, to relate the foregoing general discussion to the trial of this case.

At the heart of both the plaintiffs' claims and the defendants' counterclaims are allegations of conspiracy and predatory intent. These allegations, if legally sufficient, will call for just the kind of judgments of fact that are traditionally within a jury's competence and for which a jury's unique abilities

---

80. Judge Higginbotham also demonstrates that the abandonment of the civil jury in England, widely believed to be a recognition of its inefficiency, actually resulted from manpower short-ages during the two World Wars, and the inertial failure to do anything to resume the use of juries once the manpower shortages had ended. 56 Tex.L.Rev. at 50–52.

are especially valued.[81] Moreover, we believe that with proper and frequent judicial guidance (we contemplate a preliminary charge and periodic interim charges on the law) as well as thoughtful organization of evidentiary presentation by counsel, the jury will be able to understand and deal intelligently with all the facts and issues.[82]

81. We do not intend by this reference to intimate a view on the issues raised by defendants' motion for summary judgment in which it is alleged that the predatory intent question must now be decided in favor of defendants as a matter of law on the developed record.

82. The need for improved techniques in managing jury trials of complex antitrust litigation has recently received attention from a Presidential Commission, and we note with interest their suggestions:

> Even if the role of juries in some antitrust cases is limited, juries will continue to try many antitrust cases, including some that cannot be considered simple, and a number of innovative techniques can help juries understand those cases better. It has proved useful for courts to instruct the jury on the relevant legal issues at the beginning of trial as well as at the end. It may also be useful for courts to refresh juries on the factual and legal relationships of the different parts of the trial, such as evidence and argument on the "relevant" market. Counsel may assist the jury's early understanding of the case by giving more comprehensive and focused opening statements. If the case is to be submitted on interrogatories, a preliminary set of interrogatories may be given to the jury at the start of the trial. These procedures collectively should facilitate the jury's understanding and assessment of the evidence presented.
>
> The parties might provide the jurors with a binder containing important exhibits. During trial, the expanded use of visual aids may contribute to ready comprehension. Jurors may be permitted to take notes during trial and the exhibits, trial transcript (if ready), and jury instructions can be made available in the jury room during deliberations. Counsel should also evaluate the utility of preparing summaries of the evidence for the jury's use.

Report to the President and the Attorney General of the National Commission for the Review of Antitrust Laws and Procedures 107 (1979) (footnote omitted).

83. This due process argument was the basis for the decision in *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 104 (W.D.Wash. 1976), in which the court specifically related the *Ross* footnote's mention of "the practical

The foregoing observations demonstrate why we reject as plainly lacking in merit the defendants' suggestion that the extraordinary complexity of this matter would make a trial by jury fundamentally unfair, thereby denying them the due process of law guaranteed by the Fifth Amendment,[83] and the related argument that, in

abilities and limitations of juries" to considerations of fairness and due process.

As part of their "due process" argument, the defendants contend that the anticipated length of the trial makes it impossible to obtain a fair trial by jury: Because business people and professionals would have to be excused for cause pursuant to 28 U.S.C. § 1866(c), "the jury that is impaneled . . . will not be representative of the community . . . and will not have on it persons best able to cope with the issues." *See ILC Peripherals Leasing Corp. v. IBM,* 458 F.Supp. 423, 448 (N.D.Cal.1978); *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 69–70 (S.D.N.Y.1978); *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99, 104 (W.D. Wash.1976); Comment, *The Right to an Incompetent Jury: Protracted Commercial Litigation and the Seventh Amendment,* 10 Conn.L.Rev. 775 (1978). The student Comment presents a statistical analysis of the jury selection process in *SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983 (D.Conn.1978), showing that excuses for cause and peremptory challenges eliminated disproportionate numbers of prospective jurors who were employed in technical or managerial fields, who were male, or who had attended college.

It may well be that factors of "undue hardship or extreme inconvenience," 28 U.S.C. § 1866(c), will persuade the court to excuse many business executives and professionals, but this certainly does not mean that the defendants will be forced to submit their case to a jury selected from society's incompetents and misfits.

Moreover, the factors justifying excuse from jury service will have to be reassessed in light of the Jury System Improvements Act of 1978, P.L. 95–572, 92 Stat. 2453 (1978). Congress recognized that economic hardship to jurors threatened the statutory policy of providing to all litigants the right to juries "selected at random from a fair cross-section of the community in that judicial district," and sought in the 1978 Act to correct that problem. H.R.Rep.No.95–1652, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, pp. 5477, 5479. The Act increases jurors' compensation to $30 per day for the first thirty days of service and $35 per day thereafter, and also increases travel allowances. The Act also protects employees from intimidation, coercion, or discharge as a result of their jury service, and guarantees

complex litigation, a right to trial by jury would carry with it the "right to an irrational verdict." Juries—like judges—may sometimes render irrational verdicts, but in such an event the court serves as a check on the power of the jury. It is well settled that the court may direct a verdict without infringing the constitutional right to trial by jury. *See Galloway v. United States,* 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943). The standard for directed verdicts in this circuit has been expressed as follows:

> [W]e must examine the record in a light most favorable to the [party against whom the verdict is to be directed], and review the specific evidence in the record and all inferences reasonably capable of being drawn therefrom. We must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a

jury might reasonably afford relief. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Lebrecht v. Bethlehem Steel Corp.,* 402 F.2d 585 (2 Cir. 1968); *Schad v. Twentieth Century-Fox Film Corp.,* 136 F.2d 991 (3 Cir. 1943); *Rawleigh, Moses & Co. v. Kornberg,* 210 F.2d 176 (8 Cir. 1954); *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969). "[I]f the evidence is of such character that reasonable men, in the impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury." *Silverii v. Kramer,* 314 F.2d 407, 409 (3d Cir. 1963). See *Rogers v. Exxon Research & Engineering Co.,* 404 F.Supp. 324, 335–36 (D.N.J.1975). Since a directed verdict motion deprives a party of jury fact-determination, it should be granted sparingly and circumspectly. "Nevertheless the federal courts do not

---

the resumption of their employment rights without loss of seniority, as if they had been on furlough or leave of absence. Finally, the Act defines the terms "undue hardship or extreme inconvenience" as they are used in 28 U.S.C. § 1866(c) to mean:

> . . . great distance, either in miles or travel-time, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider, as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service; . . .

28 U.S.C. § 1869(j). Thus, the Act necessarily limits the number of prospective jurors who might be excused from service in this case because of economic hardship to themselves or their families. We therefore expect that the pool from which the jury is drawn will include a fair number of people of considerable sophistication and intelligence, drawn from the ranks of the employed as well as from those men and women who have chosen not to have a "job" or who are retired or unemployed.

Moreover, it is clear that the right to trial by jury does not include the right to have any particular number of economics professors or bankers on the jury. The Supreme Court has

described the requirements of due process and the Sixth Amendment in criminal trials:

> It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, *Fay v. New York,* 332 U.S. 261, 284, 67 S.Ct. 1613, 1625, 91 L.Ed. 2043 (1947); *Apodaca v. Oregon,* 406 U.S. [404, 92 S.Ct. 1628, 32 L.Ed.2d 184], at 413, 92 S.Ct. at 1634 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

*Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). Whatever due process may require in the civil context, it cannot be more than is required in criminal trials by the Sixth Amendment's guarantee of "an impartial jury"; certainly here there is no threat of systematic exclusion of distinctive groups in the community. The legislative policy declared in 28 U.S.C. § 1861 goes no further, though its requirements could not in any event overcome the clear command of the Seventh Amendment. *See* Comment, *supra,* 10 Conn.L. Rev. at 783 n. 27.

Finally, even if defendants' "cross-section" contentions had some merit, we think it would be premature to act on them at this time, rather than after the voir dire has reduced the element of speculation. *See* note 16, *supra.*

follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." 9 Wright & Miller, Federal Practice and Procedure, § 2524, at 542–43 (1971) [footnotes omitted].

*Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir. 1978).

Since issues are presented to the jury only when "reasonable" men and women "in the impartial exercise of their judgment may reach different conclusions," when a jury "may properly find a verdict" for either party, there is little or no no room for an "irrational" verdict. And if the court erroneously sends issues to a jury which thereafter decides them "irrationally," further safeguards are available in the power of either the trial court or the court of appeals to grant judgment notwithstanding the verdict. *See Neely v. Martin K. Eby Construction Co.,* 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); Rule 50(b), Fed. R.Civ.P.

### b. *Other Functions of the Jury*

The foregoing discussion has addressed the relative skill of judges and juries at making accurate findings of fact. What is at issue here is more; it is the very nature or character of justice provided by our judicial system. In this respect, the Seventh Amendment reflects societal values deeply rooted in our notions of democracy—values which require that factual decisions affecting the life, liberty, and property of litigants should, at least at their option, be made by a cross section of the community, i. e., a jury of their peers. Thus, even if judges were "better" than juries at finding facts accurately in complex litigation, no decision to exclude juries from participation in these cases should be made without weighing the other important values promoted by the use of juries.

■ One unique virtue of the jury is its "black-box" function; it gives results without reasons.[84] In contrast, the court in a bench trial must "find the facts specially."[85] The "black-box" jury allows our courts to deliver individualized justice—to do "equity"—without sacrificing our expressed devotion to the uniform rule of law. *See* Higginbotham, *supra,* at 56–57; Wigmore, *A Program for the Trial of a Jury Trial,* 12 Judicature 166, 170 (1929). Thus, when "justice" requires, juries can reach results at variance with the law. Because these decisions are not explained, they remain exceptions; the same results from opinion-writing judges would be precedents.[86]

The materials constituting the Seventh Amendment's "legislative history" demonstrate that this part of the jury's "practical abilities"[87] was of great importance to the antifederalists who are largely responsible for the constitutionalization of the civil jury:

> prominence and protection in the Constitution because its aresponsibility allowed it to disregard legal rules when the rules produced results contrary to community standards, and its representativeness insured that it would do just that." Calabresi & Bobbitt, *supra* note 84, at 208 n. 12.

**84.** Professor Calabresi therefore calls the jury an "aresponsible agency." *See* G. Calabresi & P. Bobbitt, Tragic Choices 57–79 (1977).

**85.** Rule 52(a), Fed.R.Civ.P. This rule requires the court to state its findings as to both ultimate and subsidiary facts, *O'Neill v. United States,* 411 F.2d 139, 146 (3d Cir. 1969), and to do so with sufficient "detail and exactness" to facilitate appellate review. *EEOC v. United Virginia Bank,* 555 F.2d 403, 406 (4th Cir. 1977); *Roberts v. Ross,* 344 F.2d 747, 751 (3d Cir. 1965). *See* note 18, *supra.*

**86.** Mr. Justice Black, the author of the Court's opinions in *Beacon Theatres* and *Dairy Queen,* has been reported as suggesting, in conversation, "that the jury system was accorded its

**87.** Our rejection of the notion that the *Ross* footnote prescribes the test for Seventh Amendment questions, *supra* at 926–930, eliminates the need to parse each word and comma in it. Those who are so moved, however, might well consider the "practical abilities" of juries and not only their "limitations."

There is, moreover, a generalized but weighty premise that underlies every one of the antifederalist arguments in favor of constitutional protection of the right of jury trial in civil cases. It is unquestionable, but nonetheless sometimes overlooked, that the general intention of antifederalist agitation for mandatory jury trial was to achieve results from jury-tried cases that would not be forthcoming from trials conducted by judges alone. Clearly the antifederalists were not arguing for jury trial on the ground that it was a more efficient form of trial or in some procedural way inherently superior to trial by the court. It is common today to oppose the institution of the civil jury and its preservation in the Seventh Amendment on the asserted ground that trials in which juries sit are long, expensive, prone to unseemly forensics, and sometimes productive of decisions that are probably at odds with the substantive rules that the judge instructs the jury to apply. But the antifederalists were not arguing for the institution of civil jury trial in the belief that jury trials were short, inexpensive, decorous and productive of the same decisions that judges sitting without juries would produce. The inconveniences of jury trial were accepted precisely because in important instances, through its ability to disregard substantive rules of law, the jury would reach a result that the judge either could not or would not reach. Those who favored the civil jury were not misguided tinkerers with procedural devices; they were, for the day, libertarians who avowed that important areas of protection for litigants in general, and for debtors in particular, would be placed in grave danger unless it were required that juries sit in civil cases.

Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn.L.Rev. 639, 671–72 (1973) (footnotes omitted).[88]  According to Wolfram, this is particularly evi-

**88.** Two of Wolfram's observations on the ratification debates are of interest here. First, the antifederalists' arguments showing the importance of the jury's ability to produce results that sometimes were at variance with the law were usually very indirect. Wolfram explains this as made necessary by the politics and the "instincts of public morality" of the time. 57 Minn.L.Rev., at 703–05.

Second, there were some "scattered references" during and after the debates to the utility of jury trials in particular types of cases, "[b]ut none of these seem to have contemplated that these issues of utility could be evolved into a standard for determining the extent of the right to jury trial." *Id.*, at 718, 719. For some of these scattered references, *see id.*, at 671 n. 86, 719.

A contemporaneous expression of the view that complex matters were properly tried in equity, without juries, may be found in The Federalist No. 83 (A. Hamilton):

My convictions are equally strong that great advantages result from the separation of the equity from the law jurisdiction, and that the causes which belong to the former would be improperly committed to juries. The great and primary use of a court of equity is to give relief in *extraordinary cases*, which are *exceptions* * to general rules. To unite the jurisdiction of such cases with the ordinary jurisdiction, must have a tendency to unsettle the general rules, and to subject every case that arises to a *special* determination; while a separation of the one from the other has the contrary effect of rendering one a sentinel over the other, and of keeping each within the expedient limits. Besides this, the circumstances that constitute cases proper for courts of equity are in many instances so nice and intricate, that they are incompatible with the genius of trials by jury. They require often such long, deliberate, and critical investigation as would be impracticable to men called from their occupations, and obliged to decide before they were permitted to return to them. The simplicity and expedition which form the distinguishing characters of this mode of trial require that the matter to be decided should be reduced to some single and obvious point; while the litigations usual in chancery frequently comprehend a long train of minute and independent particulars.

* It is true that the principles by which that relief is governed are now reduced to a regular system; but it is not the less true that they are in the main applicable to SPECIAL circumstances, which form exceptions to general rules.—PUBLIUS

*Id.*, at 549–550 (Mod. Library ed.) (emphasis in original). This argument is proposed by Hamilton in defense of the omission from the constitution of a right to jury trial in civil actions. Certainly the widespread opposition to the constitution expressed because of this omission, and the adoption of the Seventh Amendment in response thereto, represent a resounding rejection of Hamilton's conclusions; whether his premises were also rejected is not clear.

dent in the antifederalists' concern with the protection of debtor-defendants,[89] the frus-

**89.** The concern for debtors was due in part to the provision in the 1783 treaty of peace with Great Britain "that creditors on either side, shall meet with no lawful impediment to the recovery of the full value in sterling money, of all bona fide debts heretofore contracted." Wolfram, *supra* note 25, at 673–679 & n. 92. During the preconstitutional period, creditors from Britain or another of the states had to sue in the courts of the debtor's state "where, under the protection of favorable local laws, the debtor might receive a sympathetic hearing before a jury composed of his friends and relatives." *Id.*, at 676. Several provisions in the new constitution, including those for federal diversity and alienage jurisdiction, were intended to provide some measure of relief for creditors. *Id.*, at 677–78 & n. 95.

Wolfram canvasses the ratification debates in each state, and concludes that "concern for local debtors faced with the threat of suit in a federal court, without a jury, was one of the chief motivations for opposition to the Constitution." *Id.*, at 678. A good example is the remark with which Patrick Henry concluded a speech in the Virginia ratification convention: "If previous amendments are not obtained, the trial by jury is gone. British debtors will be ruined by being dragged to the federal court, and the liberty and happiness of our citizens gone, never again to be recovered." *Id.*, at 691.

**90.** The power of a jury to disregard the court's instructions in accordance with the equities of the individual case or with what they thought the law should be had been rather dramatically demonstrated to colonial America in the celebrated libel trial of John Peter Zenger in 1735. At the time, truth was no defense in a criminal libel case, and the jury was to determine only whether the defendant had published the allegedly libelous material; the presiding judge charged the jury that "whether the words . . . make a libel . . . is a matter of law . . . which you may leave to the Court." Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger 100 (Katz ed. 1963). But Andrew Hamilton, perhaps the original "Philadelphia lawyer," had argued eloquently to the jury that truth should be a defense to libel, and that a jury "are by law at liberty . . . to find both the law and the fact . . .;" the jury returned a general verdict of not guilty. *Id.*, at 12–13, 23, 91–93, 101. Somewhat ironically, one of the "libels" for which Zenger was tried was "that it seems trials by juries are taken away when a governor pleases." *Id.*, at 64.

Although the *Zenger* trial was a criminal one, it seems to have contributed to "a widespread popular conviction at the time of the adoption of the seventh amendment that a jury in a civil

tration of unpopular or unwise law through jury nullification,[90] and the protection of

case [had] the right to 'decide the law'." Compare Wolfram, *supra*, at 669 n. 84 *with* Henderson, *The Background of the Seventh Amendment*, 80 Harv.L.Rev. 289, 289–291, 327–335 (1966).

The evidence from the ratification debates that the possibility of jury nullification was important to the antifederalists consists mainly of expressions "that trial by jury is a safeguard against an oppressive exercise of the power of taxation." Wolfram, *supra*, at 705–709. The words are Alexander Hamilton's in The Federalist No. 83, used to describe an antifederalist argument which he goes on to rebut by pointing out, *inter alia*, that in most states summary procedures of distress and sale were available to collect taxes without a jury trial. *Id.*, at 705 n. 183. *But cf. Damsky v. Zavatt*, 289 F.2d 46 (2d Cir. 1961) (In 1791 in England, taxes could be collected in action of debt, which carried right to jury trial). And Hamilton himself argues that the possibility of disregard of the law makes prize cases especially unsuitable for determination by juries:

> Juries cannot be supposed competent to investigations that require a thorough knowledge of the laws and usages of nations; and they will sometimes be under the influence of impressions which will not suffer them to pay sufficient regard to those considerations of public policy which ought to guide their inquiries. There would of course be always danger that the rights of other nations might be infringed by their decisions, so as to afford occasions of reprisal and war. Though the proper province of juries be to determine matters of fact, yet in most cases legal consequences are complicated with fact in such a manner as to render a separation impracticable.

Hamilton, *The Federalist No. 83*, at 548–49 (Mod. Lib. ed.).

A clear statement of the power of nullification may be found in Chief Justice John Jay's charge to the jury in *Georgia v. Brailsford*, 3 U.S. (3 Dall.) 1, 1 L.Ed. 483 (1794), a jury trial in the Court's original jurisdiction arising on a feigned issue in an equity case, and tried to a "special jury":

> It may not be amiss, here, gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court, to decide. But it must be observed, that by the same law, which recognizes this reasonable distribution of jurisdiction, you have, nevertheless, a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this, and on every other occasion, however, we have no doubt, you

individuals in litigation with the federal government. *See id.*, at 667–708.

"Black-box" juries are also important in borderline cases calling for decisions and distinctions that might otherwise seem arbitrary. Mr. Justice Holmes described this function as follows:

> When he has discovered that a difference is a difference of degree, that distinguished extremes have between them a penumbra in which one gradually shades into the other, a tyro thinks to puzzle you by asking where you are going to draw the line, and an advocate of more experience will show the arbitrariness of the line proposed by putting cases very near to it on one side or the other. But the theory of the law is that such lines exist.
> . . . As that difference has no gradation about it, when applied to shades of conduct that are very near each other it has an arbitrary look. We like to disguise the arbitrariness, we like to save ourselves the trouble of nice and doubtful discriminations. . . . [A]nd so, as we get near the dividing point, we call in the jury.

Holmes, *Law in Science and Science in Law*, 12 Harv.L.Rev. 443, 457 (1899). *Cf. Duncan v. Louisiana*, 391 U.S. 145, 161, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) ("This [line-drawing] process, although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little."). Holmes points out later in the same article that the question of negligence *vel non* was originally a question of law for the court:

> But about the middle of the last century, when the rule of conduct was complicated with practical details the court began to leave some of these questions to the jury. Nevertheless, Mr. Starkie, a man of intellect, who was not imposed upon by phrases, very nearly saw the ground upon which it was done, and puts it on the purely practical distinction that when the circumstances are too special and complicated for a general rule to be laid down the jury may be called in.

*Id.*, at 459. There is thus a common-law tradition of calling in juries to decide certain questions only when there is enough complexity to require one. To impose a new rule taking very complex cases away from juries would imply a conception of the jury as a kind of Goldilocks, to be used only when the amount of complexity is "just right." [91]

In all cases where our system needs a "black-box" decider, the use of a representative jury seeks to insure that the decisions will reflect contemporary community values in courts otherwise dominated by judges with life tenure. *See id.*, at 460. Also, by enhancing the public's sense of participa-

---

> will pay that respect which is due to the opinion of the court: for as, on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still, both objects are lawfully within your power of decision.

*Id.*, at 4 (footnotes omitted).

**91.** Holmes himself seems to have had a rather Hamiltonian view of juries; he looked forward to the day when the "democratic verdict of the jury" might eventually be replaced by "the commercial and rational test of the judgment of a man trained to decide." *Id.*, at 445. And his view, expressed with only a touch of sarcasm, was that

> . . . every time that a judge declines to rule whether certain conduct is negligent or not he avows his inability to state the law, and the meaning of leaving nice questions to the jury is that while if a question of law is pretty clear we can decide it, as it is our duty to do, if it is difficult it can be decided better by twelve men taken at random from the street.

*Id.*, at 457. An example of the classic Holmes-Knowlton debate on the relative merits of simple or per se liability rules which can be applied by courts "as a matter of law" against those of more complex rules which require a jury, is *Lorenzo v. Wirth*, 170 Mass. 596, 49 N.E. 1010 (1898) (Holmes, J.); *id.*, 49 N.E. at 1011 (Knowlton, J., dissenting). For discussions of this choice, *see* Calabresi & Bobbitt, *supra* note 84, at 206 n. 5; G. Calabresi, *Access to Justice and Substantive Law Reform: Legal Aid for the Lower Middle Class*, in 3 Emerging Perspectives and Issues in the "Access-to-Justice" Movement, (Cappelletti ed. 1978). *Cf.* Nixon, *Changing Rules of Liability in Automobile Accident Litigation*, 3 Law & Contemp. Prob. 476, 477–78 (1936).

tion, the use of representative juries contributes significantly to the legitimacy of our courts and of our entire system of government. *See* Higginbotham, *supra*, at 52, 59–60; Kaufman, *A Fair Jury—The Essence of Justice*, 51 Judicature 88, 91 (1967).

■ The jury also provides a needed check on judicial power. Although the allocation of the factfinding role to the jury serves most obviously to limit the authority of the trial judge, the second clause of the Seventh Amendment [92] demonstrates the importance of the limit on appellate invasion of the province of the jury as well. Because judicial factfinding is more closely reviewed than jury factfinding, the elimination of juries from complex or protracted litigation would increase the power of both trial and appellate judges. *See* Higginbotham, *supra*, at 57.[93] There is no reason to believe that any of the jury's functions are less important in complex and protracted litigation than in smaller and simpler cases. Indeed, as "big" cases proliferate and consume an increasing share of our judicial resources, the survival of the peculiar quality of justice traditionally delivered by juries in our courts of law may depend on the continued availability of juries in such cases.

## IV. *Conclusion*

This opinion has addressed a number of questions in order to determine whether the Seventh Amendment right to trial by jury applies even in a case so massive and so complex that serious questions of jury competence may be raised.

Because the historical test for the Seventh Amendment defines the parameters of the constitutional right to a jury trial by reference to English practice in 1791, we have explored the traditional boundaries of the jurisdictions of courts of law and courts of equity. Our survey demonstrated that some cases normally belonging to the courts of common law could, if sufficiently complex, be brought in equity. But this was possible only in actions seeking an "accounting," and only at the plaintiff's option. Because this is not an "accounting" case, and because here the plaintiffs actively seek a jury trial, the historical test requires that a jury be available. This conclusion is buttressed by other considerations as well. There is little evidence that the plaintiff's historical ability to bring complex accounting matters to a court of equity was attributable to considerations of jury competence and, in any event, it may not have survived the merger of law and equity. Moreover, the remedy of treble damages sought in the case before us is one which was traditionally available *only* on the verdict of a jury in a court of common law.

■ We next examined the Supreme Court's recent decisions in order to determine whether questions of jury competence had been elevated to constitutional stature by the mention in *Ross v. Bernhard* of "the practical abilities and limitations of juries." We determined that to so read the *Ross* dictum would be inconsistent with the intentions of the Supreme Court, with settled principles of jurisprudence, and with the very policies expressed in the Seventh Amendment itself. We have concluded, therefore, that the complexity of the case before us is not a constitutionally permissible reason for striking the plaintiffs' jury demands.

The defendants' motion is denied. An appropriate order follows.

### MEMORANDUM AND ORDER OF CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)

### I. *Preliminary Statement*

In July, 1978, certain defendants in this consolidated antitrust litigation moved to

---

**92.** ". . . [A]nd no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

**93.** Indeed, in view of the jury's role as a check on judicial power, it "might be thought to be particularly inappropriate . . . for the federal courts to claim a broad and loosely structured power to determine whether this civilian check on their own functioning should be interposed." Wolfram, *supra* at 644.

strike the plaintiffs' jury demand on the ground that the cases were individually and collectively beyond "the practical abilities and limitations" of any jury. In Pretrial Order No. 183, filed June 6, 1979, we denied that motion. An accompanying opinion (hereinafter cited as "Jury Trial Opinion") discussed at length the legal issues raised by the defendants' motion. The moving defendants now seek certification of Pretrial Order No. 183 for immediate appellate review pursuant to the Interlocutory Appeals Act of 1958, 28 U.S.C. § 1292(b).

Under § 1292(b), an order may be certified for interlocutory appeal if: 1) it involves a "controlling question of law;" 2) there is "substantial ground for difference of opinion" with respect to that question; and 3) immediate appeal "may materially advance the ultimate termination of the litigation." We have canvassed recent Third Circuit case law with respect to § 1292(b) certification. While cognizant of the salutary principle that piecemeal litigation is to be avoided and that § 1292(b) is to be sparingly applied, we nonetheless conclude that it is appropriate that we certify to the court of appeals our order denying the motion to strike plaintiffs' jury demand, accompanied by a statement that the controlling question of law is whether our decision—that the demand for trial by jury may not be stricken in this case—is correct. This conclusion is based upon the following discussion of § 1292(b).

II.  *Controlling Question of Law*

This requirement for § 1292(b) certification has for the most part eluded precise definition. We do, however, find the discussion in *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974) most helpful on the question whether this case presents a "controlling question of law." The court in *Katz* reasoned that, consistent with the statute's purpose of avoiding wasted trials, "[a] controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final ap-

peal." 496 F.2d at 755. In addition, the court's interpretation of the legislative history of § 1292(b) led it to conclude that questions of law which would not lead to reversal on appeal may also be controlling if they are "serious to the conduct of the litigation, either practically or legally." Possible savings of time of the district court and expense to the litigants are factors which deserve consideration in this context. *Id.*

Plaintiffs argue that because a ruling on the jury issue is not dispositive of the litigation and the suit will continue, whether tried to a jury or to the court, the question presented is not controlling within the meaning of § 1292(b). But this argument is clearly untenable in light of the following statements in *Katz* :

> Nor need the order be determinative of any plaintiff's claim on the merits, since a dismissal for want of jurisdiction is within § 1292(b)  .  .  .  Nor need a reversal of the order terminate the litigation, since with impleader and transfer of venue orders, two of the sponsors' examples, the lawsuit could continue regardless of the interlocutory determination although an erroneous decision might cause a reversal on appeal from a final order.

496 F.2d at 755 (Citations and footnote omitted).

Plaintiffs argue further that the question of law at issue here is not controlling because the erroneous granting of a jury trial, as distinguished from the erroneous denial of a jury trial, does not constitute reversible error. Plaintiffs rely upon *Hurwitz v. Hurwitz,* 78 U.S.App.D.C. 70, 136 F.2d 796 (D.C. Cir. 1943), in which Judge Thurman Arnold stated that when an action is erroneously tried to a jury, the error is harmless if the appellate court determines that "the proper result was reached." *Id.* 78 U.S.App.D.C. at 73 n.9, 136 F.2d at 799 n.9;  *see also* 11 Wright & Miller, *Federal Practice and Procedure* § 2887 (1973). However, Judge Arnold went on to state that if the record shows that "the court using its independent judgment would have been justified in disregarding the verdict," the judgment

should be reversed "to require the trial court to make independent findings of fact and enter judgment in accordance with those findings." 78 U.S.App.D.C. at 73, 136 F.2d at 799. Since the erroneous granting of a jury trial may thus be reversible error under *Hurwitz* (and since it is hardly desirable for the judge in a year long trial not to know who is the real factfinder) the question presented is nonetheless controlling under *Katz*.[1]

■ In any event, a controlling question of law under § 1292(b) may be presented even if the order involved here would not constitute reversible error, so long as the question presented is "serious to the conduct of the litigation." *Katz, supra,* at 755. As defendants assert, jury and bench trials necessitate different litigation strategies, allocations of court time, and expense to the parties. These factors alone are sufficiently weighty, even if the possibility of reversible error were absent, to justify our determination that the order involves a controlling question of law.

### III. *Substantial Ground for Difference of Opinion*

Our denial of the motion to strike plaintiffs' jury demand reflects, *inter alia,* our conclusion that *Ross v. Bernhard,* 396 U.S. 531, 538 n.10, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) "may not be read as requiring or permitting the consideration of 'the practical abilities and limitations of juries' in determining whether the constitutional right to trial by jury extends to matters committed by Congress or the common law to federal district courts." 478 F.Supp. at 926. Having written a 101-page opinion on the matter we shall not "carry the coals to Newcastle" by summarizing that opinion here. While we firmly believe our conclu-

sion to be correct, we note that several other judges in massive and complex cases have reached the opposite result. *See* 478 F.Supp. at 926. We respect those other judges, and believe that the contrariety of views on the subject compels the conclusion that there is "substantial ground for difference of opinion."

### IV. *Material Advancement of the Ultimate Termination of the Litigation*

We approach this criterion with a keen awareness that this litigation is already nearly nine years old. Trial is scheduled to being in the early Spring of 1980 and is expected to take approximately one year. Pretrial proceedings have consumed enormous amounts of time and energy of both the court and the litigants. Moreover, an elaborate timetable of pretrial events has been promulgated (Pretrial Order 154) and we are wary of upsetting the delicate balance contained therein. A copy of Pretrial Order No. 154, as amended, is attached hereto as Appendix A and incorporated by reference. Accordingly, we have, at the threshold, considered the possibility that an interlocutory appeal at this point may result in further delay of the trial. However, we conclude that there is sufficient time for the court of appeals to dispose of this matter prior to our scheduled trial date.[2] We note, in this regard, that by express provision of § 1292(b), certification does not stay proceedings in the district court unless so ordered. Pretrial proceedings may therefore continue unaffected until the commencement of trial.

Most important, immediate appellate review of Pretrial Order No. 183 can obviate the possibility of a wasted year-long jury trial resulting from reversal on final appeal.

---

1. Plaintiffs also cite *Fitzgerald v. United States Lines Co.,* 306 F.2d 461 (2d Cir. 1962). The plurality opinion in that case merely stated that "an appellate court will *not always* reverse because of erroneous grant of a jury trial." *Id.* at 470 (emphasis added). The dissenting opinion, in dictum in a footnote, overstates the holding of *Hurwitz v. Hurwitz,* 78 U.S.App.D.C. 70, 136 F.2d 796 (D.C.Cir. 1943). *See* 306 F.2d at 478 n.4. We decline to erect a rule on the basis of dictum in a footnote to a dissenting opinion in another circuit.

2. Indeed, we heard the argument on the jury trial question well in advance of trial in order that any interlocutory appeal could be disposed of without interfering with our carefully considered pretiral and trial schedule. See 478 F.Supp. at 895.

Section 1292(b) allows the courts "to permit decisions of legal issues as to which there is considerable question without requiring the parties first to participate in a trial that may be unnecessary." *Johnson v. Alldredge,* 488 F.2d 820, 823 (3d Cir. 1973), *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). The requirement of "material advancement of the ultimate termination of the litigation" is well met where, as here, the litigation involved is protracted and expensive and the probability of retrial is decreased by interlocutory review. We add that we construe "ultimate termination" as referring to final determination of the litigation, not just conclusion of the trial.

## V. *Exceptional Nature of Question of Law*

The foregoing discussion of the three criteria of § 1292(b) is sufficient to compel certification. It might not, however, be sufficient to persuade the court of appeals to grant leave to appeal, for, under the statute, it is within the court of appeals' discretion to permit appeal of a certified order. Such discretion is not limited by specific criteria, and denial of permission to appeal may be based on considerations unrelated to the criteria for certification discussed above. *Katz, supra,* 496 F.2d at 754. Our survey of recent Third Circuit cases strongly suggests that there is an additional factor which militates in favor of certification and also of acceptance of certification: the uniqueness, exceptionality, or extraordinary importance of the question of law involved.[3] *See Link v. Mercedes-Benz of North America, Inc.,* 550 F.2d 860 (3d Cir.) *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Katz, supra; Milbert v. Bison Laboratories, Inc.,* 260 F.2d 431 (3d Cir. 1958). *Link, Ungar,* and *Katz* arose in the context of class action decisions; however, we find them helpful, particularly in terms of their gloss upon the three statuto-

rily imposed criteria. In *Ungar,* the Third Circuit declared that "[t]o qualify for interlocutory review in this circuit a class certification must be attended by special factors which take it outside the ambit of the general rule. *Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.) (in banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974)." 531 F.2d at 1213. Apparently finding that such special factors existed, the court of appeals undertook review of the district court's class certification order. In *Link,* on the other hand, the court of appeals refused to review a class certification order certified by the district court for interlocutory review pursuant to § 1292(b). Again noting that interlocutory review of class certification decisions must be justified by special factors, the court of appeals stated that the district court should not certify its order for immediate appeal "without stating persuasive reasons why the particular class action question is so unusual as to demand the intervention of an appellate court." 550 F.2d at 863. *Cf. Matlack, Inc. v. Hupp Corp.,* 57 F.R.D. 151, 159 (E.D.Pa.1972) (contract case in which we declined to certify under § 1292(b) our order denying summary judgment, noting, *inter alia,* that "[t]he questions of law involved are not of unusual importance, either to the substantive law of contracts or the interpretation of the Federal Rules of Civil Procedure.")

In *Milbert v. Bison Laboratories, Inc.,* one of the first cases to construe § 1292(b), Judge Maris wrote:

> It is quite apparent from the legislative history of the Act of September 2, 1958 that Congress intended that section 1292(b) should be sparingly applied. It is to be used only in exceptional cases where an intermediate appeal may avoid protracted and expensive litigation and is not intended to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation.

260 F.2d at 433. Judge Maris quoted from the report of the House Judiciary Committee on the bill as follows:

---

3. Indeed, it would not be unreasonable to suggest that a district judge should be hesitant to certify unless there were a realistic chance that the court of appeals would accept certification.

There should be some way, for example, in long-drawn-out cases such as antitrust and conspiracy cases, to dispose of vital questions which are raised in the trial without having to wait for the taking of testimony and the conclusion of the trial before the questions can be finally determined on appeal.

\* \* \* \* \* \*

Your committee adopts with approval the view contained therein that appeals under this legislation should only be used in exceptional cases where an intermediate appeal may avoid protracted and expensive litigation and is not to be used or granted in ordinary litigation wherein the issues raised can otherwise be properly disposed of.[4]

Id. at 433–434.

The instruction we draw from the foregoing cases is that, because interlocutory appeals are not favored, the presence of uniqueness, exceptionality, or extraordinary importance of the question of law involved, and the magnitude of this case itself, are factors which should be taken into consideration in every case in determining whether § 1292(b) certification is appropriate. And *see* n.3 *supra*. Certainly those criteria apply here, for the litigation is of enormous scope and importance and the question certified is one of the raging questions in the law today. There is scarcely a seminar on current problems in federal civil practice in which the subject of the right to jury trial in complex cases is not discussed.

VI. *The Question of Law to be Certified*

In authorizing appellate review pursuant to § 1292(b) we are cognizant that what is certified is the order itself, and that the scope of review is within the discretion of the appellate court. However, Third Circuit Rule 23 requires that we state the controlling question of law, although we note that the appellate court is not bound thereby. *Consolidated Express, Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494, 502 (3d Cir. 1979); *Katz, supra,* 496 F.2d at 754, *Johnson v. Alldredge, supra,* 488 F.2d at 823. We state the question as follows: Is our decision that the demand for jury may not be struck in this case correct?

We have stated the question thusly, notwithstanding a variety of formulations suggested by the parties, because we believe that such a formulation properly poses the issue for the court of appeals, which will have the benefit of the wide ranging discussion of the issues in our Jury Trial Opinion. We note in this regard that the bulk of the opinion was devoted to the question of "whether trial by jury, usually available as of right in private, treble-damage antitrust cases, is guaranteed even in a case so massive and complex as to be beyond 'the practical abilities and limitations of juries.'" 478 F.Supp. 899. However, the opinion also expressed some views on the question whether *this* case is so extraordinarily complex that a trial by jury would be so unfair as to deny defendants the due process of law guaranteed by the Fifth Amendment. Because it is not for us to draw the boundaries of appellate review, and because it is the *order* which is certified, we believe that the foregoing statement of the controlling question is the appropriate one.

PRETRIAL ORDER NO. 154

TABLE OF CONTENTS

| | Page |
|---|---|
| I. Purpose of Order | 947 |
| II. Completion of Discovery | 948 |
|     A. General Discovery | 948 |
|         1. Submission of Discovery Requests | 948 |
|         2. Compliance with Outstanding Discovery Requests | 948 |

4. House Report No. 1667, 85 Cong.2d Sess., pp. 1, 2.

PRETRIAL ORDER NO. 154

| | | | Page |
|---|---|---|---|
| II. | Completion of Discovery—Continued | | |
| | B. Expert Witness Discovery | | 948 |
| | 1. Defendants' Discovery of Plaintiffs' Expert Witnesses | | 948 |
| | 2. Plaintiffs' Discovery of Defendants' Expert Witnesses | | 948 |
| | 3. Defendants' Discovery of Plaintiffs' Expert Witnesses on the Counterclaim | | 949 |
| III. | Final Pretrial Statements | | 949 |
| | A. Purpose | | 949 |
| | B. Structure | | 949 |
| | C. Contents | | 949 |
| | D. Preclusionary Effect | | 949 |
| | E. Time for Filing FPS | | 950 |
| | F. Addenda and Errata | | 950 |
| IV. | Public Record and Reports (Fed.R.Ev. Rule 803(8) Material) | | 950 |
| V. | Charts, Summaries and Calculations (Fed.R.Ev. 1006 Material) | | 950 |
| VI. | Documents for Use at Trial | | 950 |
| | A. Preparation of List; Contents | | 950 |
| | B. Objections to Authenticity of Documents Listed in FPS | | 951 |
| | C. Sanctions | | 951 |
| | D. Objections to Admissibility | | 951 |
| | E. Demonstrative Evidence | | 951 |
| | F. Copies for the Court | | 951 |
| | G. Original Documents | | 951 |
| VII. | Depositions to be Introduced at Trial | | 951 |
| VIII. | Stipulation of Uncontested Facts | | 952 |
| IX. | Conspiracy Proof | | 952 |
| X. | Motions for Summary Judgment | | 952 |
| XI. | Japanese Language Documents and Translations | | 952 |
| XII. | Requests for Pretrial Rulings | | 953 |
| XIII. | Requests for Special Interrogatories, Preliminary Jury Instructions, and Interim Instructions | | 953 |
| XIV. | Trial Briefs | | 953 |
| XV. | Continuing Pretrial Conferences | | 953 |
| XVI. | Jury Trial Matters and Trial Date | | 953 |
| | A. Jury Selection and Trial Date | | 953 |
| | B. Length of Trial | | 954 |
| | C. Trial Logistics | | 954 |
| | D. Disposition of Case In Event Jury is Unable to Agree | | 955 |
| | E. Lead Counsel | | 955 |
| | F. Notice of Witnesses and Documents to be Used | | 955 |
| | G. Juror Notetaking | | 955 |
| | H. Transcript | | 955 |
| | I. Official Interpreter | | 956 |
| XVII. | Settlement Master | | 956 |
| XVIII. | "Time Out" Rule | | 956 |
| | APPENDIX A Summary-Timetable | | |
| | APPENDIX B "Time Out" Rule | | |

## I. *Purpose of Order*

This is a case management order which will govern the final phases of this litigation. A summary-timetable is attached hereto as Appendix A. This order has been entered only after extensive consultation with counsel for the parties, during the course of which counsel has been afforded

the opportunity to comment upon several earlier drafts prepared by the Court.

## II. Completion of Discovery

### A. General Discovery

#### 1. Submission of Discovery Requests

We have, by separate Order, fixed deadlines for submission of discovery requests. No additional discovery requests may be propounded except for good cause shown. "Good cause" shall be deemed to include the necessity of follow up discovery requests based upon new material disclosed in responses to presently outstanding discovery requests or in the Final Pretrial Statement.

#### 2. Compliance with Outstanding Discovery Requests

We have already fixed dates for compliance with most outstanding discovery requests and have ruled upon virtually all outstanding discovery motions. Except for good cause shown, depositions shall be conducted in accordance with the schedule heretofore established by agreement of the parties or order of the Court. All outstanding Discovery Requests for which deadlines have not been heretofore set shall be responded to no later than May 15, 1979.

### B. Expert Witness Discovery

#### 1. Defendants' Discovery of Plaintiffs' Expert Witnesses

On or before March 5, 1979, plaintiffs are directed to furnish defendants with the names of all experts they will use at trial. Plaintiffs have represented that two of their expert witnesses, Stanley Nehmer and Dr. Horace DePodwin will have completed their economic analyses by May 15, 1979 and June 1, 1979 respectively. On or before June 15, 1979 plaintiffs' counsel is directed to furnish defendants' counsel with: (1) copies of reports by all of their expert witnesses setting forth their expert opinions and the bases therefor; (2) copies of any charts, calculations, summaries, economic and other models which the witnesses have prepared or consulted in connection with their opinion, together with a syllabus spec-

ifying the underlying evidentiary source thereof; (3) in the event that any chart, calculation or summary emanates from a computer program, a copy of the actual computer program, a printout of the data base or a copy of the computer disc or tape containing the data base and all printouts generated in connection therewith; (4) a schedule identifying all studies, reports, public records, statistical and other data which the expert used or consulted in arriving at his opinion; (5) to the extent that the matters set forth in (4) are not readily available to defendants, copies of the matters set forth therein; and (6) a schedule identifying any Fed.R.Ev. 803(18) material on which the experts will rely.

Defendants may thereupon depose any of the plaintiffs' experts and any members of their staffs who will testify at trial, and may serve a subpoena duces tecum calling for production of all documents identified in answers to defendants' expert interrogatories (MELCO document # 73) and defendants' request for production of documents concerning experts (MELCO document # 74); plaintiffs shall identify any such staff persons by June 15, 1979. Notwithstanding the foregoing, plaintiffs shall respond by April 6, 1979 to defendants' interrogatories as to the professional background and qualifications of the experts and their experience in prior litigation, and shall produce transcripts of the experts' prior testimony, relevant speeches and presentations, which the expert in the exercise of due diligence can locate.

#### 2. Plaintiffs' Discovery of Defendants' Expert Witnesses

On or before May 15, 1979, defendants shall designate their expert witnesses with respect to the counterclaims, and on or before July 15, 1979 defendants shall submit to plaintiffs' counsel the material described in the six categories of § II.B.(1) hereof. On or before August 15, 1979, defendants shall designate their defensive or other expert witnesses and on or before November 20, 1979, they shall submit to plaintiffs' counsel the material in the six referenced

categories. The defendants' experts shall be subject to depositions by plaintiffs' counsel; moreover, plaintiffs may propound interrogatories and serve a subpoena *duces tecum* as to defendants' experts, as described in the preceding paragraph.

### 3. *Defendants' Discovery of Plaintiffs' Experts Witnesses on the Counterclaim*

If plaintiff will advance expert witnesses in response to defendants' counterclaims, they shall identify any such witnesses on or before August 15, 1979 and specify to defendants material in the six referenced categories on or before October 15, 1979. The previously stated provisions with respect to depositions and background interrogatories shall also apply.

## III. *Final Pretrial Statements*

### A. *Purpose*

The principal operative framework for the trial shall be an annotated Final Pretrial Statement (FPS) to be filed by the parties. The plaintiffs shall file a joint FPS and the defendants shall file where possible a joint FPS on all common issues. Any defendant may file its own FPS to cover positions which are not common, or which differ from the joint FPS on common issues.

### B. *Structure*

The FPS shall be organized by headings descriptive of each claim and defense asserted by the parties to the litigation. Where appropriate, these headings shall be further subdivided into factual categories descriptive of the particular consumer electronic products and time frame and defendant or other entity involved.

### C. *Contents*

The pretrial statement shall set forth, under the appropriate headings, separately and with particularity, each fact that the party intends to prove at trial either affirmatively or by way of defense, together with a list of: (1) the witnesses (including expert witnesses) whose testimony will be advanced to prove that fact; (2) the documents (including drawings and photographs) which will be offered to prove that fact; [1] and (3) line by line references to any portions of depositions and to answers to interrogatories and requests to admit which will be offered to prove that fact.

By this formulation we do not intend that the parties must provide a script for trial. We do, however, intend that the parties set forth in narrative form not just the ultimate facts, but all the facts they will prove, including all subsidiary or supporting facts. In so doing they will make, at a minimum, the kind of submission they would make if they were writing detailed requests for findings of fact setting forth what the evidence has established in a nonjury case. The plaintiffs and counterclaim plaintiffs shall also set forth the method by which they will prove impact, the method by which they calculate each discrete category of damages, and a detailed calculation of their claimed damages. In view of the primacy of the conspiracy claims in plaintiffs' case and defendants' counterclaims, the FPS shall itemize all overt acts to be proved at trial. In particular, the FPS shall enumerate with specificity the facts (i. e. the evidence *aliunde*) upon which they rely to prove that each defendant (including counterclaim defendant) or other entity knowingly joined in the alleged conspiracy and all facts, separately as to each defendant, upon which they rely as to each defendant's participation in the alleged conspiracy. Where any facts will be offered against fewer than all parties, the FPS shall identify the parties against which the facts are or are not offered.

### D. *Preclusionary Effect*

Except for good cause shown, the parties are precluded from offering at trial any

---

1. If the document will not be used in full, then the portion thereof to be used should be designated.

facts or evidence supporting such facts which have not been disclosed in the FPS.[2] Good cause is to be construed to include genuine inadvertence, genuine recent recollection by a witness, matters occurring after the filing of the FPS including later production of documents,[3] bona fide rebuttal points not previously contemplated for submission, et cetera.

### E. *Time for Filing FPS*

(1) Pursuant to previous order of the court, the plaintiffs will submit a list of the headings and subheadings they intend to use in the FPS by March 21, 1979. Counterclaim plaintiffs shall submit a similar list by March 21, 1979.

(2) Plaintiffs shall file their FPS on or before July 2, 1979.

(3) Defendants shall file their FPS with respect to their counterclaims on or before August 1, 1979.

(4) Defendants shall file their FPS in response to plaintiffs' claims on or before December 15, 1979.[4]

(5) Plaintiff shall file its FPS in response to defendants' counterclaims on or before December 21, 1979.

(6) The FPS may be used at trial in the same manner and effect as interrogatory answers.

### F. *Addenda and Errata*

The Court recognizes the enormous pressure under which the FPS will be prepared. Accordingly, the parties are granted leave to file, within 20 days after the filing of the FPS, any addenda and errata which may, upon serene review, appear to be required.

### IV. *Public Record and Reports (Fed. R.Ev. 803(8) Material)*

In their respective FPS's the parties shall set forth a list of all public records, reports, statements or data compilations of public officers or agencies which they intend to offer into evidence at trial pursuant to Fed. R.Ev. 803(8). Within 30 days thereafter, any party objecting to admission of such materials shall file written objections thereto. The foregoing arrangement is required so that any hearings in regard to the admissibility of such records and reports may be held prior to trial.

### V. *Charts, Summaries and Calculations (Fed.R.Ev. 1006 Material)*

In their respective FPS's the parties shall identify all charts, graphs, calculations, economic models, and summaries which the parties propose to use as evidence at trial pursuant to Fed.R.Ev. 1006 or upon which any expert witness will rely.

### VI. *Documents for Use at Trial*

#### A. *Preparation of List; Contents*

Within 30 days after the filing of their FPS and as an addendum thereto, the parties shall, for housekeeping purposes and for the other purposes set forth in this paragraph, prepare a separate document list, containing all the documents mentioned in the FPS. Within that period of time all of said documents shall be premarked for trial purposes with distinguishing symbols. The parties shall agree upon a code. The documents shall be keyed to the code and there shall be set forth, for each document, the document identification number developed for purposes of this litigation, its date and general nature. If the document has

---

**2.** Certain interrogatories have been and will hereinafter be answered with preclusionary effect. The preclusionary effect of those answers will not be altered by any provision of this Pretrial Order.

**3.** There shall, however, be a duty to supplement the FPS.

**4.** To the extent that defendants are delayed in getting material information from the plaintiffs

ordered by the Court needed for defendants' economic defense there shall be a corresponding delay of the time for filing defendants' FPS. Similarly, to the extent that plaintiff is delayed in getting from counterclaim plaintiffs material information ordered by the Court needed for plaintiff's counterclaim economic defense there shall be a corresponding delay of the time for filing plaintiff's responsive FPS.

no identification number so that it may readily be identified, the document list shall also include the author and addressee of the document and shall have attached a copy thereof. In the event that the document list contains any document which has not theretofore been inspected by the opposing parties, a copy thereof should be furnished at the time of furnishing the document list. The document list may be amended thereafter only for good cause shown. Any document which is advanced as a business record under Fed.R.Ev. 803(6) shall be identified on the document list as such by an appropriate symbol.

### B. *Objections to Authenticity of Documents Listed in FPS*

Except to the extent written notice to the contrary is given within 60 days after receiving plaintiffs' and defendants' FPS's on plaintiffs' principal claim and defendants' counterclaims and within 30 days after receiving the responsive FPS's, each party shall be deemed to have agreed (for purposes of this litigation only) with respect to the documents listed in the FPS:

(1) that the originals thereof are authentic within Fed.R.Ev. 901 and 902;

(2) that a duplicate, as defined in Fed. R.Ev. 1001, of the listed documents is admissible to the same extent as would be the original;

(3) that any of the listed documents purporting to be correspondence was sent by the purported sender and received by the purported recipients on approximately the dates shown or in accordance with customary delivery schedules; and

(4) that any document offered as a business record meets the requisites of Fed.R.Ev. 803(6).

We shall convene hearings to adjudicate any dispute as to such matters.

### C. *Sanctions*

Unjustified refusal to admit with respect to the matters addressed in the preceding section VI.B shall be sanctionable as under Fed.R.Civ.P. 37(c), which we deem applicable hereto. Excessive listing of documents, which imposes onerous burdens upon the opposing parties, shall likewise be deemed sanctionable; i. e., if it appears at or after trial that a party has abused the FPS in that fashion, sanctions may be imposed.

### D. *Objections to Admissibility*

Additionally, the parties shall submit, within 90 days after submission of the list provided in VI.A the grounds for objecting to the admissibility of any document. The parties shall thereupon attempt to resolve any such objections and shall report to the Court as to their progress at an ensuing pretrial conference. The Court, after hearing, may make pretrial rulings on admissibility.[5]

### E. *Demonstrative Evidence*

Copies of all charts, graphs, and models which the parties intend to use as demonstrative evidence at trial shall be exchanged 30 days prior to trial.

### F. *Copies for the Court*

Copies of all documents to be marked for identification shall be furnished to the document clerk to be designated by the Court no later than 30 days before trial, so that the document clerk may set up a filing system.

### G. *Original Documents*

Upon request of any party which has a particular need for purposes of the trial to inspect or use the original, in lieu of a copy, of any document or documents produced by another party the producing party shall, at least 30 days prior to trial, furnish for inspection by any other party the original of any such document or documents, the cost of such production to be borne by the requesting party.

---

**5.** We acknowledge that trial will have commenced at the time for filing objections to the documents listed in the responsive FPS's.

## VII. Depositions to be Introduced at Trial

For housekeeping purposes, there shall be filed within 30 days after the filing of the FPS, and as an addendum to the FPS, a separate appendix listing the depositions and deposition excerpts referenced in the FPS. Where any former testimony is to be offered pursuant to Fed.R.Ev. 804, the grounds for unavailability of the witness at trial shall be stated in this addendum. Within 30 days thereafter, any party objecting to any such offer shall state in writing the grounds of objection. The parties shall then meet in an effort to resolve the objections and shall report to the Court as to their progress at an ensuing pretrial conference. The Court may, after hearing, make pretrial ruling as to admissibility of such matter. Within 30 days after the filing of the addendum required in this paragraph, any party wishing to avail itself of Fed. R.Ev. 106 shall counterdesignate any deposition excerpts to be read in conjunction with the original designation.

Within 30 days prior to trial, all answers to interrogatories and to requests to admit which a party intends to offer (together with the interrogatories or requests to admit), shall be reproduced together in a convenient packet or folder for ease of reference during trial.

## VIII. Stipulation of Uncontested Facts

The parties shall carefully examine the initial FPS's and shall earnestly consult with a view to entering into stipulations of uncontested fact, including facts whose truth is uncontested but whose relevancy is not; if such facts are ruled admissible they need not be proved. A stipulation of uncontested facts shall be filed by September 1, 1979.

## IX. Conspiracy Proof

Plaintiffs and defendants shall file formal proposals for an order specifying the order of proof of conspiracy within 45 days after either (1) the filing of plaintiffs' FPS or (2) the Court's decision on the various summary judgment motions addressing the issue of conspiracy, whichever is later.

## X. Motions for Summary Judgment

We have before us extensive motions for summary judgment filed by the Melco, Toshiba, Matsushita, Sanyo, Hitachi and Sears defendants. We also have before us plaintiffs' voluminous response to Melco's motion. Plaintiffs shall respond to the other pending motions for summary judgment by April 2, 1979, and the other moving defendants shall have until April 15, 1979 to reply thereto.

Hearing on these matters will be held commencing on April 18, 1979, at 10 a. m. in Courtroom 16A.

Defendants may file additional (noncumulative) motions for summary judgment no later than August 15, 1979. Plaintiffs shall respond thereto within 45 days after the filing of the motion. Plaintiff may move for summary judgment with respect to the counterclaims no later than September 15, 1979, and defendants shall respond thereto within 45 days after the filing of the motion.

## XI. Japanese Language Documents and Translations

(1) In accordance with the terms of Pretrial Order No. 116, the plaintiffs shall submit to the defendants all foreign language documents which they intend to use at trial, together with their translations of these documents.[6]

(2) Within six weeks after receipt of these documents, defendants shall inform the plaintiffs whether they admit that the proffered translations are accurate, unless for good cause shown defendants are unable to accomplish this within six weeks. If the defendants dispute the accuracy of the plaintiffs' translation of any document, the defendants shall forthwith submit their own translation thereof to the plaintiffs. If the plaintiffs are unwilling to accept the

---

6. We recognize that not all the documents can be submitted at once; accordingly, plaintiffs shall submit batches of documents with translations as soon as a batch is ready.

defendants' translation, the parties shall thereupon confer and attempt to agree on a translation. If the defendants concede the accuracy of the translation, then, except for good cause shown, that translation may, without further submission, be used at trial provided, of course, that it otherwise meets the requirements of admissibility.

(3) In the event that the parties are unable to agree upon a translation, they shall submit their differences to the special translation masters who have been appointed by the Court, who shall in turn recommend to the Court what translation should be adopted as correct.

(4) The plaintiffs shall submit to the Court, on the last day of each month, a schedule of the document numbers submitted pursuant to this Pretrial Order. Defendants may make application to the Court for sanctions in the event that plaintiffs do not make prompt and steady submissions of documents pursuant hereto. Excessive designation of documents for translation, which imposes onerous burdens upon the opposing parties shall be sanctionable as under Fed.R.Civ. 37(c).

(5) The provisions of this Pretrial Order shall be reciprocal and shall likewise apply to defendants commencing on March 1, 1979.

### XII. *Requests for Pretrial Rulings*

Requests for pretrial rulings on evidentiary or other matters shall be submitted no later than 60 days before trial, so that hearings can be held before trial.

### XIII. *Requests for Special Interrogatories, Preliminary Jury Instructions, and Interim Instructions*

In view of the expected length of the trial (approximately one year), the Court deems it to be its responsibility to provide ongoing education for the jury as to the contentions of the parties and the applicable legal principles. This process shall commence with preliminary jury instructions which shall precede the opening statements. Accordingly, the parties shall file requests for preliminary jury instructions no later than December 15, 1979. They shall also, at that time, file proposed special interrogatories which will be subject to revision but which will help to frame the issues for trial. This educational process shall continue during the trial; accordingly, the parties may, from time to time, submit requests for interim instructions. The time for filing requests for final jury instructions and final special interrogatories is deferred.

### XIV. *Trial Briefs*

Plaintiffs and counterclaim plaintiffs shall file comprehensive trial briefs as to their claims and counterclaims no later than 60 days prior to trial. Trial briefs by defendants and by defendant on the counterclaims shall be filed no later than 30 days prior to trial. Reply briefs shall be filed no later than 5 days prior to trial. The trial briefs shall set forth the parties' proposed order of proof. They shall then address all legal issues of any substance anticipated to arise at trial, and shall set forth the legal contentions which the submitting party will advance at trial together with the legal authorities (statute and case law) on which the party will rely.

### XV. *Continuing Pretrial Conferences*

The Court will continue to meet with counsel on a regular basis to deal with various motions and case management problems. A final pretrial conference will be held on January 18, 1980.

### XVI. *Jury Trial Matters and Trial Date*

#### A. *Jury Selection and Trial Date*

The trial shall commence with jury selection on Monday, February 4, 1980, in the Ceremonial Courtroom of the United States Courthouse, Independence Mall West, Phila., Penn.[7] The actual trial will commence

---

**7.** By separate Order we have consolidated the Zenith and NUE cases for trial and denied Sony's motion for separate trial. As a necessary adjunct thereto, we have ordered the NUE case transferred from the District of New Jersey to this district pursuant to 28 U.S.C.

on Monday, February 18, 1980, at 9:30 a. m. in Courtroom 16A.[8] Requests for voir dire questions shall be filed and served no later than January 21, 1980. If a party wishes to submit exceptional voir dire questions to the jury, in the nature of multiple choice questions to determine juror attitudes or otherwise, such questions must be filed with the Court no later than November 29, 1979. The Court shall conduct the voir dire, except that counsel for the foreign defendants may conduct voir dire addressed to possible prejudice against foreign defendants. We shall consider at the final pretrial conference the number of alternate jurors, and the number and allocation of peremptory challenges.

### B. *Length of Trial*

At the final pretrial conference we shall discuss limitation on the length of the trial. Counsel at one time represented to the Court that the case can be tried in approximately one year. We may elect to hold counsel to that estimate and limit trial time to one year,[9] allocating time for presentation of the cases of the respective parties as they shall agree or, in the absence of agreement, on the basis of equitable apportionment determined by the Court.[10]

### C. *Trial Logistics*

We note that: (1) there are some 11 groups of parties, each of which has separate counsel and discrete interests; (2) each of such groups is entitled to have lead and associate counsel present in the courtroom during trial; and (3) there is inadequate space under the present Courtroom layout to accommodate all such counsel. The

Court has therefore agreed that most of the benches may be removed from the Courtroom to be replaced by small tables for each group of counsel, leaving the remaining benches for witnesses and the public as well as for paralegal assistants.

In order to address these concerns, counsel for the parties shall formally designate representatives to act as liaison to the Public Buildings Service of the General Services Administration (G.S.A.) with respect to matters of trial logistics. Logistics liaison counsel shall thereupon confer with a representative of the Clerk of Court hereafter to be designated, the G.S.A. Building Manager and the Area Manager, and with Otis Yokum, G.S.A. Senior Space Facilities Specialist, with respect to the details and timing of such renovation and the allocation of its cost. These conferees shall likewise address the question of providing separate rooms for work space for counsel and paralegals which, inter alia, will accommodate: (1) the storage of files; (2) telephones; (3) duplicating and photocopying machines; (4) a coffee machine; (5) computer terminals; and (6) an audiotape system to be fed into a room in the courthouse in which translation of the proceedings for officials of the Japanese companies may occur. Items (1)(2)(3)&(4) have been requested by all parties, and items (5) and (6) by Sears and some of the Japanese defendants. The Court approves these requests but orders that the requesting parties shall equitably bear the costs of installation and operation of these systems. The General Service Administration is ordered to complete the necessary design and construction and furnish the space and facilities previously described,

---

§ 1404(a). We have also denied Zenith's informal motion to sever the trial of its Robinson-Patman claims and the defendants' counterclaims. We retain under advisement the question whether plaintiffs' claims under § 7 of the Clayton Act should be severed and separately tried. We also retain under advisement the question of bifurcation; *i. e.*, whether the issues of liability and amount of damages should be tried separately. Counsel should, however, assume that there will be no severance for purposes of preparation of the FPS.

**8.** The hiatus will provide those selected as jurors with an opportunity to arrange their affairs in the advent of what is anticipated to be a year long trial. Reference in this Order to "trial" shall be deemed to refer to jury selection.

**9.** *See SCM Corp. v. Xerox Corp.*, 1978–2 Trade Cas. ¶ 62, 399 (D.Conn. 1977).

**10.** We note, for instance, that counsel for plaintiffs and coordinating counsel for the defendants have at one time stated that their cases in chief should each take approximately 4 months to present.

and shall also furnish facilities adjacent to the Courtroom for storage of Courts' files on the case and the documents furnished by the parties for use of the Court.

Moreover, since the Courtroom will not accommodate the over 150 lawyers and paralegals who have been identified as working actively on the case, the logistics liaison committee shall also submit to the Court a plan for regulating the number of counsel and paralegals who may be in the Courtroom at any one time, keeping in mind that space must be reserved for any members of the general public who may desire to witness the trial.

### D. *Disposition of Case In Event Jury is Unable to Agree*

In the event that the jurors are unable to agree on the answers to any of the special interrogatories on which this case may be submitted, the Court may answer such interrogatories as though this were a bench trial.

### E. *Lead Counsel*

The plaintiffs have designated Edwin P. Rome, Esquire, as lead counsel, with principal responsibility for examination of witnesses, and the conduct of trial. The defendants shall designate co-lead counsel for purposes of general trial matters conducted outside the presence of the jury. As to each witness, the defendants shall designate one counsel to conduct the principal examination or cross-examination. However, any party whose position is affected by the testimony of any witness shall be entitled to independent non-cumulative examination or cross-examination by its own counsel. Counsel may alternate with respect to such examination. Defendants shall arrange among themselves procedures for opening statements which shall avoid overlap or duplication on common questions, except that the Court will permit counsel for each defendant group to make individual introductory or background opening statements, as well as to highlight any special (non-cumulative) points particularly relevant to the claim or defense of that defendant. An objection by one plaintiff or defendant shall be deemed an objection by all plaintiffs or defendants. Nothing in this order shall be construed as not permitting counsel with a discrete issue from being heard. Judgment as to the manner of closing argument is reserved.

### F. *Notice of Witnesses and Documents to be Used*

Except for good cause shown, at least seven trial days before a witness, deposition, document, etc. is to be called or introduced at trial, all counsel shall be notified of the intent to call such witness or offer such deposition or document and of the documents, if any, to be used during direct examination of such witness. Within two days after such notification, any party objecting to the admissibility of any designated documents, shall inform the Court of the grounds of any objection to any such document (unless we have theretofore ruled on same). If less than a complete document, deposition, etc. is to be introduced, all counsel shall be provided with one week's notice of the intention to do so, so that counsel representing any other party shall have an opportunity to invoke Fed.R.Ev. 106.

### G. *Juror Notetaking*

The jurors shall be permitted to take notes during trial and the Clerk is to furnish appropriate writing materials for this purpose as well as a separate locked drawer for each juror to provide secure storage of the notes in the jury room. The jurors' notes shall be gathered by the Clerk and impounded and sealed by him after the jury has reached its verdict, not to be opened except pursuant to an order of this Court. The Court shall provide each member of the jury with a written copy of the final charge.

### H. *Transcript*

The parties shall arrange with the Official Court Reporter for half day or daily copy of the trial transcript. The parties are granted leave to install an audiotape at their own expense.

## I. *Official Interpreter*

Since testimony may be given by witnesses testifying in the Japanese language, and since it appears from pretrial colloquy that there are not infrequently differences of opinion as to the accuracy of Japanese-English translation, the parties shall promptly attempt to locate an interpreter agreeable to all parties to act as official interpreter during such testimony. If the parties are unable to do so, the Court will locate and appoint such a person with the assistance of the special document translation masters who were appointed pursuant to Pretrial Order No. 143 and of the Administrative Office of the United States Courts. The parties shall also agree upon the division of cost for such translation services.

## XVII. *Settlement Master*

The parties are directed to submit to the Court no later than September 15, 1979, the names of distinguished lawyers or businessmen (which may include former public officials), who might be suitable persons to act as a settlement master. The names submitted should be of individuals knowledgeable in matters of commerce and trade regulation, and, as shown by their personal biographies, not identified or aligned with any of the interests implicated in this case. The settlement master will explore the possibilities of settlement with all the parties and will mediate between or among any parties who evince a willingness to adjust their claims amicably. The fees of the settlement master shall be borne equitably by the parties. The amount and apportionment of such will be decided by the Court.

## XVIII. *"Time Out" Rule*

In view of the pace at which this litigation has proceeded, particularly over the past several years, and given the incredibly onerous burdens upon counsel, the Court hereby serves notice that if conditions do not improve, it may invoke the "Time Out" Rule, set out as Appendix B.[11]

### APPENDIX A
Summary-Timetable

| Date | Party | Event |
|---|---|---|
| 03/01/79 | D | Pretrial order # 116 begins to apply to defendants |
| (Last day of each month) | P | Shall submit to the court a schedule of the document numbers submitted pursuant to pretrial order # 116 |
| 03/05/79 | P | Furnish D's with names of experts they will use at trial |
| 03/21/79 | P | Will submit list of the headings and subheadings they intend to use in FPS |
| 03/21/79 | D | Counterclaim D's shall submit a similar list |
| 04/02/79 | P | Plaintiff respond to pending summary judgment motions (besides Melco's) |
| 04/15/79 | D | Shall reply to plaintiffs' response to summary judgment motions |
| 04/18/79 | P & D | Hearing on above summary Judgment will be held |

---

11. The Court gives credit for this rule to Thomas P. Lynch, Esquire, of the firm of Mudge, Rose, Guthrie & Alexander (NYC), which represents the Toshiba defendants. However, we do note that there is venerable precedent for this practice in the English common law. According to Glanville, the last chief justice during the reign of Henry II (1138–1189), "only two essoins (excuses for delay) are allowed in any possessory recognition, and none at all in the writ of novel disseisin." Thayer, *The Jury and Its Development*, 5 Harv.L.Rev. 249, 262 (1892).

Summary-Timetable

| Date | Party | Event |
|---|---|---|
| 05/15/79 | P & D | All outstanding discovery requests due |
| 05/15/79 | D | Shall designate their expert witnesses with respect to counterclaim |
| 06/15/79 | P | Furnish D's with copies of reports by all expert witnesses; and material and evidence used in preparation setting forth their expert opinions, the bases therefor; and must identify experts and any members of their staff who will testify |
| 07/02/79 | P | Shall file FPS |
| 07/15/79 | D | Furnish P's with copies of reports by all expert witnesses; and material and evidence used in preparation setting forth their expert opinions, the bases therefor; and must identify experts and any members of their staff who will testify in respect to counterclaim |
| 7/21/79 (within 20 days of filing FPS) | P | File addenda and errata to FPS |
| 7/31/79 (within 30 days of filing FPS) | D | Shall file written objections to admission of public records and reports in P's FPS |
| 7/31/79 (within 30 days of filing FPS) | P | Must prepare a separate document list containing all documents listed in FPS |
| 7/31/79 (within 30 days of filing FPS) | P | Shall file a separate appendix to the FPS, listing depositions and deposition excerpts referenced in the FPS |
| 08/01/79 | D | Shall file their FPS with respect to their counterclaims |
| 08/15/79 | D | Shall designate their expert who will respond to P's experts |
| 08/15/79 | P | Shall identify any witnesses who will response to D's counterclaim |
| 08/15/79 | D | May file additional (non-cumulative) motions for summary judgment |
| 8/21/79 (within 20 days of filing FPS) | D | File addenda and errata to their FPS |
| 8/31/79 (within 30 days of filing FPS) | P | Shall file written objections to admission of public records and reports in FPS |
| 8/31/79 (within 30 days of filing FPS) | D | Must prepare a separate document list containing all documents listed in FPS |
| 8/31/79 (within 30 days of filing FPS) | D | Shall file a separate appendix to the FPS, listing depositions and deposition excerpts referenced in the FPS |
| 8/31/79 (within 30 days of P's filing appendix) | D | State in writing grounds of objection and counterdesignate any deposition excerpts |
| 09/01/79 | P & D | Stipulate uncontested facts in initial FPS's |
| 09/15/79 | P & D | Shall submit to the Court names of suitable persons to act as a settlement master |
| 09/15/79 | P | May move for summary judgment with respect to counterclaims (within 45 days after the filing defendants must respond) |

Summary-Timetable

| Date | Party | Event |
|------|-------|-------|
| 9/29/79 (within 60 days of receiving FPS) | D | Shall give written objection to authenticity of documents listed in FPS |
| 10/1/79 (within 45 days of filing) | P | Must respond to additional summary judgment motions |
| 10/1/79 (within 30 days of D's filing appendix) | P | State in writing grounds for objection and counterdesignate any deposition excerpts |
| 10/15/79 | P | Furnish D's with copies of reports by all expert witnesses; and material and evidence used in preparation setting forth their expert opinions, the bases therefor; and must identify experts and any members of their staff who will testify |
| 10/29/79 (within 90 days of submission of list of documents in P's FPS) | D | Must submit grounds for objecting to admissibility of any document |
| 10/30/79 (within 60 days of receiving FPS) | P | Shall give written objection to authenticity of documents listed in FPS |
| 10/30/79 (within 45 days of filing) | D | Must respond to P's summary judgment motions |
| (Within 45 days of 1) Filing of FPS or 2) Court's decision on summary judgment motions addressing conspiracy, whichever is later) | P & D | Shall file formal proposals for an order specifying the order of proof of conspiracy |
| 11/15/79 | P & D | Exceptional voir dire questions must be filed |
| 11/20/79 | D | Furnish P's with copies of reports by all expert witnesses; and material and evidence used in preparation setting forth their expert opinions, the bases therefor; and must identify experts and any members of their staff who will testify in response to P's experts |
| 11/29/79 (within 90 days of submission of list of documents in D's FPS) | P | Must submit grounds for objecting to admissibility of any document |
| 12/04/79 | P & D | Shall file comprehensive trial briefs on own claims |
| 12/04/79 | P & D | Shall submit requests for pretrial rulings on evidentiary or other matters |
| 12/15/79 | P & D | Shall file requests for preliminary jury instructions and proposed special interrogatories |
| 12/15/79 | D | Shall file FPS in response to P claims |
| 12/21/79 | P | Shall file FPS in response to D counterclaims |
| 01/04/80 | P & D | Copies of all documents to be marked for identification shall be furnished to document clerk to be designated by the Court |
| 01/04/80 | P & D | Shall file trial briefs on opponents' claims |
| 01/04/80 | P & D | All answers to interrogatories and to requests to admit which a party intends to offer shall be reproduced together in a convenient packet or folder |

## Summary-Timetable

| Date | Party | Event |
|---|---|---|
| 01/04/80 | P & D | Upon request of any party which has a particular need of any documents produced by another party, the producing party shall furnish for inspection the original of any such document |
| 01/04/80 | P & D | Shall exchange copies of all charts, graphs and models that will be used as demonstrative evidence |
| 01/07/80 | P & D | Request for voir dire questions must be filed and served |
| 01/11/80 (within 20 days of filing FPS) | D & P | Shall file addenda to respective FPS |
| 01/18/80 | P & D | Court will hold final pretrial conference |
| 01/15/80 | D & P | Shall file a separate appendix listing documents and depositions referenced in the FPS |
| 01/21/80 (within 30 days of filing FPS) | D & P | Shall file written objections to admission of public records and reports in opponents FPS |
| 01/21/80 (within 30 days of filing FPS) | P | Must prepare a separate document list containing all documents listed in FPS and referencing depositions |
| 01/21/80 (within 30 days of filing FPS) | D & P | Shall give written objection to authenticity of documents listed in FPS |
| 01/31/79 | P & D | Shall file reply briefs |
| 02/01/80 | P & D | Shall start jury selection |
| 02/15/80 (within 30 days of appendix) | D & P | Must state in writing grounds of objection |
| 02/15/80 (within 30 days of filing of appendix to responsive FPS) | P & D | Shall counterdesignate any deposition excerpts |
| 02/18/80 | P & D | Trial will commence |
| 04/15/80 (within 90 days of submission of list of documents in opponents responsive FPS) | D & P | Must submit grounds for objecting to admissibility of any document |

## APPENDIX B

### "Time Out" Rule

#### A. *Statement of Rule*

For no good cause shown * each side will be entitled to three (3) time outs between now and the date of trial. A time out is defined as a one week period in which no discovery can be served, all deadlines are postponed and counsel can generally goof off.

1. The procedure for calling a time out will be as follows:

Both plaintiffs and defendants will designate one individual as the official time out persons (hereinafter referred to as the "Designated Whistler"). The designated whistler will be issued a whistle from the case liaison logistics committee which will be strung around his, her or its neck. When a time out is desired, the designated whistler will go to the offices of opposing

---

* No good cause shown is defined as family events, such as anniversaries, birthdays, sporting events involving siblings, laziness, genuine ennui (pronounced NUE); drunkenness, firm events, such as annual dinner dance or outing; and anything else which helps attorneys to keep their sanity during the course of these proceedings.

lead counsel (see ¶ XVI.E.) and blow the whistle three (3) times. Thereafter there will be a one (1) week time out.

2. As stated above, each side is entitled to three time outs. However during the period of the two month warning (*see* ¶ B below) each side will be entitled to only one time out, providing that side still has remaining at least one time out.

3. Time outs must not be called on two consecutive one week periods. That is there must be an intervening week between time out periods. This rule is designed to prevent counsel from spending more than one week of their time with their family, friends, partners and associates.

4. As stated above, each side will be entitled to only three time outs. Any attempt by any side to exceed this three time out limit will be regarded by the Court as a serious infraction of the rules (hereinafter "illegal use of whistle"). The sanction for illegal use of whistle will be that such counsel attempting to exceed the three time outs will have his, her or its desk moved five yards (in the event of a non-flagrant violation) or fifteen yards (in the event of a flagrant infraction) further from the jury box at trial.

B. *Two Month Warning*

As stated above, there will be a two month warning. Such a two month warning will be called by the Court two months prior to trial. At this point, there will be a three day stoppage of the clock in which all counsel will be required to get their personal affairs in order. Personal affairs will include such items as Last Will and Testament, final instructions to spouse and family, arrangements for publication of memoirs and other less important details. During the two month warning, the clock will run continuously except for time outs described in ¶ A above.